### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

_____

HARVEY MIGUEL ROBINSON,        :
         Petitioner,            :
                             :
         v.                   :       No. 06-cv-00829
                             :
JEFFREY BEARD, Commissioner, Pennsylvania  :
Department of Corrections; DAVID             :
DIGUGLIELMO, Superintendent of the State     :
Correctional Institution at Graterford; FRANK   :
TENNIS, Superintendent of the State Correctional  :
Institution at Rockview; and LEHIGH COUNTY    :
DISTRICT ATTORNEY,                 :
            Respondents.          :

_____

## O P I N I O N

**Joseph F. Leeson, Jr.**                                         **September 8, 2020**
**United States District Judge**

## I.    INTRODUCTION

Harvey Miguel Robinson, a prisoner under sentence of death in the Commonwealth of

Pennsylvania, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition,

Robinson alleges due process violations, ineffective assistance of counsel, trial court error, and

prosecutorial misconduct. The petition challenges the sentence of death in No. 58, only, for the

murder of Jessica Jean Fortney. As for the other two murders, in judgment No. 55, Robinson was

resentenced to a term of thirty-five years to life because he was a minor at the time of the

offense, and in judgment No. 56, Robinson was resentenced to life without the possibility of

parole. Having reviewed the extensive pleadings and the voluminous state court record, the

Court denies the petition.

## II.  FACTS – TRIAL EVIDENCE OF THE CRIMES OF CONVICTION

Robinson elected to go to trial. The decision of the Pennsylvania Supreme Court (PSC)

affirming Robinson's convictions on direct appeal recited the factual basis of his convictions as

follows:

At about 12:35 a.m. on Wednesday, August 5, 1992, Allentown police were dispatched to a reported burglary at the residence of Joan Burghardt (Burghardt) at 1430 East Gordon Street, on the East Side of the City of Allentown. Burghardt, a twenty-nine-year-old white female, weighing 225 to 240 pounds, resided alone at that address, a one-bedroom, first-floor apartment in a residential neighborhood. She told the police that someone had entered her apartment between 11:00 p.m. Tuesday and 12:30 a.m. Wednesday, when she returned from taking a friend home. Burghardt noticed that a fan, which she left on before leaving the apartment, had been turned off, the patio door she had left open was closed, and the screen on the door, which was locked, had been ripped about six to eight inches, just enough to get a hand through, near the locking mechanism. Burghardt also reported that $40 to $50 was missing from a bank bag in her dresser drawer. In all other respects, Burghardt reported her apartment appeared to have been undisturbed.

At approximately 11:30 a.m. on Sunday, August 9, 1992, Burghardt's neighbor telephoned the police to complain that: (1) Burghardt's stereo had been on for three days and nights; (2) no one answered the doorbell; (3) the screen had been out of the window for three nights; and (4) during one of those nights it had sounded like somebody was beating Burghardt up, hitting the walls, and screaming. When the police arrived at Burghardt's apartment they noticed the screen for the front of the apartment was on the ground leaning upright next to the front window, the window was open, and the screen for the rear window was pushed out and lying on the ground beneath that window, which was also open. The screen on the patio door was cut about six inches long next to the door handle. The television was blaring loudly and the front door and the patio door were locked. The patio screen door was closed but not locked.

Upon entering the apartment, the police found Burghardt dead, lying on her stomach on the living room floor in front of her couch. There was a large amount of blood on the couch, walls, and floor. She was beaten severely about the head. Aside from where the body was found, the apartment appeared to be neat and orderly. With the exception of the screens, there were no pry marks on the doors or windows or other evidence of forced entry. The police concluded that the perpetrator entered the residence through the front window and exited through the rear window.

At the time of her death, Burghardt was wearing a sleep shirt and a pair of jockey shorts that were ripped at the crotch and pulled up. She was unclothed from her hips

down. A dresser drawer in the bedroom was open and a pair of black shorts was on the floor. There were blood spots and white stains on the back of the shorts. A peach-colored shirt was located on the closet door. It contained a lot of blood in distinctive patterns that appeared to have been made by swipe marks from whatever was used as the murder weapon.

The subsequent autopsy revealed that Burghardt had been sexually assaulted and bludgeoned to death by thirty-seven individual blunt force injuries to her scalp, causing extensive skull fractures and damage to the brain. The weapon was a circular, cylindrical instrument about one-half to three-quarter inches in diameter with a smooth surface and about ten to twenty inches long. The force of the blows was so deliberate and tremendous that, as the instrument came down, it embedded hair between the fracture and skull.

Burghardt also had defensive injuries on both hands, evidencing that she was alive and attempting to protect herself from her assailant. Serology tests established that all of the blood and hair found at the scene, including those samples found on the black shorts and peach colored shirt, were consistent with those of the victim. However, the shorts had seminal stains on the outside, as though someone had ejaculated onto them. Tests of the semen stains on the shorts showed the deoxyribonucleic (DNA) profiles that were later matched to the DNA profiles obtained from Appellant's blood. An analysis of the blood spattering at the crime scene indicated the perpetrator was approximately 5'10" tall and stood over the victim during the attack.

Approximately ten months later, at about 6:45 a.m. on Wednesday, June 9, 1993, Allentown police responded to a call of a reported missing person at 1058 East Gordon Street, a residential neighborhood, also on the East Side of Allentown. A resident became suspicious when the normally punctual newspaper delivery girl, Charlotte Schmoyer (Schmoyer), failed to deliver the newspaper. Her newspaper cart was left unattended for approximately thirty minutes in front of a neighbor's house and the newspaper had been delivered to another neighbor. Upon their arrival, the police found the unattended newspaper cart half-filled with the day's newspapers in front of the house; a separate copy of the newspaper; a Walkman radio and its headset separated from each other on the ground between two houses; and finger streaks on the windowpane of the door to the nearby garage of one of the houses. Police concluded that a struggle had ensued and Schmoyer, a fifteen-year-old white female, weighing 180 pounds, had been abducted.

Later that day, while searching a heavily wooded area at Allentown's nearby East Side Reservoir (Reservoir), the police found a bloody trail that led them to the body of Schmoyer, which was buried beneath some logs. Her sweatshirt was slightly pulled up; her sweatpants and underpants had been pulled down toward her knees. She had a large, gaping wound in her throat, separate stab wounds below that gash, multiple stab wounds on her back, and a patterned bruise on the right side of her cheek. An autopsy revealed twenty-two stab wounds, sixteen in the back (including

seven that were fatal), and six in the front area of the neck (of which any combination of one or three would have been fatal). In addition, there were cutting and scraping wounds in the neck area, indicating they were inflicted while the victim was conscious and her neck bent down as a protective measure, and seven more cuts to the back of the sweatshirt, indicating that some struggle occurred in that the sweatshirt was cut but the body was not penetrated. The weapon was a single-edged knife about four inches long. At least two of the wounds were up to the hilt of the blade.

Subsequent serology and DNA tests indicated that Schmoyer had intercourse shortly before death. Appellant's DNA was found on her vaginal swab and blood consistent with that of Appellant and inconsistent with that of Schmoyer's blood, was found on her sweatshirt and sweatpants, along the trail leading to her body, and on leaves at the crime scene near her head. All of the blood found on or about Schmoyer was consistent with that of either Schmoyer or Appellant; none of the blood was inconsistent with one of their profiles. A comparison of a hair found on the right knee of Schmoyer was consistent with hair from Appellant's head and inconsistent with Schmoyer's own hair; and a comparison of a hair found on the sweatshirt of Schmoyer was consistent with Appellant's pubic hair and, again, inconsistent with Schmoyer's own hair.

On June 28, 1993, Denise Sam–Cali (Sam–Cali), a thirty-eight-year-old white female weighing 160 to 165 pounds, and her husband resided at 1141 East Highland Street, on Allentown's East Side. That evening she was home alone; her husband was out of town. She awoke during the night to noises from within a walk-in closet near her bedroom door. As Sam–Cali attempted to flee the house, an assailant grabbed her. She exited the house, but the assailant grabbed her again on the front walk, flipped her on her back, and got on top of her using his knees to hold her down.

As Sam–Cali and the assailant began to fight, he pushed down on her mouth, choked her, and punched her face at least four times. She tried to punch him and bit him on the inside of his upper right arm. He raped her and then ran through the house to escape by way of the back patio-door. Afterwards, Sam–Cali called the police. She had been beaten severely about the head, her neck had strangulation marks, and her lip was slashed. A large butcher knife wrapped in a paper napkin from her kitchen was found lying on the floor outside of her bathroom door. Following this incident, Sam–Cali and her husband left their East Allentown residence for a few days.

Approximately two weeks later, shortly after 7:00 a.m. on July 14, 1993, Jessica Jean Fortney (Fortney), a forty-seven-year-old white female, weighing 235 pounds, who resided with other members of her family at 407 North Bryan Street, on Allentown's East Side, was found dead in her bed. Fortney was half-naked; her shorts and underpants were pulled down mid-way between her knee and groin area and around only one thigh. Her face swollen and black. She had dried blood

about her lips, eye, nose, nostrils, and neck. There was blood spatter on the wall directly behind the sofa and on the lampshade next to the sofa. The window on the first floor was open; there was no screen in it.

The autopsy revealed that Fortney died in the early morning hours as a result of suffocation by strangulation (probably manual) and blunt trauma. There were in excess of fifty different injury patterns, many of them compatible with being beaten by a closed fist about the face. Some of them indicated an object, such as a ring, on her assailant's hands. Other injury patterns revealed that Fortney's attacker placed his knees on her during the beating, causing her blood to spatter on the wall, lampshade, and him. Serology tests established that Fortney had sexual intercourse within a few hours of her death. It was later determined that Fortney and Appellant had different blood profiles. Blood and body fluids from Fortney's vaginal swabs were consistent with Appellant's profile and seminal fluid from Fortney's vaginal swabs matched Appellant's DNA.

Four days after the Fortney homicide, on the evening of July 18, 1993, Sam–Cali and her husband returned home. At about 4:00 a.m. the next morning, Sam–Cali heard a noise in the house and then the back door opened. Thereafter, the alarm went off. The intruder apparently fled. From that night on, an Allentown police officer stayed at the Sam–Cali residence.

At approximately 1:25 a.m. on July 31, 1993, Officer Brian Lewis (Officer Lewis), who was at the Sam–Cali home, heard the doors being jarred and noticed someone at the front window. The officer saw the fingertips of a black-gloved hand removing the screen to the window. He then saw a head, and then the rest of the body, enter the home. When the intruder was fully inside the home, the officer challenged him. The intruder went to the kitchen and shots were exchanged. The officer retreated to the bedroom, where he heard banging and ripping at the kitchen door. Upon returning to the kitchen, the officer found the kitchen empty. The intruder escaped by breaking through several glass panels on a wooden door and pushing out the rear storm door.

At about 3:30 or 3:45 a.m., Officer Lewis was called to a local hospital where he identified Appellant as the intruder at the Sam–Cali home earlier that evening. Appellant had fresh, bleeding wounds to both of his arms and legs. He also had a healing scar of a bite mark several weeks old on his upper right arm. Later that day, the police obtained blood and hair samples from Appellant and searched his residence, where they found: (1) a black ski mask and a pair of gloves under the sofa cushions; (2) several drops of blood and a soaked, green-and-purple striped rugby-type shirt in the laundry; (3) additional blood in the bathroom; (4) additional pairs of gloves, including a pair of large black rubber gloves; (5) blood stained shorts and socks; (6) a pair of black high-tech sneakers in Appellant's bedroom; and (7) a loaded .380 semi-automatic handgun in the bedroom closet, which used to belong to the Sam–Calis prior to its disappearance some time before July 31, 1993.

The head stamp on the upper most cartridge in the handgun was identical with that on the empty cartridge casings found at the Sam–Cali house earlier that morning. Officer Lewis identified the horizontal striped shirt, shorts, sneakers, black knit cap, and rubber gloves found at Appellant's house, as those worn by the intruder at the Sam–Cali residence. Further, Sam–Cali identified Appellant as the person who assaulted and raped her.

It was later established that the patterned design of the bruise on Schmoyer's cheek was consistent with the size, design, and wear characteristics of the high-tech sneaker seized from Appellant's bedroom. There was no evidence found to exclude the possibility that the injury on her face was caused by Appellant's sneaker. Similarly, chevron patterns found on the Walkman radio that belonged to Schmoyer and found at the scene of her disappearance corresponded with the shape and spacing of Appellant's sneaker.

The police interviewed Appellant on August 4, 1993. At that time, Appellant told the officers that he drove his two-door Chrysler Laser automobile, and that he never drove his mother's four-door blue Ford Tempo automobile, license plate number ZGP260, except to look for jobs. In fact, at approximately 3:45 a.m. on September 7, 1992, a little less than one month after Burghardt's death, an Allentown police officer made a traffic stop of the blue Ford Tempo that Appellant was operating. On June 3, 1993, another Allentown police officer stopped the blue Ford Tempo at 2:40 a.m. and Appellant, its operator, was cited for driving the wrong way on a one-way street. At about 6:25 a.m. on the day of Schmoyer's abduction and death, June 9, 1993, James Stengel, an Allentown City employee at the Reservoir, saw a blue, four-door automobile (which he later identified as a Ford Tempo) with damage to its right side in the Reservoir parking lot. At about 6:40 a.m. on that day, a carpenter on his way to work identified Appellant as operating a blue automobile and acting strangely only three blocks from the Reservoir. Finally, at about 3:30 a.m. on July 31, 1993, when he sought treatment at the hospital after the last Sam–Cali incident, Appellant was in possession of the blue Ford Tempo automobile, license plate ZGP260, with right side body damage. This automobile was owned by Appellant's mother and was registered to 709 North Kearney Street. Blood patterns subsequently found in the vehicle were later determined to be from Appellant.

Additional evidence also established that Appellant resided at 709 North Kearney Street, Allentown, in August of 1992, when Joan Burghardt was murdered, until September 23, 1992, and again from May 14, 1993, until his arrest on July 31, 1993, during which time Schmoyer and Fortney were murdered and Sam–Cali assaulted. Appellant did not reside in, or visit, Lehigh County between September 23, 1992, and May 14, 1993, because, during this period of time, he was detained in a juvenile placement facility on an unrelated charge. Appellant's residence at 709 North Kearney Street is about: (1) four blocks from 1057 East Gordon Street, where Schmoyer was abducted, and about one mile from the Reservoir where her body was found; (2) five blocks from 1430 East Gordon Street, where Burghardt lived

and was murdered; (3) five or six blocks from 1141 East Highland Street, where Sam–Cali resided and was assaulted; and (4) two miles from 407 North Bryan Street, where Fortney lived and was murdered. It was also established that from 1984 until 1986, Appellant resided at 310 North Second Street, in Allentown, which is less than one block from the place of Fortney's murder.

On October 12, 1993, relating to the three incidents involving Sam–Cali, Appellant was charged with Information Nos. 2450/1993, 2451/1993, and 2452/1993, which included three counts of burglary and related offenses, two counts of attempted homicide, one count of rape and related offenses, multiple counts of aggravated indecent assault, and one count of firearms not to be carried without a license. On the same day, the Commonwealth informed Appellant that it intended to try these Informations together. Subsequently, on February 8, 1994, the Commonwealth filed additional Informations against Appellant in the following order: (1) as related to the Schmoyer homicide, No. 0055/1994, which included charges of criminal homicide, kidnapping, rape, aggravated indecent assault, and indecent assault; (2) as related to the Burghardt homicide, No. 0056/1994, which included charges of criminal homicide, burglary, criminal trespass, rape, aggravated indecent assault, and indecent assault; and (3) as related to the Fortney homicide, No. 0058/1994, which included charges of criminal homicide, burglary, criminal trespass, rape, aggravated indecent assault, and indecent assault. Similar to the charges filed on October 12, 1993, the Commonwealth notified Appellant that it intended to try Information Nos. 0055/1994, 0056/1994, and 0058/1994 together.

On February 28, 1994, Appellant entered guilty pleas to: (1) burglary, attempted criminal homicide, and firearms not to be carried without a license in Information No. 2450/1993, in relation to the attack on Sam–Cali on June 29, 1993; (2) burglary in Information No. 2451/1993, in relation to the break-in at the Sam–Cali residence on July 19, 1993; and (3) burglary, attempted criminal homicide, and firearms not to be carried without a license in Information No. 2452/1993, in relation to the events at the Sam–Cali residence on July 31, 1993. Subsequently, the trial court sentenced Appellant to a forty-and-one-half to eighty-one year prison sentence in connection with his guilty pleas.

The parties proceeded on Information Nos. 0055/1994, 0056/1994, and 0058/1994, and, after a trial that lasted from October 10 through November 8, 1994, a jury found Appellant guilty of three murders of the first degree and all of the other offenses relating to the Burghardt, Schmoyer, and Fortney homicides. Following the penalty phase of the trial, on November 10, 1994, the jury sentenced Appellant to death for each of the three first-degree murder convictions. The jury found the following aggravating circumstances in each case: (1) the killing was committed during the perpetration of a felony; (2) Appellant had a significant history of felony convictions involving the use or threat of violence; and (3) Appellant "has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue." The jury found the additional aggravating circumstance of "torture" in the Burghardt and Schmoyer homicides.

The jury also found the following as mitigating circumstances pursuant to the "catch-all" provision of 42 Pa.C.S. § 9711: (1) "family background and environment;" (2) "use of alcohol and drugs;" and (3) "school history." *See* Sentencing Verdict Sheets. On November 29, 1994, the trial court imposed additional sentences for the non-capital offenses.

Thereafter, Appellant filed a post-sentence motion on December 8, 1994, alleging various pre-trial and trial errors. On March 28, 1996, he filed a pro se "Clarification Motion for the Appointment of New Counsel," expressing his preference to raise trial counsel's ineffectiveness on direct appeal. On May 6, 1996, Appellant filed a pro se "Motion for Notes of Testimony and for Post Trial Discovery." By order dated May 17, 1996, and filed on May 21, 1996, the trial court relieved Appellant's trial counsel of further representation and appointed new counsel.

Appellant was given until December 9, 1996, to amend his post-sentence motions or file new post-sentence motions. On April 23, 1997, Appellant filed a pro se Supplemental Motion for Relief pursuant to Pa.R.Crim.P. 720, which was dismissed without prejudice to Appellant's right to incorporate it into motions filed by appointed counsel. Thereafter, counsel filed amended post-sentence motions on July 28, 1997, supplemental post-sentence motions on September 15, 1997, and second supplemental post-sentence motions on September 10, 1999. Several evidentiary hearings were held before the trial court during 1998 and 1999. By Order of June 29, 2001, the trial court denied the motions in all respects, except that Appellant's sentences of death for murder of the first degree in the Burghardt and Schmoyer homicides were vacated and a re-sentence proceeding was ordered in accordance with 42 Pa.C.S. § 9711.

*Commonwealth v. Robinson (Robinson I)*, 581 Pa. 154, 174-85 (Pa. 2004).

As the trial court ordered Robinson be resentenced in No. 55, for the murder of Schmoyer and No. 56, for the murder of Burghardt, the trial court resentenced Robinson to a term of thirty-five years to life because he was a minor at the time of the offense in No. 55, and in judgment No. 56, Robinson was resentenced to life without the possibility of parole. Thus, only Robinson's sentence of death for the murder of Fortney, in No. 58, remains.

III.    **DIRECT APPEAL PROCEEDINGS**

Following his conviction, Robinson filed a direct appeal to the PSC in which he raised approximately sixty substantively independent issues. The PSC separated its opinion into four sections: Pre-trial, Guilt Phase, Penalty Phase, and Prosecutorial Misconduct.

In his Pre-trial Phase, Robinson raised the following issues for review: (1) failure of the trial court to sever the charges involving the different victims, (2) failure of the trial court to grant his motion for change of venue, (3) ineffective assistance of counsel for failure to ask the trial court to modify the procedures employed in Lehigh County to select members of the pool of jurors available to try this case, and (4) ineffective assistance of counsel for failing to pose "life qualification" questions to potential jurors.

In his Guilt Phase, Robinson raised the following issues for review: (1) ineffective assistance of counsel with respect to the DNA testimony of Commonwealth experts by not introducing evidence or cross-examining them with respect to the existence and acceptance of alternative statistical models; (2) that the trial court erred by permitting Denise Sam-Cali to testify because it allowed evidence of prior bad acts and uncharged criminal conduct to be heard by the jury; (3) ineffective assistance of counsel with regard to alleged hypnosis of witnesses Sam–Cali and James Stengel; (4) ineffective assistance of counsel and trial court error for the admission of select photographic, audio, video, and physical evidence at trial; (5) trial court error for the testimony of Karen Schmoyer when she discussed her feelings and thoughts regarding her missing daughter; (6) trial court error for the testimony of Jean Vas describing the scene of the murders; (7) trial court error for the testimony of Lieutenant Dennis Steckel describing that he was familiar with Robinson, knew what school Robinson attended, and where Robinson resided

in 1984 and 1986; and (8) the trial court's statements in front of the jury regarding the testimony of potential witness Latanio Fraticeli.

In his Penalty Phase, Robinson raised the following issues for review: (1) ineffective assistance of counsel for failing to introduce mitigation evidence during the penalty phase of the proceedings; (2) trial court error for allowing the jurors to see photographs of the victims for thirty seconds; (3) trial court error by not granting a continuance to permit Robert Burns to testify; (4) ineffective assistance of counsel for failing to call Robinson as a witness; (5) the jury's determination that the killings of Burghardt and Schmoyer implicated the aggravating circumstance of "torture"; (6) the trial court, the Commonwealth, and both defense attorneys incorrectly referenced to the aggravator expressed in 42 Pa.C.S. § 9711(d)(11), as the "multiple victim" or "multiple killings" aggravating circumstance; (7) the trial court improperly instructed the jury in relation to the aggravator embodied in 42 Pa.C.S. § 9711(d)(11); (8) the trial court erred in response to a jury question regarding the possibility of a life sentence without parole; and (9) ineffective assistance of counsel for failing to move to bar Commonwealth from seeking the death penalty in this case pursuant to various provisions of the United States and Pennsylvania Constitutions.

Lastly, for Prosecutorial Misconduct, Robinson raised the following issues for review: (1) the Commonwealth called Robinson a "predator" in its opening statement, (2) the Commonwealth called Robinson a "territorial predator" in its closing argument, and (3) ineffective assistance of counsel for failing to object to the Commonwealth's statement in its closing argument that Robinson had not expressed remorse for his crimes.

The PSC rejected Robinson's direct appeal issues and affirmed the judgment of sentence.

IV.     **POST-CONVICTION PROCEEDINGS**

Robinson filed his Amended Petition for Writ of Habeas Corpus and for Collateral Relief

from Criminal Conviction pursuant to the Post Conviction Relief Act (PCRA) on August 2,

2010. The Amended Petition raised the following issues:

> I.     Trial counsel rendered ineffective assistance by failing to adequately
> investigate and prepare for Petitioner's capital sentencing hearing.

> II.    Because of the Petitioner's profound brain damage and young age at the
> time of the offense, his execution would violate the Eighth Amendment.

> III.   Petitioner was denied his right to a fair trial, effective assistance of counsel,
> and due process in violation of the Sixth, Eighth, and Fourteenth
> Amendments to the United States Constitution and Article I Sections 1, 6,
> 9, 13, and 26 of the Pennsylvania Constitution because of the cumulative
> effect of the errors described in this amended petition.

After three evidentiary hearings, the PCRA court denied Robinson's petition on June 21,

2012. Following the PCRA court's denial, Robinson appealed to the PSC and presented three

issues for review:

> I.     Trial counsel rendered ineffective assistance by failing to investigate and
> present evidence of Mr. Robinson's severe brain damage, and post-
> sentence/appellate counsel were ineffective for failing to investigate and
> raise this issue.

> II.    Counsel rendered ineffective assistance by presenting a diagnosis of anti-
> social personality disorder, supporting the Commonwealth's case for death,
> and post-sentence/appellate counsel were also ineffective for failing to raise
> the issue on post-sentence motion and appeal.

> III.   Because of Appellant's profound brain damage, his execution would violate
> the Eighth Amendment.

The PSC rejected these claims. Robinson now brings forth this federal habeas petition,

filed on March 24, 2014. In his federal habeas petition, Robinson presents the following issues

for review:

I.  Trial counsel rendered ineffective assistance by failing to adequately investigate and prepare for Petitioner's capital sentencing hearing; post-verdict counsel rendered ineffective assistance by failing to adequately investigate and raise the issue.

II.  Counsel rendered ineffective assistance by presenting a diagnosis of antisocial personality disorder, supporting the Commonwealth's case for death, and post-sentence/appellate counsel were also ineffective for failing to raise this issue on post-sentence motion and appeal.

III.  Because of Petitioner's profound brain damage, his execution would violate the Eighth Amendment.

IV.  The Commonwealth's failure to timely disclose that a key Commonwealth witness had been hypnotized prior to her testimony and initially identified someone else as her attacker violated Petitioner's right to due process, right to a fair trial, and right to be free from cruel and unusual punishment; trial counsel rendered ineffective assistance.

V.  The Court's failure to hold a hearing on the impact of hypnosis on the testimony of Ms. Sam-Cali and Mr. Stengel violated Petitioner's right to due process and a fair trial; trial counsel rendered ineffective assistance.

VI.  The trial court erred in denying Petitioner's motion to sever; prior counsel ineffectively failed to litigate this claim at trial and on appeal.

VII.  Petitioner was denied his right to a fair trial, to a fair and impartial jury and to due process in violation of his rights under the Sixth and Fourteenth Amendments because the jury pool from Lehigh County was saturated with highly prejudicial pretrial publicity. All prior counsel were ineffective for failing to properly litigate this issue at trial and on direct appeal.

VIII.  Petitioner should be granted relief from his death sentence because he was deprived of his Sixth, Eighth, and Fourteenth Amendment rights as the result of multiple errors during the voir dire proceedings.

IX.  Petitioner is entitled to relief because the trial court's failure to remove several jurors for cause deprived Petitioner of his rights to due process and a fair and impartial jury.

X.  Petitioner was denied a fair and impartial jury in violation of his Sixth, Eighth, and Fourteenth Amendment rights where Lehigh County jury selection procedures systematically excluded minorities; prior counsel were ineffective.

XI. Petitioner was denied his rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution where the Commonwealth introduced evidence of other bad acts allegedly committed by Petitioner as well as evidence of Petitioner's propensity for violence and bad character.

XII. Petitioner was denied his right to due process and the effective assistance of counsel because the Commonwealth repeatedly engaged in prosecutorial misconduct during both the guilty and penalty phases of the trial without objection by trial counsel. The trial court erred by permitting the introduction of this inadmissible and prejudicial evidence.

XIII. The trial court violated Petitioner's right to compulsory due process, a fair trial and his right to be free from cruel and unusual punishment by failing to grant a short continuance to allow a critical mitigation witness to arrive in court.

XIV. The trial court's instructions on the meaning of life imprisonment violated the due process clause of the Fourteenth Amendment and the Eighth Amendment of the United States Constitution. Prior counsel were ineffective.

## V.   STANDARDS OF REVIEW

### A. Habeas Standards

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) "'limits the power of a federal court to grant habeas relief to a person in custody pursuant to a state court judgment' to when the person's custody is 'in violation of the Constitution or laws or treaties of the United States.'" *Abdul-Salaam v. Sec'y of Pa. Dep't of Corr.*, 895 F.3d 254, 265 (3d Cir. 2018) (quoting *Han Tak Lee v. Glunt*, 667 F.3d 397, 402 (3d Cir. 2012) quoting 28 U.S.C. § 2254(a)). Where a state court adjudicates the merits of a federal claim, a district court may grant habeas relief on that claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court explained the two components of § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-13. To determine whether a state court's application of federal law is "unreasonable," the Court must apply an objective standard, such that the relevant application "may be incorrect but still not unreasonable." *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001) (citing *Williams*, 529 U.S. at 409-10). The test is whether the state court decision "resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 890 (3d Cir. 1999) (en banc).

With respect to § 2254(d)(2), "[f]actual issues determined by a state court are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence." *Dellavecchia v. Sec'y Pa. Dep't of Corr.*, 819 F.3d 682, 692 (3d Cir. 2016) (alteration in original) (quoting *Werts v. Vaughn*, 228 F.3d 178, 196 (3d Cir. 2000)). State court factual determinations are not unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citing *Williams*, 529 U.S. at 411). Rather, "§ 2254(d)(2) requires that we accord the state trial court substantial deference." *Brumfield v. Cain*, 135 S .Ct. 2269, 2277 (2015). If "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Wood*, 558 U.S. at 301 (quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006) (alteration in original)).

However, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review," and "does not by definition preclude relief." *Brumfield*, 135 S .Ct. at 2277 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

      If the state court did not address the merits of a federal claim, "'the deferential standards provided by AEDPA . . . do not apply,' and the Court 'must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA.'" *Johnson v. Folino*, 705 F.3d 117, 127 (3d Cir. 2013) (quoting *Taylor v. Horn*, 504 F.3d 416, 429 (3d Cir. 2007); and *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001)). A state court decision is "an unreasonable application" of Supreme Court case law only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Abdul-Salaam*, 895 F.3d at 265-66 (quoting *Williams*, 529 U.S. at 413). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004))).

### B.  Exhaustion of Remedies and Procedural Default

      A habeas petitioner must "exhaust [] the remedies available in the courts of the State" before obtaining habeas relief. 28 U.S.C. § 2254(b)(1)(A). If the state courts have declined to review the merits of a petitioner's claim based on his failure to comply with an independent and adequate state rule of procedure, the claim is procedurally defaulted. *See Harris v. Reed*, 489 U.S. 255, 262-63 (1989). Although "[a] habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion[, as] there are no state remedies any longer 'available' to him," *Coleman v. Thompson*, 501 U.S. 722, 732 (1991), procedurally

defaulted claims cannot be reviewed unless "the [petitioner] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id*. at 750.

For a claim to be exhausted, "[b]oth the legal theory and the facts underpinning the federal claim must have been presented to the state courts, and the same method of legal analysis must be available to the state court as will be employed in the federal court." *Tome v. Stickman*, 167 F. App'x 320, 322-23 (3d Cir. 2006) (quoting *Evans v. Court of Common Pleas, De. Cty., Pa.*, 959 F.2d 1227, 1231 (3d Cir. 1992)). A state prisoner must "fairly present" his federal claims to the state courts before seeking federal habeas relief by invoking "one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see Holloway v. Horn*, 355 F.3d 707, 714 (3d Cir. 2004) (quoting *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999) ("'Fair presentation' of a claim means that the petitioner 'must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted.'")). The habeas petitioner bears the burden of proving exhaustion of all state remedies. *Boyd v. Waymart*, 579 F.3d 330, 367 (3d Cir. 2009) (quoting *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997)).

"Exhaustion is not a jurisdictional requirement, but rather a rule of comity, and a federal court may in certain circumstances decide the merits of a claim despite non-exhaustion." *Evans*, 959 F.2d at 1231. A district court may deny a claim on its merits despite non-exhaustion "if it is perfectly clear that the applicant does not raise even a colorable federal claim." *Id*. (quoting *Granberry v. Greer*, 481 U.S. 129, 135 (1987)). Like the exhaustion requirement, the doctrine of procedural default is grounded in principles of comity and federalism. As the Supreme Court has explained:

> In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases.

*Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000) (quoting *Coleman*, 501 U.S. at 732). To demonstrate cause and prejudice, the petitioner must show some objective factor external to the defense that impeded counsel's efforts to comply with some state procedural rule. *Slutzker v. Johnson*, 393 F.3d 373, 381 (3d Cir. 2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). To demonstrate a fundamental miscarriage of justice, a habeas petitioner must typically demonstrate actual innocence. *Schlup v. Delo*, 513 U.S. 298, 324-26 (1995).

## C.  Ineffective Assistance of Counsel Standards

A claim for ineffective assistance of counsel is grounded in the Sixth Amendment right to counsel, which exists "in order to protect the fundamental right to a fair trial." *Lockhart v. Fretwell*, 506 U.S. 364, 368 (1993) (quoting *Strickland v. Washington*, 466 U.S. 668, 684 (1984)). To prevail on a claim for ineffective assistance of counsel, a habeas petitioner must demonstrate both that (1) his attorney's performance was deficient, i.e., that the performance was unreasonable under prevailing professional standards, and (2) that he was prejudiced by his attorney's performance. *Strickland*, 466 U.S. 668, 687-88, 690-92. Counsel's deficiencies must be "so serious" that he "was not functioning as the 'counsel' guaranteed" to petitioner by the Sixth Amendment. *Id*. at 687. This standard is "highly deferential" to defense counsel, as "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id*. at 689-90. It is presumed that "counsel's conduct might have been part of a sound strategy," and "if the Commonwealth can show that counsel actually pursued an informed strategy (one decided upon after a thorough investigation of the

relevant law and facts), the 'weak' presumption becomes a 'strong' presumption, which is 'virtually unchallengeable.'" *Thomas v. Varner*, 428 F.3d 491, 499-500 (3d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690).

The Court "may address the prejudice prong first '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice.'" *United States v. Travillion*, 759 F.3d 281, 289 (3d Cir. 2014) (alteration in original) (quoting *Strickland*, 466 U.S. at 697). Prejudice is proven if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. Consequently, counsel cannot be found to be ineffective for failing to pursue a meritless claim. *See United States v. Bui*, 795 F.3d 363, 366-67 (3d Cir. 2015) ("[T]here can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument.") (quoting *United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999)).

In reviewing Robinson's ineffective assistance of counsel claims for post-conviction relief, the PSC applied Pennsylvania's ineffectiveness standard, *see Commonwealth v. Pierce*, 527 A.2d 973, 974-75 (Pa. 1987), which requires a defendant to establish that: (1) his underlying claim has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) resulting prejudice. The United States Court of Appeals for the Third Circuit has held that the *Pierce* standard comports with the clearly established federal *Strickland* standard. *Werts*, 228 F.3d at 203-04. As a result, Robinson must establish that the Pennsylvania courts' application of *Pierce* was "not only erroneous, but objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (citations omitted). However, the Supreme Court has instructed that "[s]urmounting *Strickland*'s high bar is never an easy task." *Nguyen v. Attorney Gen. of N.J.*, 832 F.3d 455, 465

(3d Cir. 2016) (alteration in original) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). Thus, the *Strickland* standard must be applied "'with scrupulous care,'" which makes it "all the more difficult" to "[e]stablish[ ] that a state court's application of *Strickland* was unreasonable under § 2254(d)." *Id.* (quoting *Premo v. Moore*, 562 U.S. 115, 122 (2011)).

## V.   ANALYSIS

### A.  Issue One

In Issue One, Robinson argues both his trial counsel and PCRA counsel were ineffective by failing to produce evidence of his brain damage throughout his life. Robinson argues his trial counsel was ineffective for failing to provide evidence of his brain damage to the jury during the penalty phase, which potentially could have mitigated his sentence. Additionally, Robinson objects to the factual determination issued by the PSC in light of the conflicting testimony regarding the records production. Furthermore, Robinson avers his post-verdict counsel was ineffective for failing to conduct an investigation into failure to investigation Robinson's juvenile records for evidence of neurological impairment. Lastly, Robinson asserts the PSA ruling was incorrect based upon the evidence presented of his brain damage throughout the PCRA litigation.

The United States Supreme Court's application of the *Strickland* standard with regard to defense counsel's duty to investigate mitigating evidence provides relevant guidance in this case. In *Williams v. Taylor*, 529 U.S. 362 (2000), the United States Supreme Court concluded that trial counsel was ineffective because his representation of the petitioner during the penalty phase of the trial did not meet professional standards and prejudiced the petitioner. *Williams*, 529 U.S. at 395–97.

The record in *Williams* established that trial counsel did not begin to prepare for the penalty phase until a week before the trial. *Id.* at 395. The record also demonstrated that trial

counsel presented the testimony of three witnesses during the penalty phase: petitioner's mother, two neighbors who briefly described the petitioner as a "nice boy" and not violent, and a taped excerpt of a psychiatrist who explained that, during an earlier robbery, the petitioner removed the bullets from a gun to ensure no one was physically injured. *Id.* at 369.

However, the United States Supreme Court held that trial counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing [petitioner's] nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." *Id.* at 395. The Court also explained that trial counsel failed to introduce available evidence that petitioner was "borderline mentally retarded" or to seek prison records, which demonstrated petitioner's commendable acts and nonviolent behavior. *Id.* at 396.

Furthermore, the United States Supreme Court in *Williams* explained that although not all of the additional evidence was favorable, "the failure to introduce the comparatively voluminous amount of evidence that did speak in [petitioner's] favor was not justified by a tactical decision to focus on [petitioner's] voluntary confession." *Id.* The Supreme Court held that these omissions "clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the [petitioner's] background." *Id.*

Finally, the Supreme Court determined that the state supreme court's determination that petitioner was not prejudiced was unreasonable because it failed to evaluate all of the mitigation evidence available to trial defense counsel. *Id.* at 397–98.

In *Wiggins v. Smith*, 539 U.S. 510, 523 (2003), the United States Supreme Court emphasized that the focus of the inquiry regarding whether counsel exercised reasonable professional judgment, "is not whether counsel should have presented a mitigation case," but,

rather, "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [petitioner's] background was itself reasonable." The Court further explained that "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy." *Wiggins*, 539 U.S. at 527.

Based on this rationale, the United States Supreme Court in *Wiggins* concluded that trial counsel were ineffective for "abandon[ing] their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources" and "in light of what counsel actually discovered" in the records they did obtain. *Id*. at 524–25.

Specifically, the record in *Wiggins* demonstrated that trial counsels' investigation drew from three sources: (1) the results of a psychological testing, which revealed that petitioner had difficulty coping with demanding situations and exhibited features of personality disorder; (2) the presentence investigation report; and (3) records from Baltimore County Department of Social Services detailing petitioner's placements in multiple foster homes. *Id.* at 523.

Finally, after reweighing the evidence in aggravation against the totality of available mitigating evidence, the United States Supreme Court concluded that the petitioner was prejudiced by counsel's ineffectiveness. The Supreme Court reasoned that the petitioner's sentencing jury only heard one significant mitigating factor, and "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a difference [sic] balance." *Id.* at 537.

Furthermore, counsel's duty to investigate mitigating evidence persists even in the absence of support from petitioner. In *Rompilla v. Beard*, 545 U.S. 374, 377 (2005), the United States Supreme Court held "that even when a capital defendant's family members and the

defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial."

Similarly, in *Porter v. McCollum*, 558 U.S. 30 (2009), the United States Supreme Court held that although the petitioner was fatalistic and uncooperative in trial counsel's investigation, counsel still must "conduct some sort of mitigation investigation." *Id*. at 40.

In *Rompilla*, trial counsel interviewed petitioner and five family members and consulted with three mental health experts in an effort to uncover mitigation evidence. *Rompilla*, 545 U.S. at 381–82. The petitioner's contributions were minimal and he "was even actively obstructive by sending counsel on false leads." *Id*. at 381. The state postconviction court characterized trial counsel's interviews of family members as "detailed." *Id*. at 381–82.

Defense trial counsel in *Rompilla* did not seek petitioner's education records, medical records, records of his adult and juvenile incarcerations, or the record of petitioner's prior conviction. *Id.* at 382. However, had trial counsel obtained the record of petitioner's prior conviction, "[t]he accumulated entries would have destroyed the benign conception of [petitioner's] upbringing and mental capacity" that trial counsel gleaned from only talking with the petitioner and his family members. *Id.* at 391.

The United States Supreme Court in *Rompilla* held that this ineffective assistance of trial counsel prejudiced the petitioner because "the undiscovered evidence, taken as a whole, might well have influenced the jury's appraisal' of [petitioner's] culpability." *Id.* at 393.

The United States Supreme Court has subsequently confirmed that *Williams*, *Wiggins*, and *Rompilla* present the appropriate standards for evaluating whether counsel's performance was deficient at the penalty phase. *Cullen v. Pinholster*, 532 U.S. 170 (2011). The Supreme

Court additionally confirmed that *Strickland* requires a case-by-case analysis of the evidence available and the circumstances faced by defense counsel when evaluating the reasonableness of counsel's investigation into mitigating circumstances. *Cullen*, 563 U.S. at 194-96.

In *Cullen*, the United States Supreme Court concluded that defense counsel was not ineffective in presenting sparse mitigating evidence because his client was so unsympathetic that counsel's decision to only call his client's mother at the penalty phase, in an attempt to create sympathy for his client's family, was a reasonable strategy in light of the circumstances. *Id*. at 195-96.

The Supreme Court in *Cullen* held that because of defendant's extensive criminal past and lack of remorse, counsel's reasonable decision to focus on creating sympathy for defendant's family made "particular investigations unnecessary," such as seeking mitigating evidence to "humaniz[e] the defendant." *Id*. Further, the Supreme Court explained that the state court reasoning that defendant was not prejudiced was entitled to deference because the additional available mitigation evidence largely duplicated the evidence already presented during the proceedings and, further, was of questionable mitigating value. *Id.* at 200.

The basis of Robinson's argument is premised upon the allegedly inconsistent testimony submitted by the parties during the PCRA phase of the litigation and the PCRA and PSA courts determination of those factual disputes. The Commonwealth asserts the school records were provided to Robinson while Robinson asserts he did not receive the records.

"When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 575 U.S. 312, 316 (2015). Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a

determination of a factual issue made by a State court shall be presumed to be correct [and the]

applicant shall have the burden of rebutting the presumption of correctness by clear and

convincing evidence." 28 U.S.C. § 2254(e)(1).  Furthermore, "[w]hen a state court arrives at a

factual finding based on credibility determinations; the habeas court must determine whether that

credibility determination was unreasonable." *See Keith v. Pennsylvania*, 484 F. App'x 694, 697

(3d Cir. 2012) (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006)).

### i.   Failure to provide records

Robinson first argues his trial attorneys, Carmen Marinelli and James Burke, failed to

provide his school records to the defense expert, Dr. Robert Sadoff, which could have

established brain damage evidence to be presented to the jury as mitigating evidence. The

Commonwealth counters on the basis that the PCRA and PSA court correctly determined the

factual dispute in favor of the Commonwealth because Burke testified he crossed the street from

the Lehigh County Court of Common Pleas to the Allentown School District building to procure

Robinson's records for expert review. The PSC credited trial counsel's testimony over Dr.

Sadoff as follows:

> This case is unlike many other capital PCRA matters involving allegations of an
> ineffective failure to investigate, because here there is no doubt that penalty phase
> counsel obtained the school records. Counsel so testified at the PCRA hearing,  and
> his account was consistent with his post-trial testimony more than ten years earlier.
> Counsel specifically remembered walking across the street to obtain the Allentown
> School District records and expressed a similarly clear recollection with regard to
> obtaining the other school records, including the records from Harbor Creek. N.T.,
> 11/13/98, at 7–8. The critical factual inquiry before the PCRA court was whether
> counsel provided the records to Dr. Sadoff.
>
> The PCRA court, which had the opportunity to hear both penalty phase counsel and
> Dr. Sadoff testify, and observe their respective demeanors, specifically credited the
> testimony of penalty phase counsel over that of Dr. Sadoff. The PCRA court further
> explained that counsel's recollection was more specific and was supported by his
> testimony regarding his strategy at the penalty phase. The PCRA court noted that
> counsel's belief that Dr. Sadoff's role as an impartial expert was critical to

mitigation lent credibility to counsel's statement that there was no reason why he
would have obtained the records and not provided them to Dr. Sadoff. The PCRA
court also found that penalty phase counsel "convincingly" testified that if Dr.
Sadoff had suggested further testing, he would have pursued it since this was
precisely the type of guidance he was seeking from his expert. But, no person,
including Dr. Sadoff, ever suggested that further testing was warranted. In contrast
to counsel's testimony, the PCRA court noted that Dr. Sadoff "had no independent
recollection" of whether he had received the school records, but instead relied
solely on the absence of a reference to school records in his report. The PCRA court
also emphasized that Dr. Sadoff's report stated that he had reviewed records,
"including the following," which left open the possibility that he had reviewed
additional records that were not listed in his report. Although Dr. Sadoff attempted
to explain that notation, the PCRA court was not obliged to credit the explanation.
Finally, the PCRA court noted that Dr. Sadoff testified that he normally requested
all relevant records and it seemed likely "that he would have requested" the school
records at issue here, "or at least made a note regarding any gaps or omissions."
PCRA court opinion at 10. To the PCRA court's specific explanation may be added
the fact that guilt phase counsel corroborated that the defense had given all of the
records they had to Dr. Sadoff.

*Commonwealth v. Robinson* (*Robinson II*), 623 Pa. 345, 368-70 (Pa. 2013).

Here, after review of the relevant transcripts, the PCRA and PSA courts did not issue an

unreasonable credibility determination regarding the conflicting testimony of Burke and Dr.

Sadoff. Robinson failed to establish the PCRA and PSA courts issued an unreasonable credibility

determination by clear and convincing evidence. Indeed, the testimony by Burke, shows his

specific testimony compared to Dr. Sadoff as follows:

And when I say I served the subpoenas, too, I actually personally picked up the
documentation, whether it was at St. Gabe's Hall, and driving down to Audubon,
or whether it was walking across the street, which as I said was the most convenient
of all, to the Allentown School District, but physically, physically, went out of my
way to acquire these documents.

N.T. 12/17/2020, at 56. Conversely, Dr. Sadoff, testified he did not remember the facts of the

case other than what his reports stated. N.T. 12/20/2010, at 30-31. The PCRA and PSA courts

were faced with the arduous task of compiling testimony of an event that occurred approximately

sixteen years prior. In this arduous task, they elected to support the testimony of the more specific Burke rather than the generalized Dr. Sadoff. This was not an unreasonable decision.

Robinson attempts to argue the alleged inconsistent testimony of Burke should warrant a reversal of the ruling of the PCRA and PSC courts. The PSC court addressed the alleged inconsistency as follows:

> As with his first argument, this theory was one for appellant to pose to the PCRA court, in the hope that the court would credit Dr. Sadoff's account over that of trial counsel, an account which itself was corroborated by co-counsel. It is no basis upon which this Court can set aside the PCRA court's credibility determination. Moreover, we are disinclined to credit the suggestion that a member of the bar should be deemed to have misrepresented the facts, under oath, when the accusation, as here, is based entirely upon speculation. The fact that penalty phase counsel wanted to limit the damaging information that was presented to the penalty phase jury does not ineluctably mean that he limited Dr. Sadoff's access to this information, much less that he falsified testimony under oath by testifying that he had provided the records.

*Robinson II*, 623 Pa. at 371. The PSC court's analysis on this alleged inconsistent testimony is not unreasonable. Both the PCRA and PSC courts needed to make a credibility determination. It is unlikely Burke and Marinelli would perjure themselves, and risk disbarment, by lying. As discussed, the courts elected for the more specific testimony. Robinson has merely restated this argument at all three levels. After review, the credibility determination was not unreasonable, and Robinson failed to meet his burden of clear and convincing evidence.

### ii.   Burke's alleged failure to review Robinson's school records

Robinson argues Burke was ineffective because he failed to properly review the school records, assuming he provided the school records to Dr. Sadoff, and inquire of Dr. Sadoff about potential "red flags" in the documents. The Commonwealth counters that Burke did review the records, did not notice any "red flags," and presented such documents to Dr. Sadoff for expert review. The PSC addressed this issue as follows:

Appellant's alternative argument that trial counsel was ineffective for failing to independently recognize possible mental health issues arising from the decrease in appellant's scores on the two IQ tests, as well as the competency evaluation by Dr. Gross also fails. In light of the PCRA court's supported credibility determination that the records were provided to Dr. Sadoff, and Dr. Sadoff's unquestioned expertise, the Court would be hard pressed to fault trial counsel for failing to perceive a mental health "red flag" when the same information did not raise a red flag with the expert hired specifically for that purpose. This Court has made clear that in applying *Strickland*, courts must be careful not to conflate the roles and professional obligations of lawyers and experts, and cannot demand that counsel, who otherwise act reasonably (as, for example, by hiring a mental health expert), recognize psychological "red flags." *See* [*Commonwealth v. Lesko*, 15 A.3d 345, 382 (Pa. 2011)]. Appellant makes a bald assertion that counsel should have pointed out the decrease in the childhood IQ scores to his expert, but never explains why this should have raised a "red flag" to a lawyer, who is unschooled in mental health matters.

*Robinson II*, 623 Pa. at 373.

Indeed, Burke's own testimony supports that he analyzed all of Robinson's documents, including school and juvenile placements. N.T. 12/17/10, at 60. However, Robinson asserts this is insufficient and cites to *Winston v. Kelly*, 784 F. Supp. 2d 623 (W.D. Va. 2011) to support his theory. *Winston* was a capital case in which the defendant presented evidence that he was mentally retarded, a fact not presented to his state's post-conviction relief court. *Winston*, 784 F. Supp. 2d at 625-26. The defendant's counsel did not review his records which could show mental retardation; rather, he submitted those documents to an expert for review. *Id*. at 628. Consequently, the defendant's counsel failed to argue the defendant is mentally retarded and not subject to a sentence of death. *Id*. at 632. Thus, the court found the defendant's performance insufficient because:

Winston's trial counsel essentially testified that had they seen Winston's 1997 mental retardation classification, evidence that they had gathered, they would have claimed that Winston was mentally retarded and not eligible for the death penalty under *Atkins* and that they had no strategic reason not to pursue such a defense. But they did not review the records because they simply shipped them to their expert, Dr. Nelson, and expected him to tell them what they needed to know. As the court views it, Dr. Nelson was not responsible for telling counsel what they needed to

27
090820

know. Rather, they were responsible for knowing what evidence they had and for
asking him searching questions raised by that evidence.

*Id*. Here, the Court finds *Winston* inapposite because in *Winston*, counsel admitted to not

reviewing his client's records. In this instance, Burke testified, and the PCRA and PSA courts

credited, that Burke reviewed the records of Robinson. As Dr. Sadoff did not recognize any "red

flags," Dr. Sadoff and Burke appear to have an implicit agreement that there are no "red flags" in

the record of Robinson. Burke did not blindly send the documents to Dr. Sadoff for review like

the counsel in *Winston*. Rather, he reviewed them as well.

Thus, the PCRA and PSA did not unreasonably rule that Burke reviewed the records of

Robinson. Similar to issuing a credibility determination regarding whether Burke acquired

Robinson's school records, the PCRA and PSA needed to issue a determination on the review of

records. The determination that Burke reviewed the records was not unreasonable. Accordingly,

the PCRA and PSA courts did not unreasonably rule Burke reviewed Robinson's school records.

### iii.    Evidence of brain damage

Robinson asserts his trial counsel should have presented evidence of brain damage as

mitigating evidence. He asserts this evidence would have explained his conduct, showing he was

incapable of making his own decisions and help further explain his anti-social personality

disorder. Lastly, he asserts this evidence would have persuaded at least one juror not to find for

the death penalty. The PSC addressed the issue as follows:

> In this case, even assuming that the evidence of brain damage (whether mild or
> severe) that appellant marshaled for PCRA review would have led his jury to find
> a second mitigating circumstance, *see* 42 Pa.C.S. § 9711(e)(3) (ability of the
> defendant to appreciate the criminality of his conduct or to conform his conduct to
> the requirements of the law was substantially impaired), appellant must still
> establish, within a reasonable probability, that at least one juror would have found
> that the mitigating circumstances outweighed the aggravating circumstances. We
> agree with the PCRA court that appellant has not proven *Strickland* prejudice.

This was an extremely difficult case for any attorney. Appellant brutally raped and murdered three women. The jury also heard from the surviving fourth victim, Denise Sam–Cali, who identified appellant as the man who raped and attempted to kill her in the month-long period between appellant's second and third rapes and murders. All of the crimes occurred within a year, and in the same general area of Allentown. One of the murders involved a fifteen-year-old girl. The jury found appellant guilty of all charges, including the three murders. Thus, before the penalty phase began, the jury knew that appellant was a serial rapist and killer, a member of one of the most dreaded and notorious classes of killers in today's society.

During the penalty phase that followed, the jury had available to it not only the grisly facts surrounding the serial rapes and murders and the assault on Denise Sam–Cali, but was also presented with evidence related to appellant's assault on a school teacher, which was introduced to establish the separate significant felony history aggravator. Thus, the evidence of the murders of Ms. Burghardt and Ms. Schmoyer, as well as the two assaults, provided evidence supporting the jury's determination that appellant had a significant history of violent felonies. Additionally, the jury was presented with evidence, and ultimately found, that two of the murders involved the aggravating circumstance of torture.

On the other side of the equation is the mitigator the jury already found, while still returning three death sentences, now supplemented by appellant's proffer respecting brain damage. Notably, however, any defense expert testimony as to brain damage would have been subject to cross-examination and rebuttal, which may have undermined or diminished the force of the mitigation, as demonstrated by the counter-testimony offered by the Commonwealth at the PCRA hearing. Within this context, we see no error in the PCRA court's finding that there was not a reasonable probability that expert opinion evidence respecting appellant's brain damage would have resulted in a different weighing and a different penalty verdict. The aggravating circumstances related to the murder of Jessica Jean Fortney were grievously serious, and embraced the other two rapes and murders and the attack on Ms. Sam–Cali. *See, e.g.*, *Lesko*, 15 A.3d at 383–84 (discussing *Smith v. Spisak*, 558 U.S. 139, 154–55 (2010) and expressing that where there is substantial aggravating evidence it may be particularly difficult to prove *Strickland* prejudice based on potential mitigation evidence submitted on collateral review); *see also Gibson*, 19 A.3d at 531. This is not a case where a verdict of death was only sufficiently supported by the record; the death sentence for murdering Ms. Fortney was imposed with "overwhelming record support." *See Lesko, supra*. Accordingly, appellant has not established that he was prejudiced by any alleged failure of trial counsel in this regard. For this independent reason, his derivative Sixth Amendment claim as to appellate counsel also fails.

*Robinson II*, 623 Pa. at 375-76.

Here, the PSC did not unreasonably apply clearly established federal law in determining the status of Robinson's brain damage evidence. Robinson asserts this evidence would convince at least one juror to not seek the death penalty because he could not control his emotions; however, the evidence produced at trial shows Robinson possessed the ability to plan, stalk, and murder numerous victims. As the PSC correctly noted, the jurors heard strong evidence of Robinson's actions, and found in favor of the aggravating circumstances. Moreover, Dr. Sadoff, the person who personally analyzed Robinson at the time of trial, did not see Robinson's IQ or mental health as an issue. *See* PCRA Opinion, p. 17. Moreover, Robinson's own expert, Dr. Martell, admitted Robinson was still capable of performing some very complex tasks and his impairments did not directly mitigate the offenses for which he was convicted. Thus, the jury would have seen this whole picture, and Robinson's assertion that this evidence would have been a cure-all would have been belied by the record, especially when his own experts admit he was capable of making his own decisions.

Furthermore, Robinson's reliance on cases such as *Winston* are inapposite. Unlike in *Winston*, Robinson's defense counsel did argue Robinson's mental handicap of anti-social personality disorder. The attorneys in *Winston* failed to broach the subject of their client's mental illness. Robinson's own expert stated he did not notice any mental health issues. The PSC correctly credited such testimony. Accordingly, the PSC did not unreasonably apply federal law in determining Robinson's brain health evidence.

### iv.   Finding regarding neurological testing

Robinson asserts because his trial counsel did not provide his school records to Dr. Sadoff that Dr. Sadoff did not see the twenty-six-point drop in Robinson's IQ score. Robinson's IQ score dropped from 126 to 100. Robinson argues if Dr. Sadoff saw this drop, he would have

recommended neurological testing. However, this Court previously stated that it was not

unreasonable for the PSC to rule that Robinson's trial counsel did provide the relevant

documents to Dr. Sadoff for review. This was a credibility determination made by the PSC and it

was not unreasonable. Nonetheless, the PSC addressed the issue of neurological testing as

follows:

> The PCRA court's tangential observation respecting the availability of
> neuroimaging in 1994 indeed did not consider whether neuropsychological testing
> was available, as appellant notes. Given that the court's primary finding respecting
> the delivery of the records to Dr. Sadoff was supported, however, that error is of no
> moment.
>
> In any event, we note that, as frequently seems to be the case with mental health
> experts, the experts expressed disagreement over the significance of a decrease in
> IQ testing scores as a "red flag" that would have placed an expert on notice that
> further neuropsychological testing was warranted. Drs. Sadoff and Martell
> suggested that the decrease in performance in the second IQ test would have
> indicated further testing, but the Commonwealth's experts explained that such a
> decrease could be attributed to external factors, such as appellant's educational
> experience, given that he was inattentive in school and placed in special classes
> because of his behavior, and his desire to perform on the test. Additionally, all of
> the experts generally agreed that IQ is not necessarily an indicator of brain damage.
> Given its mistaken focus on neuroimaging, the court below did not resolve this
> dispute; but, as noted, that error is of no moment given that the predicate fact
> necessary to make this second step relevant was not established.

*Robinson II*, 623 Pa. at 374, n. 8.

Here, the PSC did not unreasonably apply federal law. Though Robinson's IQ dropped

from 126 to 100, but both of these scores are within the normal range. While Robinson focuses

on the drop, he avoids the argument that it is still within the normal range. Additionally, the PSC

needed to make a determination amongst competing experts. Dr. Sadoff, who Robinson relies

upon heavily in his argument, did not remember analyzing Robinson at the time of his trial; thus,

he needed to utilize his records from the years prior at Robinson's trial. However, the PSC

correctly noted all of the experts generally agreed that IQ is not necessarily an indicator of brain

damage. In any event, Robinson's IQ is normal. Moreover, this Court noted earlier that

Robinson's brain damage would not be cure-all because there was strong evidence that Robinson

planned and performed numerous murders. The jurors heard this evidence and elected for

aggravating factors as a result. Accordingly, the PSC did not unreasonably apply federal law in

its ruling regarding the neurological testing of Robinson.

### v.    Natural drop in IQ

Robinson asserts the PSC incorrectly ruled his IQ drop was due to external factors. The

PSC addressed the issue as follows:

> Furthermore, the PCRA court explained there was some dispute among the
> proffered experts as to whether the drop in IQ reflected in the two test scores was
> indicative of possible brain damage, or whether the decrease was attributable to
> external factors other than brain damage. In any event, the PCRA court was
> ultimately persuaded that appellant could not establish that the outcome of the
> penalty proceeding would have been altered given the magnitude of his crimes. The
> PCRA court summarized its rejection of this ineffectiveness issue as follows:

> In sum, [appellant]'s claim for relief hinges on the drop in his IQ scores between
> 1981, when he was six years old, and 1989, when he was fourteen years old.
> Although all experts agree to some extent that this diminution is "significant," the
> "low" score of 100 may have been caused by external factors, such as a poor
> education, during the intervening period as opposed to some cognitive impairment
> of [appellant]'s brain. In any event, even the score of 100 indicates a "normal"
> brain. Under those circumstances, it cannot be said that Dr. Sadoff, an experienced
> clinical psychiatrist, should have referred [appellant] for additional testing, much
> less that trial counsel was somehow ineffective for relying on Dr. Sadoff. Nor has
> it been established that the brain imaging studies subsequently used by [appellant's
> expert] in his evaluation of [appellant], would have been available to test and
> diagnose [appellant] in 1994 even if a consensus regarding a diagnosis does exist
> under present day standards. More to the point, in view of the overwhelming weight
> of the aggravating circumstances in this case, in the form of brutal serial rape and
> murder, and in light of the credible expert witness testimony presented by the
> Commonwealth regarding [appellant]'s manifest ability to utilize executive brain
> function to carefully plan and execute these crimes, there is no probability that the
> calculus of any reasonable juror would have been altered by the claims of front lobe
> impairment upon which [appellant] now bottoms his argument.

> PCRA court opinion, 6/21/12, at 17–18.

*Robinson II*, 623 Pa. at 355-56.

Here, the PSC did not unreasonably rule on Robinson's IQ score, which is in the normal range. The PSC utilized the term "may," not "shall." The PSC issued this determination because the of inconclusive expert testimony and legal arguments regarding this IQ drop. Nonetheless, this drop in IQ is 100, a normal score. This is indicative of a normal brain. As the experts were inconclusive, the PSC could not issue a firm decision on the IQ drop. But, the drop is not as catastrophic as Robinson asserts. His IQ level still remained at normal levels. The expert testimony showed he was capable of making his own decisions. This was established as Robinson planned the multiple murders of which he was accused. Furthermore, in light of the strong aggravating testimony, the jurors would have heard a drop in IQ, then realize through rebuttal evidence that the score was still in the normal range. Robinson's theory relies upon the hypothetical that his counsel should have further inquired as to the status of Robinson's brain and that status update would have persuaded the jury. This hypothetical is belied by the record, and Robinson's own expert Dr. Sadoff. Accordingly, the PSC correctly ruled regarding the drop of Robinson's IQ score, which remained in the normal range.

### vi.    The testimony of Dr. Martell and Dr. Gur

Robinson asserts the PSC incorrectly credited the testimony of the Commonwealth's experts over his experts, Dr. Martell and Dr. Gur merely because the Commonwealth presented contrary testimony. However, it is squarely within the role of the PCRA court and PSC to rectify conflicting testimony and issue a determination. Issue One is laden with factual determinations the PCRA court and PSC needed to determine; this issue is no different. Robinson's brain damage is not as egregious as he claims, and his IQ score is within the normal range as the expert who analyzed him at the time of trial found no issues worthy of his brain damage. Accordingly,

the PSC did not unreasonably rule by crediting the testimony of the Commonwealth's expert over Dr. Martell and Dr. Gur.

### vii.  Ineffectiveness of post-verdict counsel

Robinson asserts that post-verdict counsel was also ineffective for: (1) failing to conduct an investigation into Robinson's mental health, (2) failing to speak with Dr. Sadoff, (3) failing to gather Robinson's records besides his probation documents, (4) being unaware of Robinson's IQ drop, and (5) failing to present mitigating evidence contained in the Allentown School District and Harbor Creek records during the post-verdict evidentiary hearings. Robinson argues that but for these omissions, post-verdict counsel would have argued that trial counsel was ineffective for failing to investigate and present evidence of Robinson's alleged brain damage.

As is discussed above, the Court agrees with the state court's decision that there was no merit to Robinson's argument that trial counsel was ineffective for failing to pursue this course. Post-verdict counsel cannot be ineffective for failing to pursue this meritless claim. Given the conclusion that trial counsel provided Dr. Sadoff with the records indicating the IQ drop discussed above, Robinson's own expert, Dr. Sadoff, failed to identify "red flags," thus creating an implicit agreement amongst Dr. Sadoff, trial counsel, and post-verdict counsel that there were not any "red flags." Besides a conclusory remark on this claim, Robinson presents no additional evidence to support his claim against post-verdict counsel. The state court's ruling was not unreasonable in light of the facts presented.

### B.  Issue Two

In Issue Two, Robinson argues his trial counsel rendered ineffective assistance of counsel by introducing evidence of his antisocial personality disorder (APSD) because this type of evidence actually contains aggravating value and not mitigating value. The Commonwealth

argues Robinson's trial counsel pursued every option, including APSD, because the

Commonwealth would have used it against Robinson. The PSC addressed the issued as follows:

> Appellant's argument, conveniently enough, completely ignores penalty phase counsel's explanation for presenting Dr. Sadoff's testimony. Counsel was aware of the potentially damaging nature of the testimony, but counsel also believed that if he did not provide Dr. Sadoff's diagnosis to the jury, the Commonwealth would have. Counsel further explained that he wanted Dr. Sadoff to testify so the jury would hear an "outside, impartial voice:" "[Dr. Sadoff] was going to synthesize much of the background of [appellant]'s life, and also explain it to the jury." Additionally, counsel believed the diagnosis would explain appellant's life circumstances and his reaction to those circumstances, which made it one part of the broader picture that was appellant's life. In counsel's view, the diagnosis was only one facet of appellant's life history, which also included his impoverished background, his lack of appropriate role models, and his drug and alcohol abuse. N.T., 12/17/10, at 36, 42, 46–47.

> The PCRA court, which did not address the claim at length, credited counsel's explanation, noting that trial counsel was aware that the diagnosis would be revealed on cross-examination, and so he determined to deal with it "proactively in the full context of Dr. Sadoff's professional medical explanation," and attempt to use it as best he could. *See* PCRA court opinion, 6/21/12, at 7–8.

> As in all matters where counsel's effectiveness is being challenged, this Court must be careful to assess counsel's performance without the distortion of hindsight, and must instead reconstruct the actual circumstances under which counsel's decisions were made. *Commonwealth v. Birdsong*, 24 A.3d 319, 333 (2011).

> Penalty phase counsel offered reasoned explanations for his strategy, which are supported by the record, and were credited by the PCRA court. Counsel believed that Dr. Sadoff's testimony would give jurors a perspective that appellant's family members and friends could not offer. However, he also knew that if he presented Dr. Sadoff's affirmatively helpful testimony, he necessarily had to address the antisocial personality disorder diagnosis. This was not a circumstance created by counsel, but a practical reality arising from the truth of the type of being his client is. Thus, counsel was left with a difficult choice of presenting no "impartial and objective" expert evidence through the testimony of Dr. Sadoff, and therefore limiting the jury's understanding of the family and historical testimony that was presented, or presenting Dr. Sadoff's testimony, including the diagnosis, to present a full human picture of his client, while attempting to make use of the antisocial personality disorder diagnosis as best he could. He chose the latter course of action, which falls in the realm of strategy.

> Now, with the aid of hindsight, appellant suggests that trial counsel was constitutionally obliged to proceed differently, and pursue a half-truth and an

incomplete picture. That is indeed one possible strategy. But, in assailing penalty phase counsel, appellant proceeds upon the questionable and simplistic assumption that mental health diagnoses may, indeed must, be categorized as a matter of law: they either provide aggravating evidence or mitigating evidence. The reality obviously is more complex, and counsel was not precluded from assessing the situation in light of the complexity. The Commonwealth in the penalty phase seeks death; a strategy that seeks to secure life in prison by presenting a full picture of the subject of the proceeding, with an explanation for his behavior, is not inherently unreasonable.

Appellant complains that the evidence was prejudicial because a person with antisocial personality disorder commits crimes, and the evidence may have reinforced in the minds of the jurors that appellant was an out of control individual who was dangerous. But, surely the jury had enough before it from the facts presented to them concerning appellant's three rapes and murders, and his fourth rape and attempted murder, to already draw that conclusion.

In any event, even with the aid of hindsight, any court would be hard pressed to find counsel ineffective based upon his chosen course of action in these circumstances, and no reasonable court could suggest that counsel's chosen course establishes Strickland prejudice. Without the testimony of Dr. Sadoff, appellant's case in mitigation would have been paltry, especially in the face of the mountain of aggravating circumstances. Had counsel acted as appellant now says he should have, counsel no doubt would be faulted for failing to present Dr. Sadoff's expert testimony. Penalty phase counsel appreciated, and best expressed, the dilemma himself when he said, "We didn't retain [Dr. Sadoff] for purposes of having him opining [sic] that he was an anti-social personality disorder, thanks for the diagnosis, I can't wait to run with this to the jury," but the diagnosis "came out. It had to be explained." N.T., 12/17/13, at 51–52. Accordingly, appellant has not established that counsel was ineffective for presenting the testimony of Dr. Sadoff, which necessarily included the antisocial personality disorder diagnosis.

*Robinson II*, 623 Pa. at 378-81.

Here, counsel was not ineffective in presenting testimony of Robinson's APSD. Burke's expert, Dr, Sadoff, testified at Robinson's PCRA hearing as follows addressing APSD as a potential mitigating factor at the time of Robinson's trial: "Usually today, however, it's not. Although people are still writing about it as a mitigating factor in death penalty cases." N.T. 12/20/10, at 29-30. Burke testified on his strategy at Robinson's PCRA hearing for discussing the APSD as follows:

> I had to address it, it was coming out. And I felt that I could – I could ameliorate it, and I could explain it better by broaching it . . . . [Dr. Sadoff], found [the APSD], by the way, and it's in the initial report, as a mitigating factor . . . . I was clear to say statutorily, it's not an aggravator, and you have to take it for what it's being offered.

N.T. 12/17/10, at 36-38. Thus, Burke was not ineffective for electing to broach the subject of Robinson's APSD in order to lessen the Commonwealth's attack. The Commonwealth would have utilized Robinson's APSD against him, and it would be incumbent upon Burke to counter the Commonwealth's attack. He countered their attack by electing to discuss the APSD with Dr. Sadoff.

Moreover, an attorney who discusses their client's potentially negative information is not ineffective. It is a trial strategy utilized to lessen the damage of opposing counsel's argument using that information. Law schools throughout the country teach this tactic to trial advocacy students. By discussing the client's potentially negative information, an attorney helps to control the narrative of that information and shows to the jury that no information is being concealed. Accordingly, Burke was not ineffective by discussing Robinson's APSD nor were the PCRA and PSA courts unreasonable in ruling Burke was not ineffective.

### C. Issue Three

In Issue Three, Robinson asserts he cannot be sentenced to death because of his brain damage. Robinson acknowledges that he is not mentally retarded, and thus ineligible for the death penalty under *Atkins v.* Virginia, 536 U.S. 304 (2002), and that he was not under the age of 18, and thus ineligible under *Roper v. Simmons,* 543 U.S. 551 (2005). However, he urges the Court to extend the reasoning of these cases to him because he belongs to a class of individuals who suffer from severe brain damage. The PSC addressed the issue as follows:

> This Court has broadly stated that questions relating to the legality of sentencing are not waivable. *Commonwealth v. Aponte*, 855 A.2d 800, 802 n. 1 (2004).

Additionally, the *Atkins* Court explained that "the [United States] Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender," 536 U.S. at 321, 122 S.Ct. 2242, leaving little doubt that actual *Atkins* claims implicate the legality of sentencing. The fallacy of appellant's argument, of course, is that he does not have an *Atkins* claim or a *Roper* claim. Appellant acknowledges that the U.S. Supreme Court has not expanded the decision in *Atkins* to encompass, as a class, murderers proven to be brain damaged by a preponderance of the evidence, and exempt them from the death penalty. Nor has there been a trending consensus in state legislatures to exempt murderers like him from capital punishment. The right he speaks of is not embraced by *Atkins*, and indeed, has not been recognized by any governing authority. Thus, under the current state of Eighth Amendment jurisprudence; appellant's judgment of sentence was not illegal on the ground he specifies.

*Atkins* is a controlling decision of the U.S. Supreme Court on a federal question. This Court has rejected requests to extend the reach of *Atkins* beyond the necessary commands of the decision. For example, in *Commonwealth v. Baumhammers*, 599 Pa. 1, (2008), the defendant asked this Court on direct appeal to expand the *Atkins* decision to encompass mentally ill defendants. The Court rejected the request, noting that we had twice before rejected similar arguments, *see Commonwealth v. Faulkner*, 595 A.2d 28, 38 (1991) and *Commonwealth v. Fahy*, 516 A.2d 689 (1986), and that *Baumhammers* did not advance a "compelling argument" to reconsider those decisions. *Id*. at 96–97. We have also declined to extend other aspects of *Atkins* beyond the necessary commands of the decision, when presented with preserved claims on direct appeal. *See Commonwealth v. Sanchez*, 36 A.3d 24, 54–59 (2011) (nothing in *Atkins* requires mental retardation determination to be made pre-trial by judge and Court will not implement such requirement). Likewise, in passing upon corollary questions arising from the retroactive application of *Atkins* on PCRA review, we have declined to recognize derivative, cognate federal constitutional rights. *Commonwealth v. Bracey*, 986 A.2d 128, 145 (2009) (no right to jury trial on *Atkins* claim presented on post-conviction review); *accord Commonwealth v. Cunningham*, ─── Pa. ───, 81 A.3d 1, 10–11 (2013) (PCRA appeal; holding that U.S. Supreme Court's decision in *Miller v. Alabama*, ─── U.S. ───, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) does not apply retroactively to defendants whose judgments of sentence were final at time of *Miller* decision; noting this Court's practice of proceeding no farther than required by extant, governing federal precedent).

Appellant's argument in this case goes beyond the argument made in *Faulkner* and *Baumhammers* because this is a collateral attack upon his conviction. In essence, appellant asks that his collateral appeal be made the vehicle by which to establish a new federal constitutional right that retroactively makes his sentencing claim both viable and non-waivable.

In general, the proper way to seek to secure innovations in constitutional law is upon direct review, not via the PCRA. At any time before he was tried or on post-

verdict motions, appellant could have claimed that the Eighth Amendment should be expanded to exempt murderers in his particular circumstances from capital punishment. That would raise and preserve a federal claim he could seek to litigate through this Court as of right, and to the U.S. Supreme Court, in its discretion. He did not do so.

Instead, appellant is left with raising the issue on collateral review under the PCRA. But, the PCRA's eligibility provisions provide no easy harbor for the recognition, or creation, of new constitutional rights. The PCRA provides a mechanism for vindicating existing constitutional rights, and it also provides a mechanism for implementing new constitutional rules of retroactive application, no matter when the new rule is established. See 42 Pa.C.S. § 9545. But, the new rule has to exist already. Simply stated, by its terms, the PCRA does not deem cognizable claims such as appellant's that seek to innovate the new substantive federal constitutional rule that the prisoner would then have applied to himself retroactively. In short, his claim, even if deemed nonwaivable, is not cognizable under the PCRA. Appellant's theory never comes to terms with the requirements of the PCRA.

Accordingly, we conclude that this Court has no authority under the PCRA to create and apply the new federal constitutional right appellant seeks to innovate and have retroactively applied to him to undo his lawful, statutory penalty. If such a right is someday recognized and made retroactive, and appellant's death sentence has yet to be executed, he can file a serial PCRA petition and avail himself of Section 9545 of the Act, as defendants actually affected by the new death eligibility rules in *Atkins* and *Roper* have done.

*Robinson II*, 623 Pa. at 381-85.

No legitimate penological purpose is served by executing a person with an intellectual disability. *Atkins v. Virginia*, 536 U.S. 304, 317, 320 (2002). To do so contravenes the Eighth Amendment, for to impose the harshest of punishments on an intellectually disabled person violates his or her inherent dignity as a human being. "[P]unishment is justified under one or more of three principal rationales: rehabilitation, deterrence, and retribution." *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008). Rehabilitation, it is evident, is not an applicable rationale for the death penalty. *See Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). Those with an intellectual disability have a "diminished ability" to "process information, to learn from experience, to engage in logical reasoning, or to control impulses . . .

[which] make[s] it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." *Atkins*, 536 U.S. at 320. Retributive values are also ill-served by executing those with intellectual disability. The diminished capacity of the intellectually disabled lessens moral culpability and hence the retributive value of the punishment. *See id.*, at 319, 122 S.Ct. 2242 ("If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution").

In *Atkins*, the Supreme Court twice cited definitions of intellectual disability which, by their express terms, rejected a strict IQ test score cutoff at 70. That is not the issue here, contrary to what Robinson asserts. Nonetheless, *Atkins* first cited the definition provided in the DSM–IV: "'Mild' mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70." *Atkins*, 536 U.S., at 308, n. 3 (citing Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000)). The Supreme Court later noted that "'an IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.'" *Atkins*, 536 U.S., at 309, n. 5. Furthermore, immediately after the Court declared that it left "to the States the task of developing appropriate ways to enforce the constitutional restriction," *id.*, at 317, the Court stated in an accompanying footnote that "[t]he [state] statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions." *Id.*

*Atkins* further states, those persons who meet the "clinical definitions" of intellectual disability "by definition . . . have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id*. at 318. Thus, they

bear "diminish[ed] . . . personal culpability." *Id.* The clinical definitions of intellectual disability, which take into account that IQ scores represent a range, not a fixed number, were a fundamental premise of *Atkins*. And those clinical definitions have long included the SEM. *See* Diagnostic and Statistical Manual of Mental Disorders 28 (rev. 3d ed. 1987) ("Since any measurement is fallible, an IQ score is generally thought to involve an error of measurement of approximately five points; hence, an IQ of 70 is considered to represent a band or zone of 65 to 75. Treating the IQ with some flexibility permits inclusion in the Mental Retardation category of people with IQs somewhat higher than 70 who exhibit significant deficits in adaptive behavior").

Here, though Robinson has argued extensively about the 26 point drop in is IQ, from 126 to 100, does not place him in the class of individuals captured under *Atkins*. This drop, while unfortunate, is still within the normal range. The Supreme Court in *Atkins* addressed IQ scores of the mild mental retardation stage. Robinson's score of 100 does not come close to this stage. If Robinson's score was close to the beginning of being considered mild mental retardation, then his argument citing to *Atkins* could contain merit; however, it does not. Thus, Robinson's reliance upon *Atkins* is inapposite as his IQ is normal.

Similarly, the Supreme Court's holding in *Roper*, which barred the execution of juveniles, does not apply to Robinson. Robinson was over eighteen when he murdered Jessica Jean Fortney. Indeed, Robinson already received the benefit of *Roper*. Robinson was under eighteen when he murdered Joan Burghardt. Though he was initially sentenced to death for the murder of Burghardt, that sentence was vacated and the state court resentenced him to life in prison.

Robinson acknowledges, as he must, that none of these cases is directly on point.  Rather

he asks this Court to extend the reasoning of those cases to apply to him, relying on a 2006

statement from the American Bar Association:

> Defendants should not be executed or sentenced to death if, at the time of the
> offense, they had a severe mental disorder or disability that significantly impaired
> their capacity (a) to appreciate the nature, consequences or wrongfulness of their
> conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform
> their conduct to the requirements of the law.

Even if we were to apply this standard, Robinson has not persuaded us that the reasoning

should apply to him.  The expert testimony presented establishes Robinson was still capable of

performing very complex tasks. Indeed, the testimony at trial establishes that, Robinson stalked

numerous victims before murdering them. This shows the ability to put a plan into action.

Accordingly, Robinson has not established he has sufficient brain damage to warrant the relief he

seeks.

## D.  Issue Four

In Issue Four, Robinson argues the Commonwealth's failure to timely disclose that

Commonwealth witness Sam-Cali had been hypnotized and provided inconsistent statements is a

*Brady*[1] violation and Robinson's counsel was ineffective for failing to object to this testimony.

### i.   Alleged *Brady* violation

Under *Brady v. Maryland*, the prosecution must produce to the defendant evidence that is

material to either guilt or punishment, irrespective of good or bad faith. 373 U.S. 83, 87 (1963);

*see also United States v. Bagley*, 473 U.S. 667, 676 (1985) (extending *Brady* to impeachment

and exculpatory evidence); *Giglio v. United States*, 405 U.S. 150, 154 (1972). "A *Brady*

violation occurs if: (1) the evidence at issue is favorable to the accused, because either

---

[1]      *Brady v. Maryland*, 373 U.S. 83 (1963).

exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'" *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011).

"Evidence is material if there is a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different." *Wilson v. Beard*, 589 F.3d 651, 665 (3d Cir. 2009). "A 'reasonable probability' of a different result is shown when the government's suppression of evidence 'undermines confidence in the outcome of the trial.'" *Id*. (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). The Third Circuit has further explained that "evidence may be material if it could have been used effectively to impeach or corral witnesses during cross-examination." *Johnson v. Folino*, 705 F.3d 117, 129-30 (3d Cir. 2013). To that end, the Third Circuit has instructed district courts to consider not only the content of the evidence at issue but also "where it might have led the defense in its efforts to undermine [a particular witness]" when determining whether evidence is "material." *Id*. at 131.

Once a court has determined that the evidence is *Brady* material, the next inquiry in assessing whether there is a *Brady* violation is "whether suppression of that evidence undermines confidence in the outcome of a criminal trial, i.e., whether the evidentiary suppression constitutes a *Brady* violation." *Smith v. Holtz*, 210 F.3d 186, 196 (3d Cir. 2000); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (explaining that nondisclosure of *Brady* material only evolves into a *Brady* violation where the nondisclosure is "so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict"). The Third Circuit has explained that "[t]o constitute a *Brady* violation, the nondisclosure must do more than impede the defendant's ability to prepare for trial; it must adversely affect the court's ability to reach a just conclusion, to the prejudice of the defendant." *United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984).

As a general matter, *Brady* material must be disclosed in time for its effective use by the defendant at trial. *See United States v. Higgs*, 713 F.2d 39, 43-44 (3d Cir. 1983). To that end, the Third Circuit has explained that "[w]here the government makes Brady evidence available during the course of a trial in such a way that a defendant is able to effectively use it, due process is not violated and *Brady* is not contravened." *United States v. Johnson*, 816 F.2d 918, 924 (3d Cir. 1987).

In *Higgs*, the Third Circuit addressed when *Brady* material used for impeachment purposes must be provided to the defendant. There, the district court ordered the government to provide the defendant with information before trial about any witnesses who had received immunity or leniency in exchange for their cooperation with the government. *Id*. at 40. The government objected, citing threats to the witnesses' lives. *Id*. In determining when this material had to be disclosed, the Third Circuit focused its inquiry on "what information ha[d] been requested and how it [would] be used by [the defendant]." *Id*. at 43-44. The Third Circuit held that there is "[n]o denial of due process . . . if *Brady* material is disclosed to [the defendant] in time for its effective use at trial." *Id*. at 44. For impeachment purposes, the Third Circuit held that a defendant's "right to a fair trial will be fully protected if disclosure is made the day that the witness testifies." *Id*.

More recently, the Third Circuit found that there was no *Brady* violation where the jury had heard additional cross-examination in light of belatedly disclosed evidence. *United States v. Claxton*, 766 F.3d 280, 304 (3d Cir. 2014). There, the Government did not disclose certain letters that allegedly constituted *Brady* material to the defendant until trial. *Id*. at 303-04. In that case, the district court had allowed additional cross-examination of the relevant witnesses and provided defense counsel with extra time to prepare for additional cross-examination. *Id*. at 304.

Under those circumstances, the Third Circuit concluded that due process had not been

contravened. *Id.*

The PSC addressed the alleged *Brady* violation as follows:

> Moreover, prior to this trial, Appellant had already pled guilty to multiple crimes
> (including burglary, aggravated assault, and attempted homicide) in relation to the
> incidents at the Sam–Cali residence in June and July of 1993. Accordingly,
> Appellant admitted to perpetrating these crimes. *See*, *e.g.*, *Commonwealth v.
> Anthony*, 504 Pa. 551 (1984) (observing that "[a] guilty plea is an acknowledgement
> by a defendant that he participated in the commission of certain acts with a criminal
> intent . . . [and, thus, h]e acknowledges the existence of the facts and the intent");
> *Commonwealth v. Papy*, 436 Pa. 560 (1970) (noting that the circumstances of the
> case fell within a rule of law that "a [defendant's] plea constitutes an admission of
> his guilt and all of the facts averred in the indictment"); *see also Commonwealth ex
> rel. Walls v. Rundle*, 198 A.2d 528, 529 n. 1 (1964). Therefore, Appellant could not
> impeach Sam–Cali on the basis that she gave the police the name of another
> possible suspect during her initial interviews. Hence, because the evidence at issue
> was neither exculpatory nor tended to impeach another, there was no *Brady*
> violation.
>
> . . . .
>
> We will initially address the Commonwealth's purported failure to disclose the
> hypnosis of the witnesses at issue. Following his arrest, on August 4, 1993, a letter
> from the Commonwealth notified Appellant that Sam–Cali underwent hypnosis
> during the investigation. Appellant signed for the letter and admitted receiving it.
> 49 N.T., 11/24/98, pp. 76–77. As it relates to the hypnosis of Stengel, during the
> post-sentencing hearing, Appellant's counsel, Carmen Marinelli, explicitly testified
> that during the pre-trial stages of this case, he was informed that Stengel was
> hypnotized. N.T., 11/13/1998, pp. 36–37. Given these facts, it is clear that, prior to
> trial, the Commonwealth indeed disclosed to the defense that two of its potential
> witnesses were hypnotized and there was no *Brady* violation.

*Robinson I*, 581 Pa. at 220-23.

Here, no *Brady* violation occurred. Robinson received, and acknowledged, receipt of the

Commonwealth's document regarding the hypnosis. It was incumbent upon Robinson to provide

documents to his counsel for his defense. At the time the document was produced, Robinson was

unrepresented.[2] Notwithstanding the proper production of the document, and before Sam-Cali testified, the Commonwealth notified Robinson of her testimony and offered to provide transcripts. Thus, Robinson should have had ample opportunity to cross-examine Sam-Cali. The Commonwealth offered such transcripts before Sam-Cali took the stand. The Third Circuit has noted due process is not violated if disclosure is made the day the witness testifies. *Higgs*, 713 F.2d at 44. The Commonwealth disclosed such evidence before Sam-Cali took the stand.

Robinson further argues that the Commonwealth withheld Sam-Cali's statement to police that named Sal Rosado as a person of interest. The evidence presented at trial shows, however, that Sam-Cali notified police Sal Rosado could be her attacker, but it was determined Rosado could not be her attacker because he did not fit the description. As the Commonwealth explained in their response, "Sam-Cali never identified Mr. Rosado as her attacker. In fact, she identified him as *not* being the attacker. She merely suggested his name to the police." *See* ECF No. 44 at 32. Additionally, the jury would have seen physical evidence of Robinson's DNA at the scene at the crime. Accordingly, the PSC correctly ruled no *Brady* violation occurred as Robinson received the document and he had an opportunity to cross-examine Sam-Cali.

### ii.   Ineffective assistance for failing to object

Robinson argues that if counsel was aware of this information, then he was ineffective for failing to object to the admission of the hypnotized testimony without demanding that the

---

[2]     In the present pleadings, Robinson asserts that he was represented at the time that this letter was sent. *See* ECF No. 33 at 99-100.  The Commonwealth has specifically explained that Robinson was not represented at the time that the letter was sent. *See* ECF No. 31.  If Robinson had wanted to challenge this point, the time for such challenge was during direct appeal when he presented this claim.  But he made no effort to raise this argument at the time, preferring instead to argue that it did not matter if he was represented.  The Court must evaluate the state court's determination based on the record before it.  *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011).

Commonwealth comply with all of the *Smoyer* factors. Upon review, the PSC thoroughly analyzed the *Smoyer* factors in Sam-Cali's testimony and concluded that the prosecutor complied with the state requirements on this point. Additionally, as the state court explained, trial counsel affirmatively did not want Sam-Cali's hypnosis to be brought to the attention of the jury. Counsel's strategic decisions are virtually unchallengeable on appeal. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009).

Assuming arguendo that Robinson's trial counsel should have objected, the failure to object was not prejudicial. As discussed in the analysis of Robinson's *Brady* claim, Sam-Cali merely suggested Rosado's name to the police. Sam-Cali sought to provide potential attackers to the police so the police could begin their investigation. The police determined that Rosado would not be a suspect because he did not match the description of the attacker. The jury would have seen these facts as well. Moreover, the jury would also have also seen the additional physical evidence of Robinson's DNA linking him to the scene.

Thus, the facts presented to the jury would have outweighed any prejudice. Sam-Cali would have testified and the physical evidence of Robinson's DNA would have been admitted. If Robinson's trial counsel would have objected, Sam-Cali's statements would have been admitted nonetheless, and the statements show she suggested Rosado as a potential suspect. Rosado was then eliminated as a potential suspect after he did not match Robinson's appearance. Then, the jury would have seen Robinson's DNA evidence. This evidence is strong and outweighs any potential prejudice. Accordingly, there was no ineffective assistance of counsel.

### E.  Issue Five[3]

In Issue Five, Robinson avers the PSC erred by denying his motion to sever the charges

of the different victims in his case. The PSC addressed the issue as follows:

> Appellant argues that the trial court erred in denying his motion for severance of
> the charges involving the different victims.
>
> Pennsylvania Rule of Criminal Procedure 582 provides in relevant part:
>
> Offenses charged in separate indictments or informations may be tried together if .
> . . the evidence of each of the offenses would be admissible in a separate trial for
> the other and is capable of separation by the jury so that there is no danger of
> confusion . . .
>
> Pa.R.Crim.P. 582(A)(1)(a). "Whether or not separate indictments should be
> consolidated for trial is within the sole discretion of the trial court and such
> discretion will be reversed only for a manifest abuse of discretion or prejudice and
> clear injustice to the defendant." *Commonwealth v. Newman*, 528 Pa. 393 (1991);
> *also see Commonwealth v. Morris*, 493 Pa. 164 (1981).
>
> [While e]vidence of distinct crimes is inadmissible solely to demonstrate a
> defendant's criminal tendencies[, s]uch evidence is admissible . . . to show a
> common plan, scheme or design embracing commission of multiple crimes, or to
> establish the identity of the perpetrator, so long as proof of one crime tends to prove
> the others. This will be true when there are shared similarities in the details of each
> crime.
>
> *Commonwealth v. Keaton*, 556 Pa. 442 (1999) (internal citations omitted), *cert.*
> *denied*, 528 U.S. 1163 (2000); *also see Commonwealth v. Natividad*, 565 Pa. 348
> (2001) (stating that "[e]vidence of another crime is admissible where the conduct
> at issue is so closely related that proof of one criminal act tends to prove the other"),
> *cert. denied*, 535 U.S. 1099 (2002). "To establish similarity, several factors to be
> considered are the elapsed time between the crimes, the geographical proximity of
> the crime scenes, and the manner in which the crimes were committed."
> *Commonwealth v. Rush*, 538 Pa. 104 (1994).
>
> Although Appellant admits that "the offenses consolidated in this case were of the
> same class," he argues that the crimes were not similar enough to be considered a
> distinctive modus operandi of a single perpetrator. Specifically, Appellant points
> out that: (1) Fortney lived two miles away from Burghardt and Schmoyer; (2) the

---

[3]      From this point on, Robinson's brief incorrectly numbers the issues in his brief. For
clarity, the Court continues the opinion with the correct numbering.

crimes were not temporally related, but ranged over a period of eleven months; and (3) there is no "real relationship" in the way the victims were killed.

As in *Morris*, however, "[i]t is difficult to conceive of any situation where the propriety of joinder could be clearer." 425 A.2d at 721. First, all of the attacks took place in the same general locale—the East Side of Allentown, within mere blocks from where Appellant lived or, as in Fortney's case, used to live. As previously described, Appellant's residence at the time of his arrest was about: (1) four blocks from where Schmoyer was abducted, and about one mile from the Reservoir where her body was found; (2) five blocks from where Burghardt lived and was murdered; (3) five or six blocks from where Sam–Cali resided and was assaulted; and (4) two miles from where Fortney lived and was murdered.

Second, in relation to the temporal relationship between the crimes, this Court has held in the past that "remoteness in time between . . . offenses" does not render consolidation improper per se, but is simply another factor to be considered in the analysis. *See Newman*, 598 A.2d at 278 (allowing introduction of evidence of another crime in spite of an eighteen-month gap between the two offenses); *Commonwealth v. Hughes*, 521 Pa. 423 (1989) (holding that a ten-month gap between two crimes was not too remote); *Commonwealth v. Donahue*, 519 Pa. 532 (1988) (plurality opinion) (allowing testimony concerning three-year-old acts of child abuse in a case where the victim's death was caused by alleged child abuse). Presently, the attacks at issue span a period of eleven months, with the longest "idle" period (approximately ten months from August of 1992 through June of 1993) taking place between the Burghardt and Schmoyer homicides. Preliminarily, we note that eleven months is not such a long period of time as to render consolidation improper.

We further point out that, as previously explained, during an extended portion of this "idle" period, Appellant did not reside in, or visit, Lehigh County, because he was detained in a juvenile placement facility. In this respect, the present matter is remarkably similar to Rush, where eight years separated commission of two similar assaults. 646 A.2d at 561. In that case, we observed:

Normally such a lengthy interval would cause the occurrences to be considered too remote; however, for most of [these eight years] (with the exception of eighty-four days) appellant was incarcerated. Excluding this imprisonment, a time span of eighty-four days is within the acceptable remoteness standard.

*Id.* This rationale is equally applicable to the matter at hand—excluding the period of Appellant's detention at a juvenile placement facility, the crimes spanned approximately four months, which is well within "acceptable remoteness standards" set forth in our decisions. *See Newman*, *supra*; *Hughes*, *supra*. In sum, these observations only reinforce the trial court's conclusion with regard to the consolidation of the various Informations.

Finally, Appellant complains that joinder was improper, because there is no "real relationship" in the way the victims were killed. Nothing can be further from the truth, however. None of the victims knew or had any prior contact with Appellant. All were savagely beaten and raped within two months of Appellant leaving the Allentown area and two and one-half  months of his return to that locale. Each of the victims was brutally murdered at close range by hand or a hand-held instrument. In each case, Appellant left behind virtually no incriminating physical evidence, with the exception of what was subsequently discovered through microscopic, scientific examination. In all three cases, samples of Appellant's DNA were recovered from the crime scenes. Each attack was committed at night or in the early morning hours. Finally, all victims shared the same personal characteristics—they were overweight, white females, who lived in and around the East Allentown area.

Previously, analogous evidence has been held adequate to establish a sufficient logical connection for consolidation of trials. *See Keaton*, 729 A.2d at 537. We have also held that similar evidence was sufficient to allow testimony of a common scheme or plan in the way the crimes were perpetrated. *See Commonwealth v. Elliott*, 549 Pa. 132 (1997) (evidence that defendant targeted other victims of similar race and gender and raped them was admissible to prove common scheme, plan, or design), *cert. denied*, 524 U.S. 955 (1998); *Commonwealth v. Miller*, 541 Pa. 531 (1995) (evidence that defendant lured other victims of similar race, weight, and gender into his car, took them to remote areas to force sex upon them, beat them in a similar manner, and killed or attempted to kill them was admissible to prove common scheme, plan, or design), *cert. denied*, 516 U.S. 1122 (1996); *Hughes*, 555 A.2d at 1282–83 (finding that testimony concerning a subsequent rape was properly admitted at trial for a preceding rape and murder, where: (1) the crimes were committed at approximately the same time of the day, in a similar geographic location, using similar method of attack; and (2) the victims were familiar with the defendant, and were of the same age, ethnicity, and gender); *Rush*, 646 A.2d at 561 (finding "sufficient similarities to warrant the conclusion that one individual committed both crimes," where, inter alia, the crimes were committed in the same geographic locale and the victims "were black, female, and relatively young, had their underclothing or nightclothes pulled from them"). Moreover, the evidence concerning each incident was readily separable by the jury, as each crime was perpetrated against a different victim and there was no overlap in physical evidence. *See Keaton*, 729 A.2d at 538. For these reasons, we find that the trial court did not abuse its discretion in consolidating for trial the Informations relating to the homicides at issue.

There is no Supreme Court precedent holding that the joinder of criminal indictments against a single defendant could be a violation of due process. *See Ashe v. U.S. ex rel. Valotta*, 270 U.S. 424 (1926) (finding that there was "not the shadow of a ground" for habeas relief where trial court had consolidated two felony indictments); *see also Spencer v. Texas*, 385 U.S. 554,

562 (1967) (stating that the "inherent opportunities for unfairness" where a defendant is tried for multiple offenses is not a violation of due process). In the absence of "clearly established Federal law as determined by the Supreme Court," there can be no basis for overturning the state PSC's adjudication of this claim. *See Carey v. Musladin*, 549 U.S. 70 (2006).

This Court notes that there is Supreme Court dicta suggesting that the joinder of multiple indictments against a single defendant could, in some circumstances, violate due process. *United States v. Lane*, 474 U.S. 438, 446 n. 8 (1986) (noting, in dicta, that misjoinder in a federal criminal case "would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial"). However, "clearly established Federal law" refers only to the holdings, not dicta, of the Supreme Court. *Musladin*, 549 U.S. at 74 (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

Here, in the absence of clearly established federal law, Robinson's severance claim cannot proceed. A district court may grant habeas relief if the state court's  decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Supreme Court dicta is insufficient to rise to the level of clearly established federal law. With there being no clearly established federal law to analyze Robinson's severance claim, his claim fails.

## F.  Issue Six

In Issue Six, Robinson alleges the pretrial publicity, citing to local newspaper articles, prejudiced the jurors and that his trial counsel was ineffective for failing to properly file a motion

to transfer venue based upon the pretrial publicity. The Commonwealth avers there was a

sufficient "cooling off" period between the pretrial publicity and the trial.

> ### i.   Pretrial publicity

A criminal defendant has a right to "a fair trial by a panel of impartial, 'indifferent'

jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due

process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Jurors are not required, however, to be totally

unaware of the facts and issues involved in a case. *Murphy v. Florida*, 421 U.S. 794, 799-800

(1975). "It is sufficient if the juror can lay aside his [or her] impression or opinion and render a

verdict based on the evidence presented in court." *Id*. (quoting *Irvin*, 366 U.S. at 723). A

defendant can establish actual prejudice by presenting evidence to show that "those who actually

served on his [or her] jury lacked a capacity to reach a fair and impartial verdict based solely on

the evidence they heard in the courtroom." *Rock v. Zimmerman*, 959 F.2d 1237, 1253 (3d Cir.

1992), *overruled on other grounds by Brecht v. Abrahamson*, 507 U.S. 619 (1993). However,

"[w]here media or other community reaction to a crime or a defendant engenders an atmosphere

so hostile and pervasive as to preclude a rational trial process, a court reviewing for

constitutional error will presume prejudice to the defendant without reference to an examination

of the attitudes of those who served as the defendant's jurors." *Id*. In such cases, a change of

venue is required and the failure to grant it deprives the defendant of due process. *Rideau v.

Louisiana*, 373 U.S. 723, 726 (1963); *Commonwealth v. Casper*, 392 A.2d 287, 292 (Pa. 1978).

However, "[s]uch cases are exceedingly rare." *Rock*, 959 F.2d at 1253. As the United States

Supreme Court explained in *Skilling v. United States*, "[i]n each of [the prior] cases, [where the

Court applied a presumption of prejudice,] we overturned a 'conviction obtained in a trial

atmosphere that [was] utterly corrupted by press coverage'; our decisions, however, 'cannot be

made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone
presumptively deprives the defendant of due process.'" *Skilling v. United States*, 561 U.S. 358,
381 (2010) (quoting *Murphy*, 421 U.S. at 798-99). For a court to presume prejudice based on
pretrial publicity, "[t]he community and media reaction . . . must have been so hostile and so
pervasive as to make it apparent that even the most careful voir dire process would be unable to
assure an impartial jury." *Rock*, 959 F.2d at 1252.

      To determine whether pretrial publicity meets that standard, courts consider the following
factors:

     (i)     the size and characteristics of the community;

     (ii)    the general content of the news coverage (including facts such as whether
          the stories referenced the defendant's confession or other similarly blatantly
          prejudicial information, whether the news account was factual and objective
          versus sensational, inflammatory, or slanted toward the prosecution, and
          whether the stories focus on the defendant personally as opposed to the
          crime itself);

     (iii)   the timing of the media coverage relative to the commencement of the trial;
          and

     (iv)   whether there was any media interference with actual courtroom
          proceedings.

*United States v. Savage*, No. 07-550-03, 2012 WL 2376680, at *3-4 (E.D. Pa. June 25, 2012)
(quoting *United States v. Diehl–Armstrong*, 739 F. Supp. 2d 786, 793 (W.D. Pa. 2010)).

      Publicity that is accurate and factual in nature does not justify a finding that prejudice
may be presumed. *Hetzel v. Lamas*, 372 F. App'x 280, 284 (3d Cir. 2010). Even when pretrial
publicity is "factual in nature, but prejudicial and inflammatory only to the extent arising from
the normal and natural reaction to any purely factual news item about a very serious crime," it
does not create a presumption of prejudice. *Flamer v. State of Del.*, 68 F.3d 736, 754 (3d Cir.
1995); *see also Diehl-Armstrong*, 739 F. Supp. 2d at 789 (prejudice not presumed where

publicity "ha[s] focused on factual, albeit salacious, information derived from official sources, court documents and proceedings, or other publicly available records rather than on conjecture, innuendo, or editorial content."). *See*, *e.g.*, *Laird v. Wetzel*, No. CV 11-1916, 2016 WL 4417258, at *9-10 (E.D. Pa. Aug. 19, 2016) (prejudice not presumed despite article prior to retrial mentioning prior conviction and death sentence); *Savage*, 2012 WL 2376680, at *5 (prejudice not presumed despite extensive pretrial publicity containing "disturbing" quotations from telephone intercepts of defendant and descriptions of prior convictions because the reporting was "highly factual"). Moreover, "even when pretrial publicity is extensive and severe, a lapse in time between the publicity and the trial can dissipate any prejudice that may have resulted." *Pursell v. Horn*, 187 F. Supp. 2d 260, 302 (W.D. Pa. 2002) (noting seven-month period between adverse publicity and trial militated against presumption of prejudice); *see also Foy v. Lamas*, No. 2:12-0088, 2013 WL 838191, at *23 (W.D. Pa. Mar. 6, 2013) (extensive media coverage that ended seven months before trial did not justify presumption of prejudice).

Pennsylvania law regarding prejudicial pretrial publicity is consistent with this body of federal law. Pennsylvania law also holds that when pretrial publicity is sufficiently sustained, pervasive, inflammatory and inculpatory, it may present exceptional circumstances under which prejudice will be presumed. *Commonwealth v. Frazier*, 369 A.2d 1224, 1227 (Pa. 1977). To determine whether such exceptional circumstances exist, the Pennsylvania Supreme Court has instructed that the following factors are determinative: "(1) whether the pretrial publicity was inherently prejudicial; (2) whether the pretrial publicity saturated the community; and (3) whether there was a sufficient proximity in time between the publicity and the selection of a jury such that the community from which the jury was drawn did not have an opportunity to 'cool

down' from the effects of the publicity, thus making a fair trial in such community impossible."
*Commonwealth v. Counterman*, 719 A.2d 284, 293 (Pa. 1998).

Pretrial publicity is inherently prejudicial if: "(1) the publicity is sensational, inflammatory, and slanted towards conviction rather than factual and objective; (2) the publicity reveals the accused's prior criminal record, if any, or if it refers to confessions, admissions, or reenactments of the crime by the accused; and (3) the publicity is derived from police and prosecuting officer reports." *Commonwealth v. Pursell*, 495 A.2d 183, 187 (Pa. 1985) (post-conviction relief proceeding) (citing *Commonwealth v. Casper*, 392 A.2d 287, 292 (Pa. 1978)). Pennsylvania law, like federal law, holds that even where pretrial publicity would lead to a presumption of prejudice under this standard, the existence of a sufficient "cooling off period" between prejudicial pretrial publicity and trial destroys the presumption of prejudice because it permits the prejudice to dissipate. *Commonwealth v. Paolello*, 665 A.2d 439, 450 (Pa. 1995); *see also Casper*, 392 A.2d at 293 ("The critical factor in the finding of presumptive prejudice . . . is the recent and pervasive presence of 'inherently prejudicial' publicity, the likely effect of which is to render a fair trial impossible."). Pennsylvania law also holds that factual and objective reporting is not inherently prejudicial. *See Commonwealth v. Beasley*, 678 A.2d 773, 782 (Pa. 1996). "It is saturation with 'inherently prejudicial' publicity, and not the possibility of saturation alone, that is important since, as we have noted, '(e)xtensive pretrial publicity . . . does not necessarily preclude a fair trial.'" *Casper*, 392 A.2d at 295 (quoting *Commonwealth v. Powell*, 328 A.2d 507, 510 (Pa. 1974)).

The PSC addressed the issue as follows:

Furthermore, after thoroughly reviewing the record we are not persuaded by the complaints made by Appellant. Any potential bias on the part of the jurors in relation to the media coverage of the case was sufficiently dealt with during the individually-conducted voir dire when the defense counsel, the prosecutor, and the

trial court, asked the potential jurors whether they had heard or read anything about the case. Indeed, unless preliminarily excused for other, unrelated reasons, each of the prospective jurors was questioned about their familiarity with the case and their knowledge concerning the incidents from media outlets. Some jurors stated that they knew about the incidents and they were further questioned about whether their ability to decide the case would be affected. The record reveals that of the jurors who were aware of the case, most gained their knowledge through the media reports circulated at the time of Schmoyer's homicide and Appellant's apprehension, which was more than a year before the trial was set to begin. This clearly indicates the presence of a sufficient "cooling off period" that minimized any potential ill effects of the publicity surrounding the events at issue.

Ultimately, the twelve jurors and four alternates selected for trial all stated that they would be fair and impartial when hearing the case. After undertaking an independent review of the entire transcript of the voir dire proceedings, we are convinced that pretrial publicity did not result in the inability to select a fair and impartial jury in Lehigh County. Therefore, the trial court did not abuse its discretion in denying the motion for a change of venue/venire and Appellant is not entitled to any relief on this claim. For this reason, we find that Appellant is similarly not entitled to relief on his allegation of counsel ineffectiveness in relation to the motion to change venue/venire.

*Robinson I*, 581 Pa. at 196-98.

Here, the PSC did not unreasonably apply federal law by failing to transfer the venue. In addressing the elements for pretrial publicity elicited in *Savage*, as to the first element, the size and characteristics of the community, the estimated population of Lehigh County in 1990 was 291,130. Lehigh County is closely connected with Northampton County, with a population of 247,105 in 1990. Thus, the region contained approximately over 500,000 people at the time of Robinson's murders. As to the second element, the general content of the news coverage, the coverage focused upon the murders, the victims of the murders, and the trial. There are, however, two potential inflammatory remarks contained in the media coverage: (1) an article dated June 13, 1993, in which a parent says the suspect "deserves worse than the death sentence" and a man who states, "the killer should be put to death and a member of Charlotte's family should get to pull the switch," and (2) an article dated April 13, 1994, in which a spectator whispered at

Robinson's sentencing, "I hope he fries, man." As to the third element, the timing of the coverage, there appears to be more intense coverage at the time of the murders which evolves into coverage of the trial. Lastly, the media did not interfere with the trial. While the trial needed to be moved into a bigger courtroom, this is because of the size of the crowd and not because of media interference. Robinson fails to specifically articulate how the media interfered at trial.

Assuming arguendo the two comments are inflammatory, there was a sufficient cooling off period. The first article was dated June 13, 1993. The trial was not until October 1994. Thus, the region had a sixteen-month cooling off period between the remark and the time of trial. Sixteen months is sufficient as a cooling off period. Additionally, the article did not mention Robinson by name, only addressing him generally as he was not arrested yet. The second inflammatory mark was made after the trial, at Robinson's sentencing, which make the remark irrelevant. The remaining articles are not inflammatory and simply inform the public of what occurred, when Robinson was arrested, stories about the victims and survivors, and the trial. Accordingly, the coverage was not of such a nature to require a change of venue.

### ii.   Ineffective assistance of counsel

Robinson argues his trial counsel was ineffective for failing to adequately brief Robinson's motion to transfer. Upon review, counsel's performance was not ineffective. Counsel filed the motion, per their duty, and the trial court ruled against Robinson. The trial court was aware of the media publicity at the time, and knew of the rationale behind Robinson's motion. The Court does not believe Robinson's argument that, had the brief of the motion been larger, the trial court would have granted the motion to transfer.

Assuming Robinson's trial attorneys were ineffective, there was no prejudice. As discussed, most of the reporting on Robinson was during the commission of the crimes, and

afterward, focused upon the victims and his trial. The media coverage satisfied the elements elicited in *Savage*. The one inflammatory remark that occurred on June 13, 1993, was approximately sixteen months before the trial, allowing for a sufficient cooling off period. The other inflammatory remark occurred after Robinson's sentencing, making the remark irrelevant to prejudice the jurors. Thus, assuming Robinson's trial attorneys were ineffective, there was no prejudice.

### G.  Issue Seven

In Issue Seven, Robinson argues the trial court committed errors and his counsel was ineffective for excluding jurors, such as Lamar Cramsey and Deanna Robinson,[4] without ascertaining their abilities to follow the law. Further, Robinson alleges trial court error because the trial court allegedly did not permit defense counsel to "life qualify" jurors on whether they could return a life sentence, such as Gail Kocher. Robinson then asserts a generalized objection that the jurors were biased. The PSC addressed the issue as follows:

> In relation to the voir dire process, Appellant argues that his counsel were ineffective in failing to pose "life qualification" questions to the potential jurors "in order to prevent the service of a juror who is incapable of returning a verdict of life imprisonment." Brief for Appellant, p. 45.

> In the past, this Court has consistently declared that: (1) there is no requirement for trial counsel to ask "life-qualifying" questions; and (2) trial counsel is not ineffective for failing to make such an inquiry. *See, e.g.*, *Commonwealth v. Bond*, 572 Pa. 588, 819 A.2d 33, 50 (2002); *Commonwealth v. Simmons*, 569 Pa. 405, 804 A.2d 625, 638 (2001) (plurality opinion) ("[t]here is no implication or holding that the choice not to life qualify a jury amounts to advocacy so glaringly substandard as to amount to a deprivation of the Sixth Amendment right to counsel") (emphasis in original); *Commonwealth v. Henry*, 706 A.2d 313, 324–25 (1997), *habeas corpus granted in part*, *Henry v. Horn*, 218 F. Supp. 2d 671 (E.D. Pa. 2002); *Commonwealth v. Lark* (*Lark PCRA*), 698 A.2d 43, 48 (1997); *Commonwealth v. Cox*, 686 A.2d 1279, 1290 (1996) (counsel was not ineffective for failing to "life-

---

[4]      As Deanna Robinson shares the same last name as Robinson, this Court will refer to her by her first name.

qualify" jurors where jurors "assured" the court that they would follow the law and the court's instructions), *cert. denied*, 522 U.S. 999 (1997).

Presently, the notes of testimony are replete with examples where both defense counsel and the prosecutor asked the prospective jurors whether they would be able to be fair and impartial in deciding the case and whether they could follow the trial court's instructions in imposing the proper sentence. Additional questions were posed to ensure that the jurors would not automatically impose the death penalty, but would follow the statutory guidelines as explained to them by the trial court. That is all that is legally required of the jury and, therefore, we reject the argument raised by Appellant.

. . . .

Appellant also argues that he was deprived of a fair trial by the improper exclusion "for cause" of Lamar Cramsey (Cramsey), based upon his views with respect to the death penalty. Appellant maintains that although Cramsey expressed conscientious scruples against the death penalty, he ultimately indicated that he could consider the death penalty in an appropriate case.

As we have often recognized, a prospective juror may be excluded "for cause" when his views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with the instructions given by the trial judge and the juror's oath. *See Bridges*, 757 A.2d at 873; *Commonwealth v. Stevens*, 739 A.2d 507, 521 (1999). Presently, we do not need to delve into the substantive analysis of the trial court's decision, however, for even assuming arguendo that the trial court erred in excluding Cramsey "for cause," such error was harmless in light of the fact that the Commonwealth had several peremptory challenges left after the jury was selected. If Cramsey had not been struck "for cause," the Commonwealth could have peremptorily removed this juror with its remaining challenges. *See Lewis*, 567 A.2d at 1381. For this reason, Appellant is entitled to no relief on this argument.

The Sixth Amendment right to a jury trial guarantees a criminal defendant the right to a

"fair trial by a panel of impartial, indifferent jurors," *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)

(internal quotation marks omitted), and that right is extended to state criminal trials through the

Due Process Clause of the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145, 148–49

(1968). "An impartial jury consists of nothing more than jurors who will conscientiously apply

the law and find the facts." *Lockhart v. McCree*, 476 U.S. 162, 163 (1986); *see also United*

*States v. Tindal*, 357 F. App'x 436, 438 (3d Cir. 2009) (explaining that "[j]urors are presumed to

be impartial"). Further, the Supreme Court has explained that "[n]o hard-and-fast formula dictates the necessary depth or breadth of voir dire[,]" instead, "[j]ury selection, we have repeatedly emphasized, is particularly within the province of the trial judge." *Skilling*, 561 U.S. at 386 (internal citations and quotations omitted). To violate the Sixth Amendment, it does not suffice that the trial court failed to ask questions during voir dire that "might be useful"; rather, the "trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." *Id*. at 387 n.20.

The Court held in *Witherspoon* that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected." 391 U.S. at 522-23. *Witherspoon*'s holding is grounded in the right to a fair and impartial jury guaranteed to state criminal defendants by the Sixth and Fourteenth Amendments, and thus veniremen can be excluded based on their views on capital punishment only if they would be biased and lack impartiality in hearing the case.

In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Court held that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id*. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). The Court explained that:

> this standard . . . does not require that a juror's bias be proved with "unmistakable clarity" . . . because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will

react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.

*Id*. at 424-26 (footnote omitted).

The Court explained in *Witt* that "[a]s with any other trial situation where an adversary wishes to exclude a juror because of bias, . . . it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality." 469 U.S. at 423. Thus, when the state wishes to exclude a prospective juror for cause because of his or her views on the death penalty, it must question that juror to make a record of the bias. *See Gray v. Mississippi*, 481 U.S. 648, 652 n. 3 (1987) ("A motion to excuse a venire member for cause of course must be supported by specified causes or reasons that demonstrate that, as a matter of law, the venire member is not qualified to serve.") (citation omitted).

After the state offers its challenge for cause, "[i]t is then the trial judge's duty to determine whether the challenge is proper." *Witt*, 469 U.S. at 423. Thus, before it can sustain the exclusion, the judge must make a factual determination that the prospective juror would be biased. On federal habeas review, that determination of bias is entitled to the presumption of correctness. *Id*. at 428. As the Court emphasized in *Witt*, a trial judge's "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." *Id*. at 429; *see also Deputy v. Taylor*, 19 F.3d 1485, 1499 (3d Cir. 1994) ("The trial court is in the best position to observe the demeanor of the prospective jurors.").

The following colloquy was at issue in *Witt*:

[Q. Prosecutor:] Now, let me ask you a question, ma'am. Do you have any religious beliefs or personal beliefs against the death penalty?

[A:] I am afraid personally but not-

61
090820

[Q]: Speak up, please.

[A]: I am afraid of being a little personal, but definitely not religious.

[Q]: Now, would that interfere with you sitting as a juror in this case?

[A]: I am afraid it would.

[Q]: You are afraid it would?

[A]: Yes, Sir.

[Q]: Would it interfere with judging the guilt or innocence of the Defendant in this case?

[A]: I think so.

[Q]: You think it would.

[A]: I think it would.

[Q]: Your honor, I would move for cause at this point.

[COURT:] All right. Step down.

469 U.S. at 415-16. Based on this exchange, the Supreme Court held that the judge's finding of bias, although not free of ambiguity, was fairly supported and therefore presumptively correct. The Court explained that the judge was not required "to announce for the record that [the prospective juror] was biased, or his reasoning," *id*. at 430, and added that, "[i]n this regard it is noteworthy that in this case the court was given no reason to think that elaboration was necessary; defense counsel did not see fit to object to [the] recusal, or attempt rehabilitation." *Id*. at 430-31. The Court noted that counsel's failure to speak was a circumstance that it would consider when assessing respondent's belated claims that the situation was "so rife with ambiguity . . . as to constitute constitutional error." *Id*. at 431 n. 11.

Under *Witt*, therefore, the proper inquiry on pre-AEDPA habeas review of a *Witherspoon* claim is whether there is fair support in the record for the judge's finding that the prospective juror's views on the death penalty would have prevented or substantially impaired the performance of his or her duties as a juror in accordance with the instructions and oath.

With respect to voir dire-related ineffective assistance of counsel claims, specifically, at least one federal circuit court has stated that an "attorney's actions during voir dire are considered to be matters of trial strategy, which cannot be the basis of an ineffective assistance claim unless counsel's decision is so ill chosen that it permeates the entire trial with obvious unfairness." *DeLozier v. Sirmons*, 531 F.3d 1306, 1323 (10th Cir. 2008); *accord Morgan* 504 U.S. at 729 (voir dire proceedings are "subject to the essential demands of fairness.") (internal quotation marks and alterations omitted); *see also Lin v. Bartkowski*, No. 2:10-cv-5489 (DMC), 2012 WL 3124493, at *31 (D.N.J. Aug. 1, 2012) (relying on standard set forth in *DeLozier* to resolve habeas petitioner's voir dire-specific ineffective assistance of counsel claims).

### i.   Counsel's performance during voir dire

Here, the decisions made by Robinson's counsel are not ineffective, but trial strategy. As discussed above, the jury panel received questioning about their beliefs and whether they can debate, and issue, a sentence of either life or death. Robinson's counsel participated in this questioning. This Court cannot say that Robinson's counsel trial strategy was so ill chosen that it permeates the entire trial with obvious unfairness. Robinson's trial counsel was faced with the arduous task of defending Robinson in a case with a potential penalty of death. Robinson's trial counsel, unlike this Court and Robinson's current habeas counsel, do not have the luxury of witnessing the jury panel's responses live and being able to observe their body language, tone, and demeanor while being questioned.

This Court has reviewed the voir dire transcripts and determined the jurors that were empaneled were not so ill chosen that it permeates the entire trial with obvious unfairness – there was a fair trial and the jurors were fairly chosen. The PSC's determination was not unreasonable or contrary to federal law. Accordingly, Robinson's trial counsel was not ineffective. Nonetheless, the Court will address the specific individuals Robinson identified.

### ii.    Lamar Cramsey Colloquy

The colloquy of Lamar Cramsey is as follows:

[Q. Prosecutor:] Okay. And if you reached that point in terms of passing judgment, and you concluded, after listening to the evidence, the defendant was guilty of these murders, would you be able, then, to pass judgment and come into court and say guilty of murder in the first degree?

[A:] Again, I don't know.

[Q:] And the reason you don't know?

[A:] It's just hard to tell somebody -- to kill somebody.
. . . .

[Q:] Do you believe that you can follow the instructions of the Court as to the law and apply the law to the facts, and this means, no matter what your personal beliefs are as to what the law is, or what the law should be, you would have to follow the instructions of the Court. Do you believe that you could do that or would you have difficulty with that?

[A:] No, I wouldn't have any difficulty with it, because he would explain everything, right?

. . . .

[Q:] Do you believe that you could follow the law with respect to the death penalty or do you believe that it would be difficult for you to pass judgment on that?

[A:] It would be difficult to pass judgment on it.

[Q:] And can you explain why you would find it difficult to pass judgment?

[A:]  Because I never had to. It's that simple.

[Q:] Do you believe that because you've never had to you don't believe you could?

[A:] That's right.

N.T.  10/17/1994, at 1939-43.

Here, Cramsey was not wrongfully disqualified because of his views on the death penalty. Robinson attempts to cherry pick Cramsey's statements regarding his ability to "look" at Robinson while issuing the death penalty and fails to view Cramsey's statements as a whole. By cherry picking, Robinson fails to analyze the entire colloquy, especially the sections where Cramsey voices his hesitance in rendering the death penalty numerous times. Cramsey stated at least four times his hesitancy to issue the death penalty to Robinson. The Commonwealth attempted to follow up on this hesitancy and Cramsey reaffirmed his hesitancy. These statements do not pertain to "looking" at Robinson while issuing the death penalty, as Robinson asserts. Cramsey failed to rehabilitate his answers with numerous opportunities to do so. Due to his failure to rehabilitate his answers and establish confidence that he could potentially render a penalty of death if need be, the trial court properly exercised its discretion in excusing Cramsey.

Cramsey's colloquy is similar to the colloquy in *Witt*, where the juror in *Witt* expressed concern over rendering a penalty of death twice before being excused. In this instance, Cramsey expressed concern over rendering the death penalty numerous times. Both colloquies express concern and hesitance over rendering a penalty of death, even being offered a chance to rehabilitate their response and voice a less hesitant answer. In excusing a juror, the trial court is entitled to a "presumption of correctness," and in this instance, the Court believes the trial court acted properly as Cramsey voiced his hesitation in rendering a penalty of death numerous times. The trial court had an opportunity to analyze Cramsey's words and body language live, something this Court does not have the luxury to do so. Thus, dismissing Lamar Cramsey from

serving on Robinson's jury was proper as his views would prevent or substantially impair the performance of his duties in accordance with his instructions and his oath. The standard is a presumption of correctness, and the trial court was correct.

### iii.    Deanna Robinson's Colloquy

Deanna's colloquy is as follows:

[Q. Prosecutor:] Okay. As a juror, you would have to deliberate with other jurors to decide guilt or innocence, and, also, possibly the penalty as well.  And let me just move onto that for a moment. Would you, as a juror, and you've indicated some hesitancy about making a decision, would you be able to return a verdict of murder in the first degree if the evidence indicated that that was the appropriate verdict?

[A:] Yes. I think I could do that.

[Q:] Okay. But –

[A:] I don't know if this is another question or not, but the death penalty is something I have a problem with.

[Q:] Okay. Let's explore that for a moment. In Pennsylvania, if a jury returns a verdict of murder in the first degree, they decide the penalty.

[A:] The jury?

[Q:] The jury does.

[A:] All right.

[Q:] Either death or life in prison. Would you be able to do that? And let me just ask it this way.

Do you have any religious, moral or philosophical beliefs that would prevent you from imposing the death penalty?

[A:] Yes.

[Q:] Would you explain what those are?

[A:] From my religious background, I do not believe we, for whatever reason, that we should take a life for a life. However, I believe that something should be done if someone does and there are, I hope, things that you do instead of that.

[Q:] And trust me, I respect your beliefs. I'm going to ask you some questions about that. Would you state these are religious beliefs on your part?

[A:] Yes.

N.T. 10/17/94, at 1634-36.

Here, Deanna was not wrongfully excused from the jury. Deanna established her views in explicit fashion, revealing her disdain for the death penalty. When the Commonwealth questioned her views on the death penalty, she affirmed her disdain and stated it was because of her religious beliefs. Robinson fails to address Deanna's stance on the death penalty. Similar to Robinson's theory on Cramsey, Robinson's theory of Deanna not being able to "look" at Robinson is belied by the record. Deanna's views against the death penalty were reaffirmed by numerous questions by the Commonwealth. Accordingly, the trial court did not err in excusing Deanna for her beliefs on the death penalty.

Similar to *Witt*, the trial court correctly exercised its discretion and excused Deanna. Deanna's views were more explicit than the colloquy in *Witt*. Additionally, Deanna did not otherwise rehabilitate or change her views when the Commonwealth asked additional questions as to her views. Moreover, the trial court had the opportunity to observe Deanna's body language and tone, something this Court cannot do. Deanna was adamant in her views against the death penalty. The standard is a presumption of correctness, and the trial court correctly exercised its discretion in this instance as her views would prevent or substantially impair the performance of her duties in accordance with the instructions and her oath.

### iv.    Gail Kocher Colloquy

Robinson utilizes Gail Kocher to argue jurors did not face proper "life qualification" questions. The colloquy of Gail Kocher is as follows:

[Q. Defense:] The Judge is going to be -- Judge Diefenderfer is going to be instructing you on many different points and facets of the law.

Do you have any moral, religious or other obligations -- strike that -- any other feelings that you feel will get in the way of you following the Judge's instructions?

[A:]: No, I do not.

[Q:] Do you have any preconceived concepts of the innocence or guilt of a person depending on the type of crime they're charged with?

[A:] No.

[Q:] The Judge in this particular instance is going to be instructing you on first degree murder. First degree murder in Pennsylvania carries the possibility of a death sentence or life in prison.

After the fact phase of the trial, you may be required to deliberate regarding life imprisonment or the death of the defendant. Do you feel you will be able to do this?

[A:] Yes, I would.

[Q:] Do you have any moralistic, religious or other feelings regarding the death penalty?

[A:] No, I don't.

N.T. 10/10/1994, at 65-66.

Here, proper "life qualifying" questions were posed to the potential jury members. Robinson attempts to use the following question for Gail Kocher as evidence of improper life qualification questioning, "Do you feel that the death penalty should be imposed in every homicide case?" *Id*. at 66. However, in analyzing the entirety of her questioning, there were questions focused on Kocher's ability to apply the law and render a sentence within the guidelines, which included a life sentence. Specifically, some questions focused on the ability of Kocher to debate and issue either a life sentence or the death penalty. Moreover, in analyzing the colloquies of Cramer and Deanna as well, there were questions regarding the ability to impose a life sentence. The trial court did not exclude questioning on the ability of jurors to debate and

issue a sentence of life in prison. The trial court properly excluded jurors who exhibited a

potential bias in their decision-making process and this bias was revealed through the

questioning. The standard is a presumption of correctness, and the trial court correctly ruled

throughout this process. Thus, there were proper life qualification questions posed to the jury and

the PSC correctly ruled regarding this issue.

> **v.     The alleged exclusion of a significant percentage of jurors**

Here, upon review, there was no significant percentage of jurors excluded for their views

as Robinson alleges. The Court has reviewed the jurors Robinson takes issue with, and

additionally analyzed the entirety of the voir dire records and finds the records are satisfactory.

Proper questioning occurred throughout the voir dire process. Those whose views would

prejudice the process were properly excluded, such as Lamar Cramsey or Deanna Robinson.

Moreover, given the wide latitude trial courts have in the voir dire process, the trial court is in the

best position to make determinations regarding the voir dire process as opposed to the appellate

record. Thus, contrary to Robinson's assertion there was no significant percentage of jurors

excluded for their views. The standard is a presumption of correctness, and the trial court was

correct throughout the voir dire process.

## H.  Issue Eight

In Issue Eight, Robinson argues the trial court erred by not excusing two jurors, Lynn

Furr and Susan Rosen, for cause due to their bias against Robinson conveyed through comments

made during the voir dire process. The PSC addressed the matter as follows:

> Appellant additionally maintains that a new trial should be granted because he was
> forced to use peremptory challenges to strike venire persons, who should have been
> excused "for cause," and he exhausted his peremptory challenges before the jury
> was seated. Specifically, Appellant alleges that . . . . Lynn Furr (Furr) was not
> allowed to be excused "for cause," although she had seen media reports concerning
> the case; had a child, who was a carrier for the Morning Call (as was Schmoyer);

knew pastors at the church attended by Schmoyer; and doubted her ability to remain impartial; . . . . Susan Rosen (Rosen) was not allowed to be excused "for cause," although she was a therapist treating rape victims and indicated it would be difficult for her to remain impartial[.]

. . . .

Appellant is correct in pointing out that Furr had seen media reports concerning the case; had a child, who was a carrier for the Morning Call (as was Schmoyer); and knew the pastors at the church attended by Schmoyer. However, none of these observations offers much assistance to his cause.

Initially, we note that mere exposure to media reports does not render a prospective venire person unable to sit on the jury. *See Commonwealth v. McGrew*, 100 A.2d 467, 470 (1953) (observing that "[t]he fact that a juror has read or heard about a case and has an impression or an opinion, or a prejudice is not ground for rejection for cause if he testifies and the Court believes that his opinion is not fixed and that he can and will make up his mind solely from the evidence which will be presented at the trial of the case").

Admittedly, Furr stated that she had an "emotional response" to what happened to Schmoyer, who was a Morning Call carrier, because her son was once a carrier for this paper and she worried about him. N.T., 10/12/1994, pp. 871, 881. However, Furr testified that she did not have a fixed opinion about Appellant's guilt or innocence. *Id*. at 872–73, 883. She also later stated: "I don't think that I have reacted differently or with more of a fixed opinion than any other parent" and further characterized her response to the Schmoyer homicide as a "reaction . . . much the same as any parents would be." *Id*. at 883.

Although Furr acknowledged knowing the pastors at the church attended by Schmoyer, who were also involved in Schmoyer's funeral service, she testified to having "no personal involvement" in the matter. N.T., 10/12/1994, p. 884. We fail to see how this association amounts to "a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses" to provide a basis for disqualification "for cause." *Colson*, 490 A.2d at 818.

Finally, citing to the transcript of the voir dire, Appellant argues that Furr questioned her own ability to remain impartial. *See* Brief for Appellant, p. 50. This is simply not the case. Rather, Appellant is mischaracterizing the record— Furr did not express concerns about her ability to remain impartial; she testified that she "would not react favorably to graphic photographs of murdered persons" and "would [likely] have an emotional response to that." N.T., 10/12/1994, p. 893. As the trial court observed, "[Furr also] stated that [despite the graphic photographs] she would . . . try to focus on the information and weigh it fairly and that she could not imagine that a possible 'emotional reaction to graphic details' of the

photographs would be very uncommon." Trial Court Opinion, p. 24; N.T., 10/12/1994, p. 894.

. . . .

With respect to Rosen, Appellant contends that, because this venire person and her mother worked as therapists, who treated rape victims, she had "situational affinity" that would "cloud her judgment and undermine her impartiality." Brief for Appellant, p. 52. Again, however, Appellant is overly selective in referring to the answers given by Rosen.

It is true that Rosen's immediate reaction to the news accounts was that Appellant was guilty. N.T., 10/18/1994, pp. 1968–70. Rosen also stated that because of her work with women who have been raped and sexually abused, "it might be hard for me to stay impartial." *Id*. at 1972–73 (emphasis supplied). Nonetheless, Rosen also testified that she would be able to follow the judge's instructions regarding burden of proof even through she already had a fixed opinion that Appellant was guilty and that the penalty phase of the trial would not affect her ability to look at and weigh all of the facts and make a determination of guilt or innocence. *Id*. at 1972; 1974–75. After the prosecutor and trial counsel explained the nature of the penalty phase proceedings, Rosen testified that she could impose a life sentence, if the mitigating circumstances outweighed the aggravating circumstances. *Id*. at 1980–81. Finally, when counsel for defense asked Rosen whether she would be able to put aside her fixed opinion about Appellant's guilt and "be able to fair and impartially judge the testimony that's coming in and render a fair and impartial verdict," Rosen responded as follows:

I think in listening to the media, everyone always has a fixed opinion listening to what's on the news. So when we do come in here, I think we would have to realize it would all be different. You would be kind of starting fresh. But, so, see, I think I know what the right thing is to do. So I think I probably would do it. I would do it, I mean.

*Id*. at 1989–90. Hence, a fair reading of the voir dire transcript reveals that Rosen did not indicate a categorical bias as a result of her or her mother's profession and shows that she could put aside her personal views and be an objective juror.

*Robinson I*, 581 Pa. at 203-10.

The applicable federal law guarantees every criminal defendant "the right to a . . . trial [ ] by an impartial jury." U.S. Const. Amend. VI. Complementing this right are the protections afforded by the Due Process Clause, which require "that, if a jury is to be provided [ ], regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the

extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992).

Voir dire examination serves to protect the right to an impartial jury by providing the parties a

means of uncovering juror bias. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143–44 (1994).

Bias that emerges in response to voir dire questioning can lead to excusal of a juror for cause or

may facilitate the parties' exercise of peremptory strikes. *McDonough Power Equip., Inc. v.

Greenwood*, 464 U.S. 548, 554 (1984). Courts have distinguished between two types of

challenges for cause: those based on actual bias, and those based on implied bias. *U.S. v.

Mitchell*, 690 F.3d 137, 142 (3rd Cir. 2012).

 The doctrine of implied bias is rooted in the recognition that certain narrowly-drawn

classes of jurors are highly unlikely, on average, to be able to render impartial jury service

despite their assurances to the contrary. *Mitchell*, 690 F.3d at 142. Because implied bias deals in

categories prescribed by law, the question whether a juror's bias may be implied is a legal

question, not a matter of discretion for the trial court. *Id*. For instance, the Third Circuit

explained that a victim of a crime might insist that she can serve as an impartial juror in her own

assailant's trial, but the law imputes bias to her categorically because the average person in her

situation likely would harbor prejudice, consciously or unconsciously, which mandates her

excusal for cause. *Id*. Some other examples include a juror being an actual employee of the

prosecuting agency, the juror being a close relative of one of the participants in the trial or the

criminal transaction, or the juror being a witness or somehow involved in the criminal

transaction. *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring). Notably, in

these instances the juror is put in a potentially compromising situation. *Id*. at 217. However, the

Supreme Court noted that due process does not require a new trial every time a juror has been

placed in a potentially compromising situation. *Id*. Due process means a jury capable and willing

to decide the case solely on the evidence before it, and a trial judge to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. *Id*.

The test for implied bias focuses on "whether an average person in the position of the juror in controversy would be prejudiced." *Mitchell*, 690 F. 3d at 142. Courts look to the facts underlying the alleged bias to determine if they would create in a juror an inherent risk of substantial emotional involvement. *Id*. at 143. The Third Circuit has affirmed that implied bias remains available, in appropriate circumstances, to disqualify jurors whose connection with the litigation makes it highly unlikely that they can remain impartial adjudicators. *Id*. at 144.

Next, actual bias, also known as bias in fact, is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Mitchell*, 690 F.3d at 142. To "rebut the presumption of a prospective juror's impartiality," it is not enough for a defendant to point to "the mere existence of any preconceived notion as to the guilt or innocence of the accused." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). Rather, a juror is deemed impartial if he can set aside his impression or opinion and render a verdict based on the evidence presented in court. *Id*. A juror's expression of doubt about his own impartiality does not necessarily lead to a finding of actual bias. *United States v. Meehan*, 741 F. App'x 864, 872 (3rd Cir. 2018) (citing *Hughes v. United States*, 258 F.3d 453, 458 (6th Cir. 2001)). For instance, the Supreme Court upheld the impaneling of jurors who, during voir dire, expressed doubts, or even disclaimed outright their ability to be impartial. *See Patton v. Yount*, 467 U.S. 1025, 1032 (1984). The Third Circuit gives broad latitude to the impaneling judge to determine whether to excuse a prospective juror based on actual bias because the impaneling judge "possesses a superior capacity to observe the demeanor of prospective jurors and to assess their credibility." *Mitchell*, 690 F.3d at 142. Now, the Court will address the specific individuals Robinson identified.

### i.     Lynn Furr's Colloquy

The colloquy of Lynn Furr is as follows:

[Q.  Defense Attorney:] Okay. Let's leave that. I'm satisfied with that. Now, with regards to what you had indicated to Judge Diefenderfer when he made his introductory remarks and questions, you had stated that you do have a fixed opinion as to Mr. Robinson's guilt or innocence.

[A:] I would not call it an opinion. I would call it an emotional response to the case because I was the parent-- I am still the parent, though the child is no longer a child and no longer delivering  the paper -- but I think that there is a reaction among people who have had children out on the streets delivering papers in the early morning hours. It makes one form an opinion.

. . . .

[Q:] With regards to your -- now, you have an emotional response. Does that emotional response in any way interfere with your ability to render a decision in Mr. Robinson's case regarding his guilt or innocence?

[A:] That is a very difficult question to answer.

[THE COURT:]  Well, I think she did answer that.

[A:]  I have tried to  answer it to the best of my ability.

[Defense Counsel:] Yes. I was confused regarding her answer to it because it seemed to me that she –

[THE COURT:]  Well, she said that she doesn't have a completely fixed opinion and it would be a difficult thing to surmise or conjecture, I guess. I don't know what word exactly Mrs. Furr used to answer that question, if she were put into that spot; but the point is, she doesn't have a completely fixed opinion relative to the guilt or innocence of the defendant because of that. I don't want to put words in your mouth.

[A.] That's correct. I think my reaction to this is much the same as any parents would be.

[THE COURT:] I think so.

[Defense Counsel:] Okay.

[A:] I don't think that I have reacted differently or with more of a fixed opinion than any other parent.

[THE COURT:] And that's not an abnormal reaction as to what occurred to the victim.

[A:] um-hum.

[THE COURT:] But as to an opinion as to the guilt or innocence of Mr. Robinson, you're not solid on that?

[A:] No.

[THE COURT:] I think she answered that.

N.T. 10/12/1994, at 881-83

Here, Lynn Furr exhibited neither implied bias or actual bias. As to implied bias, Furr was not the victim of one of the alleged crimes, not a witness, and did not have a family member or close friend testifying. She did not exhibit any category of implied bias. Moreover, Furr did not display actual bias. While Furr hesitated regarding the emotional factor of Robinson's crimes, she stated she had no opinion as to the guilt or innocence of Robinson. Thus, she would have been a juror with an open mind. Her "emotional response" was due to having a child with a newspaper route, similar to one of the victims in this case, but she stated numerous times she would have been a juror without a fixed opinion as to the guilt or innocence of Robinson. Furr's response passes muster under existing Third Circuit precedent. *See Meehan*, 741 F. App'x at 872. The trial court had the ability to analyze Furr's answers, tone, and body language at the time of the responses and felt Furr's answers were not worthy of an excusal. The trial court did not abuse its discretion in doing so as it has wide latitude in analyzing jurors for actual bias. This Court agrees as Furr stated she did not have an opinion as to the guilt or innocence of Robinson numerous times. Accordingly, the trial court did not abuse its discretion as it used its "superior capacity" to analyze Furr's remarks and this determination was not contrary to clearly established federal law.

### ii.    Susan Rosen's Colloquy

Susan Rosen's colloquy is as follows:

[Q. Defense Counsel:] You indicated in question it would be difficult for you to be objective.

[A:] Um-hum.

[Q:]  And could you explain that and elaborate on that a little bit please?

[A:] Okay. I guess, just through my experiences of, you know, living in Philly, sometimes, you know, you hear all this stuff about murders, and my, I don't know, I believe in the death penalty. So I think that if someone is going to take someone else's life, then, I'm a strong believer in the death penalty. So I don't know if that would be a problem here.

. . . . .

[Q:] The Judge is going to instruct you regarding burden of proof, weight of the evidence, and he's going to say something to the effect that the Commonwealth has the burden of proof.

They have to prove their case beyond a reasonable doubt. And he's also going to -- he also may instruct you that the defendant, in a criminal case, does not have to take the witness stand. He doesn't have to say anything and he has no burden at all, meaning, he doesn't have to prove anything.

Will you be able to follow the Judge's instructions regarding the burden of proof?

[A:] Yes.

[Q:] Even though you already have a fixed opinion that Mr. Robinson is guilty?

[A:] (Nodded affirmatively.)

[Q:] Will you be able to put that out of your mind and follow what Judge Young will instruct you?

[A:] I think, until -- actually, I would be able to. I don't know if my subjectivity would come into it. I really can't answer that question.

. . . .

[Q:] If I confused you, let me put it to you-- let me try this way. Knowing that you'll have to deliberate on life or death if you find the individual guilty

[A:] Um-hum.

[Q:] -- will that in any way affect your ability to look at and weigh all of the facts and make a determination of guilt or innocence?

[A:] No.

. . . .

[Q:] Would you be able to put aside your fixed opinion as to Mr. Robinson's guilt and be able to fair and impartially judge the testimony that's coming in and render a fair and impartial verdict?

[A:] I think in listening to the media, everyone always has a fixed opinion listening to what's on the news. So when we do come in here, I think we would have to realize it would all be different You would be kind of starting fresh. But, so, see, I think I know what the right thing is to do. So I think I probably would do it. I would do it, I mean.

N.T. 10/18/1994, at 1967-89.

Here, Rosen exhibits no issues with implicit bias or actual bias. As to implicit bias, Rosen does not have a family member of close friend working with the Commonwealth or Robinson, did not witness the crime or otherwise be connected to the crimes. Furthermore, as to actual bias, Rosen's statement of Robinson's guilt is insufficient per Supreme Court precedent. Rosen stated, at trial, her views would be starting fresh because it is a different environment. She additionally stated her views would not affect the trial court's instructions to the guilt or innocence of Robinson. These statements are sufficient to rebut any implication of actual bias asserted by Robinson, notwithstanding the fact Rosen stated she is a "strong believer" in the death penalty. See *Irvin*, 366 U.S. at 723. The trial court had the ability to analyze the statements and demeanor of Rosen at the time, this Court does not have the luxury of doing so. Thus, the trial court did not abuse its discretion in this instance as Rosen stated her intention to start fresh and be a juror with an open mind.

I.   **Issue Nine**

In Issue Nine, Robinson alleges he was denied a jury pool that was representative of his

community and that his trial counsel were ineffective for failing to object to this lack of

representation.  Robinson further alleges that PCRA counsel, when presenting this claim on

collateral review, was ineffective for failing to obtain evidence showing the racial composition of

Lehigh County and of the jury pool.

The Sixth Amendment to the United States Constitution provides criminal defendants

with the right to a jury drawn from a fair cross section of the community: "In all criminal

prosecutions, the accused shall enjoy the right to a . . . trial [ ] by an impartial jury of the State

and district wherein the crime shall have been committed . . . ." U.S. Const. Amend. VI. "The

American concept of the jury trial contemplates a jury drawn from a fair cross section of the

community . . . It is part of the established tradition in the use of juries as instruments of public

justice that the jury be a body truly representative of the community." *Taylor v. Louisiana*, 419

U.S. 522, 527 (1975) (internal quotation marks omitted).

However, "[t]his requirement is not without substantial limits – it does not guarantee that

juries be 'of any particular composition.'" *United States v. Weaver*, 267 F.3d 231, 236 (3d Cir.

2001) (citing *Taylor*, 419 U.S. at 538).  What is required is that "the jury wheels, pools of names,

panels, or venires from which juries are drawn must not systematically exclude distinctive

groups in the community and thereby fail to be reasonably representative thereof." *Taylor*, 419

U.S. at 538. The purposes of the fair cross section requirement include avoiding "the possibility

that the composition of the juries would be arbitrarily skewed in such a way as to deny criminal

defendants the benefit of the common-sense judgment of the community" and avoiding the

"appearance of unfairness" that would result from excluding "large groups of individuals, not on

the basis of their ability to serve as jurors, but on the basis of some immutable characteristic such as race, gender or ethnic background." *Weaver*, 267 F.2d at 236 (quoting *Lockhart v. McCree*, 476 U.S. 162, 175 (1986)).

The United States Supreme Court set forth the elements of a fair cross section claim in *Duren v. Missouri*, 439 U.S. 357 (1979). To establish such a claim, the defendant must demonstrate (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in jury venires is not "fair and reasonable" in relation to the number of such persons in the community; and (3) the under representation is caused by the "systematic exclusion of the group in the jury selection process." *Id*. at 364. A defendant need not establish discriminatory intent. *See id*. at 368 n. 26.  Once a defendant has made a prima facie showing of a fair cross section claim, the burden shifts to the government to justify "this infringement [of Sixth Amendment rights] by showing attainment of a fair cross section to be incompatible with a significant state interest." *Id*. at 368.

The Court is mindful that the Pennsylvania Supreme Court has rejected various attacks on the basis that African–Americans were under-represented in the racial composition of a jury panel drawn from voter registrations lists. *See Commonwealth v. Bridges*, 757 A.2d 859, 868 (Pa. 2000); *Commonwealth v. Henry*, 569 A.2d 929, 933 (Pa. 1990); *See also Ramseur v. Beyer*, 983 F.2d 1215, 1235 (3d Cir. 1992) (holding that the defendant had not made a prima facie showing that the juror source lists, consisting of the names found on the Department of Motor Vehicles licensed driver list and the voter registration list, used in Essex County violated his rights under the Equal Protection Clause of the Fourteenth Amendment, nor his Sixth Amendment right to trial by a fair cross-section of the community). Likewise, the reasoning and holdings of those cases have been extended to approve the usage of driver's license lists for purposes of jury

selection. *See Commonwealth v. Johnson*, 815 A.2d 563, 575 (Pa. 2002) (plurality) ("Absent

some showing that driver's license selection procedures are inherently biased, [the defendant] has

failed to distinguish jury pool lists derived from voter registration records from those derived

from driver's license registration lists."); *See also United States v. Weaver*, 267 F.3d 231, 237 (3d

Cir. 2001) (rejecting the defendant's fair-cross section challenge to the plan approved by the

Western District of Pennsylvania, which employs voter registration lists as the exclusive source

from which it summons potential jurors for service).

The PSC addressed the issue as follows:

Appellant argues that his trial counsel was ineffective for failing to ask the trial
court to modify the procedures employed in Lehigh County to select members of
the pool of jurors available to try this case. He points out that in Lehigh County trial
jurors are selected from lists purchased from the Pennsylvania Department of
Transportation (PennDOT) that contain names of residents of the county, who are
registered with PennDOT. Appellant maintains that this procedure is "unlawful,
improper, and violates [his] legal and constitutional rights" because: (1) "it is likely
to result in juries unrepresentative of a cross section of the community, and . . .
ha[s] continuously failed to represent certain identifiable population groups over an
extended period of time;" (2) "the process systematically excludes youthful, elderly
and disabled citizens, because the percentages of youthful, elderly and disabled
voters is substantially smaller than the percentages of youthful, elderly and disabled
citizens in the population of the county;" (3) " the process systematically excludes
large numbers of non-caucasian population from jury service, because the
percentage of non-caucasians driving or otherwise registered with [PennDOT] is
substantially smaller than the percentage of non-caucasians in the population of the
county;" (4) "the process systematically excludes large numbers of youthful,
elderly and disabled citizens from jury service, because the percentage of youthful,
elderly and disabled citizens driving or otherwise registered with [PennDOT] is
substantially smaller than the percentage of non-caucasians in the population of the
county;" and (5) "[t]he system violates the statutory requirements for the selection
of trial jurors." Brief for Appellant, pp. 18–19.

The applicable Pennsylvania statute, entitled "Selection of prospective jurors,"
provides in relevant part:

At least annually the jury selection commission shall prepare a master list of
prospective jurors. The list shall contain all voter registration lists for the county,
which lists may be incorporated by reference, or names from such other lists which
in the opinion of the commission will provide a number of names of prospective

jurors which is equal to or greater than the number of names contained in the voter registration list.

42 Pa.C.S. § 4521(a). We have held on numerous occasions that to establish a prima facie violation of the requirement that a jury array fairly represent the community, the defendant must prove that: (1) the group allegedly excluded a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such people in the community; and (3) this under-representation is due to systematic exclusion of the group in the jury selection process. *See Commonwealth v. (Raymond) Johnson*, 838 A.2d 663, 682 (2003), *cert. denied*, 543 U.S. 1008 (2004); *Commonwealth v. (Roderick) Johnson*, 815 A.2d 563, 575 (2002). For purposes of this analysis, "'[s]ystematic' means caused by or inherent in the system by which juries were selected." *(Roderick) Johnson*, 815 A.2d at 575.

At the time of Appellant's trial, Lehigh County drew its jury pool from the list of licensed drivers in the county. See N.T., 10/19/1994, pp. 2329–58. Four years ago, in *Commonwealth v. Lopez*, 739 A.2d 485 (1999), *cert. denied*, 530 U.S. 1206 (2000), we addressed this method of jury selection in Lehigh County, finding it "statutorily permissible," *Lopez*, 739 A.2d at 494 n. 13, and see no reason to reconsider our decision. Additionally, despite his complicated argument, Appellant utterly fails to present even a semblance of statistical proof that the jury pool selection procedure utilized in Lehigh County unfairly misrepresents the number of non-caucasians, youthful, elderly, and disabled citizens in the community. Accordingly, Appellant has not established even a prima facie argument for purposes of this analysis, *see Lopez*, 739 A.2d at 495, and his ineffectiveness argument on this issue fails.

*Robinson I*, 581 Pa. at 198-200.

Robinson cites to cases from California, Arizona, and New York to support his theory that driver's license records systematically exclude African Americans and Latino Americans. However, as was explained to Robinson on appeal, the Pennsylvania Supreme Court has specifically found that Lehigh County's process of drawing its jury pool from the list of licensed drivers in the county does not unfairly misrepresent the community. *See Lopez*, 739 A.2d at 494. The court in *Robinson I* did not make an unreasonable application of state or federal law.

Moreover, Robinson's attempt to distinguish *Lopez* based on statistical evidence is unpersuasive. While Robinson correctly states African Americans and Latino Americans are

distinctive groups, he cannot establish the jury array unfairly represents the community.

Robinson complains that these groups were significantly underrepresented because African

Americans constituted only 1.3% of the panel and Latino Americans constituted less than 3%.[5]

However, Robinson ignores his own figures showing that African Americans represented only

2.3% of the total population in Lehigh County and Latino Americans represented 5.2% of the

total population.  When taking these percentages into account, there is an absolute disparity[6] of a

mere 1% for African Americans and only 1.9% for Latino Americans.  These percentages are

well below the absolute disparities deemed to show substantial underrepresentation.  *See*

*Ramseur*, 983 F.2d at 1232 ("Courts addressing the question of whether a given absolute

disparity constitutes 'substantial underrepresentation' have held that absolute disparities between

2.0% and 11.5% do not constitute substantial underrepresentation.").  Although the comparative

disparities,[7] 43.5% and 36.5% respectively, present a closer case, they are still below the

percentages courts have found impermissible.  *See id.* (determining that while the defendant's

evidence of a comparative disparity of about 40% was "borderline," is was "below the

percentage of 45.4% condemned in *Preston v. Mandeville* , 428 F.2d 1392 (5th Cir. 1970) and

close to the 42% comparative disparity found permissible in *Swain v. Alabama*, 380 U.S. 202 []

(1965)").

---

[5]     In reaching the percentage of Latino Americans, Robinson, counting four prospective
jurors, apparently does not count the one juror that was selected for another case.  In determining
whether Lehigh County systematically excluded this group, the prospective juror should not be
ignored.  Regardless, even if this prospective juror is not considered, the claim fails.

[6]     "Absolute disparity in the jury selection context is defined as the difference between the
percentage of a certain population group eligible for jury duty and the percentage of that group
who actually appear in the venire."  *Ramseur*, 983 F.2d at 1231.

[7]     "Comparative disparity is calculated by dividing the absolute disparity by the population
figure for a population group."  *Ramseur*, 983 F.2d at 1231.

Additionally, "[w]hen comparative disparity has been used, it has been emphasized that the significance of the figure is directly proportional to the size of the group relative to the general population, and thus is most useful when dealing with a group that comprises a large percentage of the population." *Weaver*, 267 F.3d at 242. Because the population percentages here, even when combined, represent only 7.5% of the population in Lehigh County and because absolute disparity is the "preferred method of analysis," Robinson has not shown that the jury selection process violated his constitutional rights. *See Weaver*, 267 F.3d at 242 (rejecting the defendant's fair cross section challenge despite the comparative disparities of 40.01% for African-Americans and 72.98% for Hispanics because they comprised such a small percentage of the population, and the absolute disparity figures of 1.23% and .71%, respectively, were low). The statistical evidence does not support Robinson's challenge to a fair cross-section of the jury and his claim is denied.

### iii.   Ineffective assistance of trial and PCRA counsel

Robinson's trial counsel was not ineffective for failing to object to the lack of representation of African Americans and Latino Americans on the jury panel. For the reasons discussed in the preceding section, any objection by trial counsel would have been futile. *See Commonwealth v. Bryant*, 579 A.2d 726, 742 (Pa. 2004) (stating, "[t]rial counsel cannot be held to be ineffective for failing to take futile actions or raise a meritless claim"). Robinson's trial counsel cannot be held to be ineffective for failing to raise a futile objection. Accordingly, trial counsel were not ineffective for failing to raise an objection regarding the diversity of the jury panel.

Next, Robinson asserts his PCRA counsel was ineffective for failing to present statistical evidence to support the fair-cross section claim. However, because the statistical evidence does

not support the meritless claim, he was not prejudiced by PCRA counsel's allegedly deficient conduct.

**J.  Issue Ten**

In Issue Ten, Robinson argues that the trial court improperly admitted evidence of prior bad acts. Specifically, Robinson alleges the evidence regarding his attack on Sam-Cali, and his subsequent arrest, was graphic, inflammatory, and unduly prejudicial constituting a violation of his constitutional rights. Robinson asserts this evidence prejudiced him not only at trial, but also at sentencing. He lastly asserts his trial court and PCRA counsel were ineffective.

To the extent that Robinson is raising a state-law evidentiary issue, his claim is not cognizable in a federal habeas proceeding. *See Keller v. Larkins*, 251 F.3d 408, 416 n.2 (3d Cir. 2001). "A federal habeas court is limited to deciding whether the admission of the evidence rose to the level of a due process violation." *Id*. In analyzing this, "a reviewing court must examine the relative probative and prejudicial value of evidence to determine whether its admission violated defendant's right to a fair trial." *Lesko v. Owens*, 881 F.2d 44, 51 (3d Cir. 1989). Robinson has not advanced any basis on which to conclude that the admission of evidence of a prior conviction amounted to a denial of due process. *See Allen v. Superintendent Waymart SCI*, 703 F. App'x 91, 97 (3d Cir. 2017) (citing *Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991) (recognizing that no clearly-established Supreme Court precedent establishes that admission of prior bad acts evidence violates due process)).[8]

Nonetheless, Pennsylvania state law governs the admissibility of prior bad acts as follows:

(b) Crimes, Wrongs, or Other Acts.

---

[8]    Similarly, in his brief to the PSC on direct appeal, Robinson raised only an allegation of error under state law.  *See* Petitioner's Brief at 57-61. Any attempt to present the claim as an allegation of error under the due process clause would be procedurally defaulted and unreviewable.

(1) Prohibited uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(1)-(2).

With respect to Rule 404(b), courts in Pennsylvania have explained: "[E]vidence of prior crimes is not admissible for the sole purpose of demonstrating a criminal defendant's propensity to commit crimes." *Commonwealth v. Melendez–Rodriguez*, 856 A.2d 1278, 1283 (Pa. Super. 2004). Nevertheless, "[e]vidence may be admissible in certain circumstances where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character." *Id*. Specifically, other crimes evidence is admissible if offered for a non-propensity purpose, such as proof of an actor's knowledge, plan, motive, identity, or absence of mistake or accident. *Commonwealth v. Chmiel*, 889 A.2d 501 (Pa. 2005). When offered for a legitimate purpose, evidence of prior crimes is admissible if its probative value outweighs its potential for unfair prejudice. *Commonwealth v. Hairston*, 84 A.3d 657 (Pa. 2014).

The PSC addressed the issue as follows:

On appeal, Appellant presents a number of claims relating to Denise Sam–Cali, who testified about her assault in the early morning hours of June 29, 1993, the subsequent break-ins at her house, and Appellant's apprehension. Initially, he argues that the trial court erred in allowing Sam–Cali to testify, because this allowed evidence of prior bad acts and uncharged criminal conduct to be introduced to the jury. Appellant maintains that Sam–Cali was not a witness to any of the charged offenses and, yet, provided "lurid and inflammatory" testimony, linking Appellant to these incidents. Brief for Appellant, p. 56. Appellant also claims that his counsel was ineffective for failing to: (1) object to this testimony; and (2) request a limiting instruction in relation to this evidence.

Initially, we note that Sam–Cali's testimony is admissible under the same principles supporting the joinder of the three homicides, i.e., to establish the identity of the perpetrator, his motive, intent, and a common criminal scheme. *See Elliott*, *supra*; *Miller*, *supra*; *Hughes*, *supra*. Furthermore, such testimony would be allowed under the "res gestae" exception to the rule against admission of evidence of prior crimes. As we explained in *Commonwealth v. Lark* (*Direct Appeal*), 518 Pa. 290 (1988)

Evidence of distinct crimes are not admissible against a defendant being prosecuted for another crime solely to show his bad character and his propensity for committing criminal acts. However, evidence of other crimes and/or violent acts may be admissible in special circumstances where the evidence is relevant for some other legitimate purpose and not merely to prejudice the defendant by showing him to be a person of bad character. . . . [One such] special circumstance where evidence of other crimes may be relevant and admissible is where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. This special circumstance, sometimes referred to as the res gestae exception to the general proscription against evidence of other crimes, is also known as the complete story rationale, i.e., evidence of other criminal acts is admissible to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.

*Id*. at 497 (emphasis in original, internal citations omitted). In the present case, the incidents at the Sam–Cali residence are intricately interwoven with the three homicides in question. The initial assault on Sam–Cali took place approximately two weeks before the Fortney homicide and Sam–Cali's testimony provided the jury with a "complete story" of Appellant's criminal spree from the Burghardt homicide in August of 1992 to Appellant's capture in July of 1993. In sum, as the trial court explained, "Sam–Cali's testimony was not offered merely to indicate [Appellant]'s propensity to commit similar crimes . . . but to show he committed these crimes charged, how he committed them, why he committed them and the circumstances of his apprehension." Trial Court Opinion, p. 32.

We also reject the ineffectiveness arguments raised by Appellant in relation to this substantive claim. First, Appellant's counsel objected to Sam–Cali's testimony on several occasions, on the basis that it was prejudicial, because it allowed the jury to consider evidence of other crimes perpetrated by Appellant. *See* N.T., 11/3/1994, pp. 1918–21, 1965. Second, while counsel for Appellant did not ask for a limiting instruction in relation to Sam–Cali's testimony, such request would have been (at best) redundant, as it appears that the trial court asked if such an instruction was required and, after receiving an affirmative response from the prosecutor, in fact, instructed the jury as to the limited purpose of this evidence. *See* N.T., 11/3/1994, pp. 1919–21, 1965–66. The trial court again cautioned the jurors about the limited use of Sam–Cali's testimony during the final jury instructions. *See* N.T., 11/8/1994, pp. 2279–2280.

*Robinson I*, 581 Pa. at 215-16.

Here, to the extent Robinson argues the trial court improperly admitted his prior bad acts testimony, it is outside the analysis of this Court. However, if Robinson argues this admission violated his due process, there is no Third Circuit precedent which supports his proposition. Robinson addresses his argument on the prejudicial nature of this admission, focusing on the evidentiary issue rather than the due process issue. Assuming arguendo of the evidentiary issue, this Court must note the substantial similarities between prior bad act evidences at the federal and Pennsylvania level. Nonetheless, no due process violation occurred with the admission of this information. The testimony highlighted the similarity of the allegations against Robinson, such as the identity of Robinson, his motive, intent, and the common criminal scheme. This testimony was not so dissimilar as to be so prejudicial that it denied Robinson's right to a fair trial.

The cases Robinson cites are inapposite in light of Third Circuit precedent. *See*, *e.g.*, *Minett v. Hendricks*, 135 F. App'x 547, 553 (3d Cir. 2005) (rejecting claim that admission of "other crimes" evidence is contrary to or an unreasonable application of clearly established Supreme Court precedent); *see also Charlton v. Franklin*, 503 F.3d 1112, 1115 (10th Cir. 2007) (state court's admission of evidence of petitioner's prior bad acts did not render trial fundamentally unfair or warrant habeas relief). Robinsons case law fails to address this point. He fails to address this because there is no precedent to do so. Notwithstanding Robinson's failure, his claim cannot proceed as there was no due process violation.

### i.   Ineffective assistance of counsel

Here, Robinson's trial counsel was not ineffective. Contrary to Robinson's argument, his trial counsel did object to the prior bad acts evidence. As the PSC noted, Robinson's trial counsel objected to the testimony numerous times. Therefore, Robinson's trial counsel performed its duty

by objecting to the testimony. Moreover, as the PSC correctly notes, the trial court inquired about an instruction regarding the testimony, thus making any request by trial counsel redundant. The request by trial counsel not only would have been redundant, but also futile in light of the trial court's request. Robinson attempts to argue what already occurred at his trial, an objection and a limiting instruction. Accordingly, Robinson's trial counsel was not ineffective during this portion of the trial.

Robinson's argument that appellate counsel was ineffective must also be rejected. As is discussed above, there is no merit to the claim presented here.  The trial court admitted the evidence due to the similarities between the issues. As the state court concluded, this decision was in accord with state law.  Further, the admission did not violate Robinson's due process rights. Accordingly, Robinson has not demonstrated that prior counsel were ineffective.

**K.  Issue Eleven**

In Issue Eleven, Robinson asserts a variety of statements he alleges are prosecutorial misconduct. He states the Commonwealth inflamed the passions of the jury during trial and sentencing by calling him a predator, the Commonwealth improperly placed the burden of proof on him in their argument, and the Commonwealth violated his Fifth Amendment right to remain silent in their argument.

The PSC addressed the issue as follows:

Appellant complains that during his opening statement to the jury, the prosecutor referred to Appellant as a "predator," N.T., 10/24/1994, p. 57, and asked the jury not "to lose sight of the ferocity of what was involved here, of the violence, of the intent to kill," N.T., 10/24/1994, p. 59.

The Webster's Third New International Dictionary defines "predator" as, inter alia, "one that prays, destroys, or devours" and "predatory" as, inter alia, "relating to, or practicing plunder, pillage, or rapine[;] using violence or robbery for aggrandizement[;] destructive, harmful, injurious." Webster's Third New International Dictionary of the English Language Unabridged, p. 1785. These

definitions are entirely consistent with the way the Commonwealth portrayed Appellant to the jury—a calculating attacker, who prowled the East Allentown area, and killed his victims with vicious ferocity.

Moreover, the intent of the perpetrator, which the prosecutor's statement emphasized, is an essential element that the Commonwealth must prove to establish first-degree murder. *See* 18 Pa.C.S. § 2502(a) (defining "murder of the first degree" as "[a] criminal homicide . . . committed by an intentional killing") (emphasis supplied); *also see* 18 Pa.C.S. § 2501(a) (stating that "[a] person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being") (emphasis supplied). Thus, it was entirely appropriate for the prosecutor to focus the jury's attention on this aspect of the case.

As reflected above, we believe that these statements were within the context of the evidence presented by the Commonwealth. Therefore, this Court finds no misconduct on the part of the prosecutor and rejects Appellant's claim that his counsel was ineffective for failing to object to these comments.

### ii. Closing Statement

Appellant argues that the prosecutor's guilt phase summation was inflammatory because he: (1) referred to Appellant as a "territorial predator," N.T., 11/8/1994, p. 2246; (2) stated that "only four people have seen [Appellant's] behavior and action and only one of them is alive to tell you about her experiences with him," N.T., 11/8/1994, p. 2247; and (3) told the jury that "[i]t's time to put the nightmare on the east side to bed. It's time to do that by returning verdicts of guilty, guilty, guilty." N.T., 11/8/1994, p. 2272. Additionally, Appellant contends that the prosecutor improperly commented upon his failure to produce evidence, when, he stated as follows:

Do you think . . . if they had somebody who could refute the Commonwealth's witnesses, we would not have seen that witness from the witness stand?

N.T., 11/8/1994, p. 2248; *see also* N.T., 11/8/1994, p. 2265. Appellant asserts that, by way of this comment, the prosecutor suggested that the defense had some burden of proof in the case.

Again, the characterization of Appellant as a "territorial predator" is entirely consistent with the case presented by the prosecutor, who maintained that Appellant targeted a certain type of victims within a specific geographical area. Similarly, the comment that only one of Appellant's victims was still alive was appropriate, in light of the Commonwealth (1) providing testimony that Appellant attacked Burghardt, Schmoyer, Fortney, and Sam–Cali; (2) offering proof that Appellant was responsible for the killings of Burghardt, Schmoyer, and Fortney; and (3) presenting the testimony of Sam–Cali as the only victim who survived her encounter with Appellant. Furthermore, the prosecutor's reference to "the

nightmare on the east side," falls squarely within the gamut of permissible oratorical flare.

Finally, a reading of the entire guilt phase summation by the prosecutor does not disclose any unfair suggestion that Appellant bore some burden of proof in the case. Indeed, the statement cited by Appellant refers to the fact that the DNA evidence presented by the Commonwealth via testimony of several expert witnesses was uncontradicted by any defense witnesses, which is fully consistent with the case presented to the jurors. Furthermore, the trial court instructed the jury concerning not making an adverse inference because Appellant did not testify and that, as a matter of law, the defendant is not required to produce any evidence to establish his innocence. *See* N.T., 11/8/1994, pp. 2280–82, 2314. Accordingly, we reject the prosecutorial misconduct arguments and the corresponding counsel ineffectiveness claims asserted by Appellant concerning the prosecutor's guilt phase closing statement.

*Robinson I*, 581 Pa. at 250-53.

### i.     Statements at trial and sentencing

Robinson asserts the Commonwealth's statements during the trial and guilt phase improperly inflamed the passions of the jurors and violated his due process. During the trial phase, the Commonwealth called Robinson a, "predator," NT 10/24/1994, at 57, instructed the jury to "never lose sight of the ferocity of what was involved here, of the violence. . . ," *id.* at 59, and called Robinson a "territorial predator" with "[w]ickedness, cruelty, evil. Wickedness of heart. Cruelty of disposition. Cruelty of mind. That was his intent. That was his motivation. It's difficult for us to fathom." NT 11/9/94, at 2246. Robinson further argues while the Commonwealth couched their argument in terms of intent, the message to the jury was that he was evil, cruel, and wicked, and was guilty because of his flawed character. He then asserts that the Commonwealth continued this argument by connecting the attack on Sam-Cali with his "predator" theme, with the Commonwealth stating, "[a]nd it also explains to you why, as a predatorial predator, he had to do away with Denise Sam-Cali." *Id.* at 2262.

Moreover, during the guilt phase, Robinson argues the Commonwealth told the jury that he had failed to express remorse, had failed to show sympathy and mercy, and was depraved. *Id*. at 2707-08. Lastly, Robinson asserts the Commonwealth also improperly suggested that he might be a danger to the members of the jury or the general public, stating, "Yes, within his household he may be fine, but when he gets out, ladies and gentlemen, watch out if you are not in his circle of friends, or his circle of family; watch out." *Id*. at 2710.

The prosecutor is entitled to considerable latitude to argue the evidence and reasonable inferences that can be drawn from that evidence. *See United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991) (citing *United States v. Scarfo*, 685 F.2d 842, 849 (3d Cir. 1982)). Moreover, the prosecution "may employ oratorical flair arguing its version of the case to the jury." *Henry v. Horn*, 218 F. Supp. 2d 671, 705 (E.D. Pa. 2002).

The Supreme Court has held that federal habeas relief may be granted when the "prosecutorial misconduct may 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The Court further opined that for due process to have been offended, "the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Id*. (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976))). *See also Ramseur v. Beyer*, 983 F.2d 1215, 1239 (3d Cir. 1992) (our review of a prosecutor's conduct in a state trial in a federal habeas proceeding is limited to determining whether the prosecutor's conduct "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." (quoting *Greer*, 483 U.S. at 765). This determination will, at times, require the Court to draw a fine line - distinguishing between ordinary trial error on one hand, and "that sort of

egregious misconduct which amounts to a denial of constitutional due process" on the other hand. *Ramseur*, 983 F.2d at 1239 (quoting *United States ex rel. Perry v. Mulligan*, 544 F.2d 674, 678 (3d Cir. 1976)).

In evaluating whether the remarks of the prosecutor rise to the level of a constitutional violation, the Court is required to examine those remarks in the context of the whole trial. *Ramseur*, 983 F.2d at 1239 (citing *Greer*, 483 U.S. at 766). The remarks must be sufficiently prejudicial in the context of the entire trial to violate a petitioner's due process rights. *Greer*, 483 U.S. at 766 (citing *Donnell*, 416 U.S. at 639). As the United States Supreme Court has held, "habeas relief is not available simply because the prosecutor's remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181 (internal quotations omitted).

Here, this Court finds no due process violations for the Commonwealth's remarks during the trial phase or guilt phase. During the trial phase, comments such as "predator" and "territorial predator" were consistent with the Commonwealth's theme. The theme of the Commonwealth's case was that Robinson preyed upon the victims, including Sam-Cali. The Commonwealth needed to prove all of the elements of first-degree murder and felt using words such as "predator" and "territorial predator" were tools to persuade the jury. These statements are within the bounds of permissible oratorical flair.

Assuming arguendo the Commonwealth's remarks were undesirable, habeas relief does not automatically attach as there was no due process violation. Robinson's trial counsel had an opportunity to counter these remarks. To demonstrate a due process violation, Robinson must demonstrate that the misconduct averred so infected the trial with unfairness as to make the resulting conviction a denial of due process. Where, as here, the state court has already reviewed and rejected the claim, the habeas petitioner bears an even higher burden – he must establish that

the state court's rejection of the claim was "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews*, 567 U.S. 37, 47 (2012).  Here the jurors were exposed to gruesome details of Robinson's actions, and the Commonwealth attempted to use the language to tie his behavior to oral persuasiveness. In the context of the entire trial, these remarks were not sufficiently prejudicial as to violate Robinson's due process. The evidence produced at trial was intense, and the language the Commonwealth utilized to attempt to persuade the jury matched the intensity.

### ii.   Statements as to burden of proof

Next, Robinson asserts the Commonwealth committed misconduct when the Commonwealth accused him of failing to produce evidence at trial.  The statements are as follows:

> Do you think, ladies and gentlemen, if they had somebody who could refute the Commonwealth's witnesses, we would not have seen that witness from the witness stand?

NT 11/8/94 at 2248.

> And again, do you think, if there was somebody else who would come in and refute Dr. Ferrell or Dr. Deadman we wouldn't have seen them from the witness stand? No.

*Id*. at 2265.

In delivering a closing argument, counsel "is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence," *United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991)., "[T]he reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of

evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001) ("[T]he prosecution is permitted to discuss a defendant's failure to refute its evidence, and defendant's cross–examining technique."); *United States v. Duronio*, No. 02–CR–0933, 2006 U.S. Dist. LEXIS 89303, at *1 (D.N.J. Dec. 8, 2006)

As to the first comment Robinson cites, the Commonwealth was discussing his failure to counter the witnesses the Commonwealth provided. This comment does not shift the burden of proof onto Robinson. The type of comment is permitted as the Commonwealth had wide latitude to argue its case in summation. Similarly, Robinson's second objection relates to the comment about his failure to refute the Commonwealth's expert. This type of statement is also permitted. This statement attacked Robinson's failure to refute, not his burden of proof, and the type of comment is permitted given the wide latitude in summation. *See Werme*, 939 F.2d at 117. Neither of the comments Robinson cites prejudiced him so substantially it violated his due process. These comments were permitted in summation and attacked Robinson's inability to refute the Commonwealth's evidence. Notwithstanding the comments, the trial court apprised the jurors on the burden of proof, thus alleviating any of Robinson's concerns. Accordingly, the Commonwealth's comments did not arise to a due process violation.

### iii.   Right to silence during guilty phase

Robinson further asserts the Commonwealth attacked his right to remain silent during the penalty phase summation. The statements are as follows:[9]

---

[9]     Since trial counsel did not object to these comments about Robinson's lack of remorse, any direct challenge to the statement was clearly waived under state law and could only have been brought on direct appeal as a challenge that trial counsel was ineffective for failing to object to these statements.  As such, it would appear that the stand-alone prosecutorial misconduct challenge is procedurally defaulted.  However, Robinson has also presented an ineffectiveness challenge.  Since the Court concludes that the claim is meritless, the Court has reviewed it without discussing the issue of procedural default.  28 U.S.C. 2254(b)(2).

And as he sits there, ladies and gentlemen, we have not heard any remorse. We have not heard any calling for the victims. He sits there, to some degree like a sphinx and you have to decide whether to impose life or death in this particular case.

NT 11/8/94, at 2707.

Think about whether or not there was ever any mercy or sympathy shown for any of the victims in this case. Think about whether or not there is any remorse. And don't think as I said to you in my opening, as you would think as good people, because that's not the way this defendant thinks.

*Id*. The PSC addressed the issue as follows:

The PSC addressed the issue as follows:

Appellant did not testify during either the guilt phase or the penalty phase of the trial. Hence, the statement cited above appears to be an improper reference to Appellant's valid exercise of his federal constitutional right and should have been objected to by trial counsel. We are convinced, however, that Appellant suffered no prejudice as a result of the prosecutor's comment.

First, we note that at issue is a brief statement that did not contain a direct reference to the fact that Appellant did not testify during the trial. Second, the trial court specifically instructed the jury that "[i]t is entirely up to the defendant whether to testify and you must not draw any adverse inference from his silence."

N.T., 11/10/1994, p. 2740. We feel that this instruction more than adequately cured any ill effect of this fleeting comment that (as we stated before) did not even contain a direct reference to Appellant's exercise of his Fifth Amendment right. *See Baker*, *supra* (the jury is presumed to follow the instructions); *Freeman*, *supra*. For all of the above reasons, Appellant is not entitled to relief on this ground.

*Robinson I*, 581 Pa. 253-54.

The Fifth Amendment protects criminal defendants from self-incrimination by permitting

them to choose not to testify at their trials. The Supreme Court gave further life to this guarantee

by holding that "the Fifth Amendment . . . forbids either comment by the prosecution on the

accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v.*

*California*, 380 U.S. 609, 615 (1965). This prohibition applies equally to both the guilt and

penalty phases of capital proceedings. *See Estelle v. Smith*, 451 U.S. 454, 462–63 (1981) ("We

can discern no basis to distinguish between the guilt and penalty phases of respondent's capital

murder trial so far as the protection of the Fifth Amendment privilege is concerned."). It does not

mean, however, that prosecutorial comments should not be examined in the broader context of

the complete trial. "[I]t 'is not enough that the prosecutors' remarks were undesirable or even

universally condemned.' The relevant question is whether the prosecutors' comments 'so

infected the trial with unfairness as to make the resulting conviction a denial of due process.'"

*Darden*, 477 U.S. at 181 (1986) (internal citations omitted); *see also United States v. Hasting*,

461 U.S. 499, 507–09 (1983) (applying the harmless error doctrine to *Griffin*); *Lesko v. Lehman*,

925 F.2d 1527, 1544 (3d Cir. 1991) ("[W]e must examine the challenged prosecutorial remark in

its trial context."). Consistent with this overarching fairness standard, the Court has permitted

prosecutors to provide a "fair response" to comments made by or on behalf of a defendant

regarding his decision not to testify. *United States v. Robinson*, 485 U.S. 25, 32 (1988) (finding

that the prosecutor could mention defendant's failure to testify when defense counsel argued that

his client had not been given an opportunity to explain himself to the jury).

      For example, in *Holland v. Horn*, 150 F. Supp. 2d 706, 771 (E.D. Pa. 2001), *aff'd*, 519

F.3d 107 (3d Cir. 2008, the petitioner challenged the statements made by the prosecutor at the

petitioner's capital sentencing proceeding, arguing that they violated the prohibition in *Griffin*

against a prosecutor commenting on a defendant's Fifth Amendment decision not to testify. In

the Commonwealth's closing argument, the prosecutor asked the jury "has any of you heard any

remorse from [Petitioner] in this case? Has any of you seen a tear in his eye? Has he expressed

the least bit of remorse for what he did to [the Victim]?" *Id*. The petitioner cited to *Lesko* in

support of his argument. *Lesko* involved prosecutorial comments regarding a defendant's choice

to testify only in support of mitigation at sentencing. In his closing argument, the prosecutor

criticized the defendant for not having the "common decency to say I'm sorry for what I did." *Lesko*, 925 F.2d at 1544. Further, the prosecutor in *Lesko* went on to represent the overall message of the defendant's testimony as "I don't want you to put me to death, but I'm not even going to say that I'm sorry." *Id*. The court determined that "the natural and necessary interpretation of these comments would be that Lesko had a moral or legal obligation to address the charges against him—indeed, to apologize for his crimes—during his penalty phase testimony, and that the jury could and should punish him for his failure to do so." *Id*. The *Lesko* court found the prosecutor's comments particularly damaging in light of the fact that had the defendant testified to those facts the prosecutor was suggesting should have been inferred from defendant's silence, "such testimony would have [clearly] been self-incriminating." *Id*.

The Court in *Holland* rejected this argument, relying upon the reasoning of the PSC. *See Holland I*, 543 A.2d 1068 (Pa. 1988). The PSC in the *Holland* case gave three separate reasons for denying the petitioner's claim. First, the trial court sustained defense counsel's immediate objection to the statements and provided a curative instruction at the end of the penalty phase. *See id*. at 1077. Second, the prosecutor's comments were intended to address the petitioner's general demeanor, a goal that is acceptable under Pennsylvania law and the Fifth Amendment. *See id*. (citing *Commonwealth v. Travaglia*, 502 Pa. 474 (Pa. 1983)). Finally, the Pennsylvania Supreme Court determined that prosecutor's comments constituted a "fair response" to defense counsel's arguments for the petitioner's remorse. *See id*.

Here, the Court agrees with the PSC about the Commonwealth's comments, but the comments do not rise to a due process violation.  Nonetheless, Robinson's reliance upon *Lesko* is inapposite. In *Lesko*, the defendant testified in support of his mitigation during sentencing and the Commonwealth attacked that limited testimony by stating, "I don't want you to put me to

death, but I'm not even going to say that I'm sorry." *Lesko*, 925 F.2d at 1544. *Lesko* is

distinguishable because Robinson did not testify and the Commonwealth's comments toward

Robinson could not be interpreted that Robinson had an obligation to testify and apologize like

the defendant in *Lesko*. Conversely, the Commonwealth's statements are similar to the

Commonwealth's in *Holland*, in which the Commonwealth stated, "has any of you heard any

remorse from [Petitioner] in this case? Has any of you seen a tear in his eye? Has he expressed

the least bit of remorse for what he did to [the Victim]?" *See Holland*, 150 F. Supp. 2d at 771.

Neither the defendant in *Holland* nor Robinson testified. Additionally, the Commonwealth was

permitted to address the demeanor of Robinson, just like the Commonwealth in *Holland* was

permitted to address the demeanor in that case.  Accordingly, given the deferential standard of

the AEDPA, the Court defers to the decision of the PSC, and finds the opinion of the PSC was

not an unreasonable application of clearly established federal law. The Court issued an

instruction, and the instruction cured any ill the Commonwealth's statement may have caused.

### iv.    Cumulative effect

The cumulative effect of the statements made at trial and sentencing, as to the burden of

proof, and as to Robinson's right to remain silent do not warrant relief. In analyzing all of the

statements, the Court believes the statements collectively did not so infect the trial as to render

the proceeding a denial of due process. The Commonwealth has wide latitude to make and argue

its case. Robinson's trial was no different. Nonetheless, as discussed previously, the trial court

issued an instruction to the jury regarding Robinson's silence.

### v.    Ineffective assistance of counsel

At the trial phase, Robinson's trial counsel was not ineffective. As the Court has noted,

comments such as predator and territorial predator are within the wide latitude attorneys are

granted during summation. If Robinson's trial counsel elected to, they could have countered this language. However, it was not ineffective to fail to counter. The comments the Commonwealth made were part of their theory of the case, and it did not prejudice Robinson.

With respect to the Commonwealth's statement as to why Robinson did not express remorse for his actions, as the PSC observed this is something that should have been objected to by trial counsel, but the failure to object did not result in prejudice. The comment constitutes a brief statement that did not contain a direct reference to the fact that Robinson did not testify during trial. Further, the court instructed the jury that "[i]t is entirely up to the defendant whether to testify and you must not draw any adverse inference from his silence." N.T. 11/10/1994, p. 2740. This instruction more than adequately cured any effect of the prosecutor's comment. Thus, the comments Robinson cites are distinguishable from *Lesko*, did not result in prejudice and do not rise to the level of a due process violation.

### L. Issue Twelve

In Issue Twelve, Robinson asserts the trial court improperly denied his request for a continuance to allow witness Robert Burns to testify on his behalf. The PSC addressed the issue as follows:

> The defense began its penalty phase presentation on November 9, 1994. However, because the last three defense witnesses, including Robert Burns (Burns), a principal of St. Gabriel's Hall, where Appellant was placed as a juvenile on prior charges, and a secretary from that facility, were out of town and subpoenaed for the next day, the proceedings ended early (at approximately 4:00 pm) and were continued to November 10, 1994. N.T., 11/10/1994, pp. 2630–31. On that day, starting at around 9:30 a.m., the defense resumed its case with the testimony of William Mocriski. N.T., 11/10/1994, pp. 2641–45. His testimony lasted approximately ten minutes and, at its conclusion, Appellant's counsel informed the trial court that the next witness—Burns—would not be arriving until 10:15 a.m. or 10:30 a.m. N.T., 11/10/1994, pp. 2636, 2649–2651. Later, Appellant's counsel acknowledged that this witness was originally subpoenaed for 9:00 a.m. N.T., 11/10/1994, pp. 2651–52. He also related that Burns and the secretary from St. Gabriel's Hall, who was apparently traveling with Burns, were the last witnesses to

testify on behalf of Appellant. N.T., 11/10/1994, pp. 2650–52. The trial court called for a thirty-minute recess and the jury was taken out of the courtroom at 9:44 a.m. N.T., 11/10/1994, p. 2653.

At 10:23 a.m., Appellant's counsel informed the trial court that: (1) Barbara Brown, Appellant's mother, agreed to testify for the defense; and (2) Burns and the secretary from St. Gabriel's Hall would be called to the witness stand after her testimony. N.T., 11/10/1994, p. 2676. The testimony of Barbara Brown concluded at around 10:45 a.m. N.T., 11/10/1994, p. 2695. However, by that time, although one of Appellant's counsels went to find Mr. Burns and the secretary from St. Gabriel's Hall, they were still not present in the courtroom.  N.T., 11/10/1994, p. 2695. At that point, the trial court requested that defense counsel make an offer of proof as to the substance of the expected testimony, which he did, identifying the witnesses and stating that their testimony would reflect on Appellant's academic and personal development at St. Gabriel's Hall. N.T., 11/10/1994, pp. 2696–98. The prosecutor refused to stipulate to this testimony, pointing out that there was conflicting evidence as to the extent of Appellant's progress at that facility. N.T., 11/10/1994, p. 2698.

By 10:50 a.m., counsel for Appellant, who went to retrieve the two witnesses, returned to the courtroom and stated that they still did not arrive. N.T., 11/10/1994, p. 2700. The court then waited until 11:00 a.m., giving the defense another opportunity to locate and present the two remaining witnesses. N.T., 11/10/1994, pp. 2704–05. At that time, because the witnesses still could not be located, over several objections by Appellant's counsel, the trial court ordered the parties to proceed with oral argument, explained to the jury the cause of the delay, and gave them a brief synopsis of the expected testimony that the defense sought to present and the prosecutor's rebuttal to that testimony. N.T., 11/10/1994, pp. 2699, 2703–06. Following the jury charge, the trial court admonished Burns, who, according to Appellant's counsel, arrived at 11:00 a.m., found Burns in contempt, and ordered him to pay a fine in the amount of $500.00. N.T., 11/10/1994, pp. 2770–71.

Presently, Appellant argues that his sentence must be vacated because the trial court "unjustifiably" refused to grant a continuance to allow Burns to testify. He also argues that his counsel was ineffective for failing to obtain such continuance.

 "The grant or refusal of a request for a continuance is a matter vested in the sound discretion of the trial court, and its decision, to grant or deny the request, will not be reversed by an appellate court in the absence of an abuse of that authority." *Commonwealth v. Birdsong*, 538 Pa. 587, 650 A.2d 26, 34 (1994). The factors to be considered to determine whether the trial court's discretion was properly exercised are: (1) the necessity of the witness to strengthen the defendant's case; (2) the essentiality of the witness to defendant's defense; (3) the diligence exercised to procure his presence at trial; (4) the facts to which he would testify; and (5) the likelihood that he could be produced at the next term of court. *See id*. at 34;

*Commonwealth v. Clayton*, 516 Pa. 263, 532 A.2d 385, 395 (1987), *cert. denied*, 485 U.S. 929 (1988); *Commonwealth v. (Eddie) Smith*, 442 Pa. 265 (1971).

Appellant acknowledges that Burns "was scheduled to appear as the first witness of the day, but was delayed in his arrival." Brief for Appellant, p. 92 (emphasis supplied). Although there is conflicting evidence as to the true extent of the witness' absence, one thing is clear—Burns was inexcusably late for a trial where a man's life stood in jeopardy. Applying the criteria set forth above to the facts at hand, we cannot find that the trial court's actions constituted an abuse of judicial discretion.

Initially, we note that Burns was not an essential witness in that he could only testify about his familiarity with Appellant during a nine-month stay at a juvenile facility. Again, however, the jury ultimately found the presence of the "catch all" mitigator. Therefore, Burns' testimony would have been redundant. Moreover, it is highly doubtful that the testimony of Burns would have strengthened Appellant's case. In fact, it is more than likely that it would have engendered the opposite effect. As demonstrated during the post-sentencing proceedings, although Burns could testify about his experiences with Appellant while he was placed at St. Gabriel's Hall, Burns was not aware of the particulars of Appellant's stay and was thus easily undermined as a witness. More importantly, the testimony of Burns would have allowed the Commonwealth to introduce damning evidence concerning Appellant's juvenile placement at St. Gabriel's Hall. As the trial court observed:

[T]he records at St. Gabriel's Hall reflect that [Appellant]'s initial adjustment was poor and "there has not been a great deal of improvement since then, according to staff . . . he is usually manipulative and slow to cooperate. His peer relationships are typically unsatisfactory." In addition, [Appellant] absconded from the institution, stole a staff member's wallet with $200.00 in it, and violated a variety of rules and regulations.

Trial Court Opinion, pp. 56–57. We observe that the trial court went out of its way in repeatedly giving time to the defense to find its last two witnesses and, ultimately, when the witnesses could not be located, gave the jury the synopsis of their testimony. Ultimately, given the circumstances at hand, such as the length of the trial, the fact that Burns was the last witness to testify, and his unexcused lateness, we find that the trial court's action did not constitute an abuse of judicial discretion. We similarly reject Appellant's claim that his counsel was ineffective in failing to seek a continuance, in light of the transcript that indicates that counsel did everything they could to secure the testimony of Burns.

*Robinson I*, 581 Pa. at 235-38.

The Court finds the trial court did not abuse its discretion in not granting a continuance for the testimony of Burns. Burns was impermissibly late for such a case of importance. The trial

court had already attempted to accommodate the defense.  Further, Burns was not merely absent, but defense counsel had been unable to reach the witness, despite efforts. The trial court has the discretion to control the flow of its courtroom, and the refusal to permit Burns to testify was not an abuse of its discretion.

Despite Robinson's argument, the trial court's decision to deny the open-ended continuance did not preclude the defense from considering mitigating factor. The PSC correctly noted this testimony would have been redundant because the jury eventually found the catch all provision. Furthermore, the PSC also correctly noted the potential harmful consequences of Burns' testimony. The decision to call Burns would have opened the door to Robinson's behavior while at St. Gabriel's Hall, which would have provided the Commonwealth with additional evidence that could have been considered as an aggravator. Therefore, the trial court's decision was not contrary to federal law. Accordingly, the trial court did not abuse its discretion.

### M. Issue Thirteen

In Issue Thirteen, Robinson argues, the Commonwealth put his future dangerousness at issue during sentencing, and the trial court never instructed the jury that, under Pennsylvania law, Robinson was statutorily ineligible for parole if sentenced to life. Instead Robinson argues, the court erroneously instructed the jury so as to suggest that Robinson, if spared death, would not necessarily be imprisoned for life. Lastly, Robinson asserts his trial counsel were ineffective because they never asked for a life-without-parole instruction even though he was entitled to such an instruction under controlling law. The PSC addressed the issue as follows:

> At one point during the charge, the following exchange took place between the trial court and one of the jurors:
>
> Juror: On the life in prison, is that without parole, just so that we are sure? Would there be a chance of parole if it was life in prison?

Trial Court: I don't see how I can guarantee—that's the present law. But what if the legislature changes the law? I can't guarantee that. That's the way the law is now.

Juror: Just so we know, Your Honor.

Trial Court: Who knows two years from now if they'll change the law. I can't tell you.

N.T., 11/10/1994, pp. 2767–68. At that point, the prosecutor requested a sidebar conference. At the conclusion of the discussion, the trial court gave the jury the following answer: "I am to tell you, and it's accurate, 'Life is life.' There won't be any parole. Life is life." N.T., 11/10/1994, p. 2769.

Presently, Appellant argues that the trial court failed to mention that there was no possibility of parole if Appellant would receive a life sentence. Thus, Appellant maintains that the jury was confused by the instructions and the trial court further compounded their misunderstanding by giving an answer indicative that "life imprisonment" may include the possibility of parole. Ultimately, Appellant contends that "not informing the jury during the sentencing instructions that a life sentence means life without the possibility of parole offends the evolving standards of decency that underlie" the U.S. and Pennsylvania Constitutions. Brief for Appellant, p. 143.

Essentially, Appellant's contention is that the trial court should have provided the jury with the instruction pursuant to *Simmons v. South Carolina*, 512 U.S. 154 (1994), that a "life sentence" means "life without a possibility of parole." However, as this Court has repeatedly held, "a *Simmons* instruction is required only where the prosecution makes the future dangerousness of the defendant an issue in the case and the defendant specifically requests such an instruction." *Commonwealth v. Champney*, 574 Pa. 435 (2003); *see also Commonwealth v. Robinson*, 554 Pa. 293 (1998), *cert. denied*, 528 U.S. 1082 (2000). Here, the Commonwealth did not argue future dangerousness and defense counsel did not request a *Simmons* instruction. Therefore, no instruction was required.

As it relates to the statement made by the trial court in response to the question posed by the juror, it is similar to what this Court faced in *Commonwealth v. Clark*, 551 Pa. 258 (1998), *cert. denied*, 526 U.S. 1070 (1999). Just as in this case, the trial court in *Clark* responded to the jury's question as to the meaning of "life imprisonment" by acknowledging, inter alia, that, although the present state of the law does not allow parole in the circumstances at hand, it cannot predict whether the legislature will decide to change that in the future. *Id*. at 35. We found that this instruction was not erroneous, *id*. at 36, and believe that *Clark* is directly on point with the circumstances presently before us. Therefore, we find no error in the instruction given by the trial court.

*Robinson I*, 581 Pa. at 245-47.

In *Simmons*, a plurality of the Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Simmons v. South Carolina*, 512 U.S. 154, 156 (1994); *see also Robinson v. Beard*, 762 F.3d 316, 327 (3d Cir. 2014) ("The fundamental takeaway from *Simmons* is that a jury cannot be presented with generalized arguments regarding the defendant's future dangerousness while also being prevented from learning that the defendant will never be released on parole.") Thereafter, the PSC held that under *Simmons* "a jury must be informed that life means life without the possibility of parole only when the prosecutor injects concerns of the defendant's future dangerousness into the case." *Commonwealth v. Speight*, 677 A.2d 317, 326 (Pa. 1996) (emphasis added) (concluding the prosecutor had not made appellant's future dangerousness an issue, and the instruction would not have been required under Simmons).

The United States Supreme Court again addressed the issue in *Kelly v. South Carolina*, 534 U.S. 246 (2002), holding that introducing evidence that only bore "a tendency" to prove dangerousness in the future raised the specter of a defendant's "future dangerousness." *Id*. at 254 ("Evidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms.").

While "[i]t is not per se error for a prosecutor to argue a defendant's future dangerousness," *Commonwealth v. Smith*, 606 Pa. 127 (Pa. 2010), where future dangerousness is at issue and a capital defendant requests a specific instruction that his first degree murder conviction precludes his eligibility for parole, it is a denial of due process to refuse that instruction. *Commonwealth v. Chambers*, 546 Pa. 370, 685 A.2d 96, 106 (Pa. 1996).

Here, the PSC did not unreasonably apply federal law in ruling on this issue as *Simmons* is distinguishable in this instance. Unlike in *Simmons*, the Commonwealth at Robinson's trial made no explicit mention of Robinson's ability to conform to society in the future. The comments made by the Commonwealth pertain to the deterrence factor of Robinson's sentencing. Robinson confuses this with "expressly" implicating the need for the *Simmons* instruction. *See Simmons*, 512 U.S. at 177, (O'Connor, J., concurring) (requiring the trial court to ask whether "the prosecution argues that the defendant will pose a threat to society in the future"). The trial court did not ask whether the defendant will pose a threat to society in the future, it did not need to as the Commonwealth focused on the deterrence factor with their statements. Ultimately, the trial court was clear in its statement to the jury: "'Life is life.' There won't be any parole. Life is life." Even if the prior statement was problematic, this clear, direct and accurate statement of the law, renders the instruction sufficient under *Simmons*. The PSC correctly interpreted *Simmons*; accordingly, it did not unreasonably apply federal law.

### i.   Ineffective assistance of counsel

Here, Robinson's trial counsel was not ineffective. As the Commonwealth's comments were not explicit enough to warrant a *Simmons* instruction, Robinson's trial counsel did not need to request the instruction. Robinson's trial counsel correctly understood the difference between comments based on deterrence versus comments on future dangerousness. As discussed, the PSC did not unreasonably apply federal law in not issuing a *Simmons* instruction, the Commonwealth's remarks did not warrant a Simmons instruction, and to compel Robinson's counsel to request a *Simmons* instruction would have been nonsensical. Robinson's theory relies upon a hypothetical, not what actually occurred in Court. The facts establish a *Simmons* instruction was not necessary, and this Court must rely upon the factual record, not hypotheticals. Since a *Simmons* instruction

was not warranted, a request by trial counsel would have been futile, and Robinson's ineffective assistance of counsel arguments are moot.

### N.  Certificate of Appealability

To appeal a final order in a habeas corpus proceeding, a prisoner in state custody must first be issued a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A). To receive a certificate, the petitioner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253((c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "That standard is met when 'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner.'" *Welch v. United States*, 136 S. Ct. 1257, 1263 (quoting *Slack*, 529 U.S. at 484).

Having found that no claim raised by Robinson has any merit, the Court also finds that he has failed to make a substantial showing of the denial of a constitutional right and that no reasonable jurist would reach different conclusions. Accordingly, the Court declines to issue a certificate of appealability.

## IV.  CONCLUSION

The Court finds that the federal habeas claims raised by Harvey Miguel Robinson attacking his sentence of death for the murder of Jessica Jean Fortney are meritless. Accordingly, the Petition for Writ of Habeas Corpus is denied. Because Robinson has not made a substantial showing of the denial of a constitutional right, a certificate of appealability is denied under 28 U.S.C. § 2253(c)(1)(A) with regard to all issues.

A separate Order follows.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge