IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |
|---|---|
| HARVEY MIGUEL ROBINSON, | |
| Petitioner, | No. 2:06-cv-00829 |
| v. | Hon. Joseph F. Lesson, Jr. |
| JOHN WETZEL, Sec'y,<br>  Pa. Dep't of Corr., et al., | **CAPITAL CASE** |
| Respondents. | |

_____

**MOTION TO ALTER AND AMEND JUDGMENT PURSUANT TO
RULE 59(E) AND CONSOLIDATED BRIEF**

Petitioner Harvey Miguel Robinson, through counsel, respectfully moves pursuant to Rule 59(e) of the Federal Rules of Civil Procedure to alter and amend the Court's judgment, order, and opinion dated September 8, 2020. Petitioner states the following in support of his motion:

### INTRODUCTION

On September 8, 2020, this Court denied and dismissed the Petition for Writ of Habeas Corpus in this capital case. *See* Opinion (ECF No. 82); Order (ECF No. 83). The Court denied the entirety of Petitioner's claims for habeas corpus relief and also denied a certificate of appealability.

1

Rule 59(e) "was adopted to make clear that the district court possesses the power to rectify its own mistakes in the period immediately following the entry of judgment." *White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445, 450 (1982). Reconsideration should be granted under Rule 59(e) if the moving party demonstrates: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Peterkin v. Horn*, 179 F. Supp. 2d 518, 520 (E.D. Pa. 2002) (granting Rule 59(e) motion). A district court's failure to notice or consider arguments or authorities that justify relief also constitutes an appropriate ground to grant a Rule 59(e) motion if these failures affected the correctness of the court's decision. *Hicks v. Town of Hudson*, 390 F.2d 84, 87-88 (10th Cir. 1967).

For the reasons urged below, Petitioner respectfully requests that the Court reconsider its rulings on Claim IV (failure to disclose Denise Sam-Cali's hypnotized statement in violation of the Fifth Amendment and related claim of counsel's ineffectiveness); Claim VI (pretrial publicity violated rights to due process and a fair and impartial jury and related claim of counsel's ineffectiveness); and Claim XIII (trial court's instructions regarding life without parole and related claim of ineffectiveness).[1]

---

[1] Petitioner does not waive any claims or arguments that are not included in this motion.

I.  **THE COURT SHOULD RECONSIDER ITS DENIAL OF HABEAS RELIEF AND A CERTIFICATE OF APPEALABILITY ON PETITIONER'S CLAIM THAT THE COMMONWEALTH'S FAILURE TO TIMELY DISCLOSE THAT A WITNESS HAD BEEN HYPNOTIZED AND PROVIDED STATEMENTS INCONSISTENT WITH HER TRIAL TESTIMONY VIOLATED DUE PROCESS AND THAT COUNSEL INEFFECTIVELY LITIGATED THE ISSUE (HABEAS CORPUS CLAIM IV).**

Denise Sam-Cali was interviewed twice by Allentown police on June 29, 1993, concerning allegations that she had been sexually assaulted. On July 21, 1993, she was interviewed by Montgomery County police. She was then placed under hypnosis where she gave yet another statement that was videotaped and transcribed. On August 4, 1993, District Attorney Robert Steinberg wrote a letter to Petitioner at the Lehigh County jail informing him that "on July 21, 1993, the victim of the charges which occurred on June 1993 was hypnotized by Oscar P. Vance, Junior, Chief County Detective, Montgomery County District Attorney's office." *See* ECF No. 33-1, Ex. 13. The letter did not disclose that Sam-Cali had provided a statement under hypnosis, nor did it disclose the contents of her statement to police. A copy of the letter was not sent to counsel. Prior to Sam-Cali's testimony at trial, the Commonwealth informed counsel that Sam-Cali had been hypnotized by police. However, the Commonwealth did not disclose that Sam-Cali made a second statement to police, nor did it provide a copy of the video and transcript of Sam-Cali's statement under hypnosis in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

The Court rejected Petitioner's due process claim as well as a claim that trial and appellate counsel ineffectively litigated the issue. *See* ECF No. 82 at 42-47. As relevant to this motion, the Court upheld the state court's ruling that the Commonwealth did not conceal Sam-Cali's hypnosis because Petitioner "received, and acknowledged, receipt of the Commonwealth's document regarding the hypnosis." *Id.* at 45. Numerous errors afflict the Court's reasoning. First, the Court misapprehends Petitioner's argument. The gravamen of Petitioner's *Brady* claim is that the Commonwealth failed to disclose that Sam-Cali provided a statement under hypnosis that contained numerous inconsistencies with her trial testimony. *See* ECF No. 33 at 88-90. It is the statement she made under hypnosis and not merely the fact that she had been hypnotized that is important. The *Brady* violation is not merely that the Commonwealth's notice to Petitioner—a then-seventeen year old juvenile—was insufficient under *Brady* but that the Commonwealth continued to conceal the existence of critical impeachment evidence until Sam-Cali took the stand at trial.

Moreover, the Court's analysis places the onus on Petitioner to have informed counsel of the letter and then on counsel to follow-up with the Commonwealth. *See* ECF No. 82 at 45-46. This is contrary to United States Supreme Court precedent. The Commonwealth has a continuing obligation to disclose *Brady* material even if there is no request by the defense. *United States v. Agurs*, 427 U.S. 97, 107 (1976). In *Banks v. Dretke*, the United States Supreme Court held that any findings to the

contrary amount to an argument that "the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence." 540 U.S. 668, 696 (2004) (quotation omitted). *Banks* further ruled that "[o]rdinarily, we presume that public officials have properly discharged their official duties," and therefore the argument that the "'prosecutor may hide, defendant must seek' is not tenable in a system constitutionally bound to afford defendants due process." *Id.*; *accord Strickler v. Greene*, 527 U.S. 263, 286-87 (1999) (defense counsel entitled to rely on prosecutor fulfilling *Brady* obligation); *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 290-91 (3d Cir. 2016) (en banc) (stating that "the concept of 'due diligence' plays no role in the *Brady* analysis"). As the court in *Dennis* made clear, "[o]nly when the government is aware that the defense counsel already has the material in its possession should it be held to not have 'suppressed' it in not turning it over to the defense." 834 F.3d at 292.

Second, the Court concluded that due process was not violated because the Commonwealth offered to provide a copy of the transcript to counsel just prior to Sam-Cali's testimony. *See* ECF No. 82 at 44-46. The trial record does not support this contention. Prior to Sam-Cali's testimony, the prosecutor told counsel that Sam-Cali had been hypnotized and that there was a tape but did not mention that the tape had been transcribed or that Sam-Cali had made a second statement to police. NT 11/3/94, 1963-64. Contrary to the Court's finding, counsel did not "have . . . ample

5

opportunity to cross-examine Sam-Cali" based on the transcripts because counsel had no knowledge that such transcripts existed. *See* ECF No. 82 at 46.

Finally, the Court suggests that the Commonwealth's failure to disclose Sam-Cali's statement was not material/prejudicial because "the jury would have seen physical evidence of [Petitioner's] DNA at the scene [of] the crime" and dismissed the fact that Sam-Cali identified someone else—Sal Rosado—as her potential attacker. *Id.*; *see also id.* at 47. The Third Circuit has squarely rejected such a "double-edged sword" defense of *Brady* misconduct. *See Wilson v. Beard*, 589 F.3d 651, 666 (3d Cir. 2009) (failure to discuss records material even where "some of the notations . . . would have bolstered his credibility as a witness, rather than damaging it"). Further, having limited Petitioner's *Brady* claim to the Rosado (mis)identification, the Court wrongly concludes that the withheld evidence is immaterial. However, in addition to this identification, there were other inconsistencies in Sam-Cali's second statement to police that the Court discounts entirely. *See* ECF No. 33 at 88-90.

At trial, Sam-Cali claimed to be certain that Petitioner was her attacker. Had the Commonwealth disclosed the tape and transcript of the hypnosis session, competent defense counsel could have challenged the Sam-Cali's testimony in critical respects. Her description of the attacker changed and was inconsistent over the course of her statements to police, and she acknowledged that she could not

6

remember crucial details about the attack. At minimum, competent counsel could have raised a challenge to the admission of her testimony under *Commonwealth v. Smoyer*, 476 A.2d 1304 (Pa. 1984). That was done prior to the testimony of James Stengel, and his testimony was limited to his independent recollection prior to being hypnotized. *See* NT 10/31/94, 1136-45. The Court's ruling is in error, and it should grant habeas corpus relief on Claim IV.

Whether or not the Court is persuaded to grant relief, Petitioner's claim at least justifies a certificate of appealability. Issuance of a COA "does not require a showing that the appeal will succeed." *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003). Instead, a federal district or circuit court must grant a COA if the district court's ruling is "debatable amongst jurists of reason," if reasonable jurists could debate whether the petition should have been resolved "in a different manner," or whether the issues presented are "adequate to deserve encouragement to proceed further." *Id.* at 336 (quotations omitted); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When considering whether to grant a COA, a court should resolve any doubts in favor of the petitioner. *Jennings v. Woodford*, 290 F.3d 1006, 1010 (9th Cir. 2002); *Whitehead v. Johnson*, 157 F.3d 384, 386 (5th Cir. 1998). "In a capital case, the nature of the penalty is a proper consideration" to weigh in favor of granting a COA. *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983). At minimum, Petitioner's claim justifies further proceedings.

## II. THE COURT SHOULD RECONSIDER ITS DENIAL OF HABEAS RELIEF AND CERTIFICATE OF APPEALABILITY ON PETITIONER'S CLAIM THAT PRETRIAL PUBLICITY DENIED PETITIONER HIS RIGHTS TO DUE PROCESS AND TO A FAIR AND IMPARTIAL JURY AND THAT COUNSEL INEFFECTIVELY LITIGATED THE ISSUE (HABEAS CORPUS CLAIM VI).

In Claim VI of the Petition, Petitioner alleged that pretrial publicity was so pervasive and inflammatory as to deny him due process and a fair and impartial jury and that trial counsel was ineffective for failing to investigate, develop, and present an adequate record to support the claim. *See* ECF No. 33 at 104-17. The Morning Call, the area's major newspaper, devoted substantial coverage to Petitioner's alleged involvement in a series of rapes and murders from the time of the offenses up through his capital sentencing proceedings. Concurrent television and radio broadcasts were similarly unrelenting. However, counsel presented only a limited picture of this coverage in support of the motion for change of venue. Counsel also failed to renew the motion or to raise a claim of actual prejudice from the seating of biased jurors at the conclusion of voir dire, though only five (5) of the 159 prospective jurors questioned had not heard of the case and the vast majority of those who had heard of the case believed Petitioner was guilty.

The Court erred in rejecting Claim VI. First, the Court stated that counsel's performance was not deficient because "[t]he Court does not believe [Petitioner's] argument that, had the brief of the motion been larger, the trial court would have granted the motion to transfer." ECF No. 82 at 57. That is not Petitioner's argument.

8

Rather, Petitioner argues that counsel wrongly curtailed its investigation of the pretrial publicity and failed to file an appropriately supported motion detailing how the pervasive and inflammatory publicity surrounding the case continued up to and through jury selection and trial. *See* ECF No. 33 at 106-110 (describing news coverage).

Second, the Court misread the trial record when addressing the prejudicial impact of the pretrial publicity. The Court discounted its effect, claiming that "[p]ublicity that is accurate and factual in nature does not justify a finding that prejudice may be presumed." ECF No. 82 at 53. Similarly, the Court found that even if counsel's performance was deficient, there was no prejudice because "most of the reporting . . . on [Petitioner] was during the commission of the crimes, and afterward, focused upon the victims and his trial," suggesting that there had been a sufficient cooling off period that lessened any effect of the inflammatory publicity. *See id.* at 57-58.

These findings are not supported by the factual record. Petitioner's case was notorious in the region, and the coverage included not only factual narrations of the events that transpired but also commentary and opinions, such as characterizations of him as a "serial killer," "evil," "brutal," and other similar derogations. Even if the articles were factual, this does not mean that the descriptors did not have a prejudicial impact on the venire's ability to make decisions based solely on what was presented

9

in court. *See, e.g.*, *Rideau v. State of La.*, 373 U.S. 723, 725-26 (1963) (televised confession was factual but prejudicial). Indeed, the record shows that many prospective jurors exposed to the pretrial publicity in this case believed Petitioner to be guilty of the crimes charged and some even believed that Petitioner had confessed.[2] Although a number of prospective jurors were excused for cause, the trial court still qualified jurors who had already formed an opinion that Petitioner was guilty—and did so in large part because they answered "yes" to the question

---

[2] *See, e.g.*, NT VD 227 ("Well, when you read it and then you see it on T.V., and everybody is condemning a person, you figure he's actually guilty."); *id.* at 356 ("Well, what I've done – from what I've read and everything else, I feel he's guilty right off the bat."); *id.* at 677 ("Well . . . based on articles in the newspaper and the television and everything leads up, I thought, to his guilt."); *id.* at 849 (opining that Petitioner was guilty "[a]fter reading yesterday's paper, yes, I did"); *id.* at 1042 (expressing the opinion that the venireperson could not be fair and impartial "[b]ecause of the newspaper media, everything I have read and heard"); *id.* at 1088 (expressing the opinion, based on television and newspaper coverage that, "I think he's guilty"); *id.* at 1267 (indicating that the evidence demonstrated Petitioner's guilt, based on print media account of DNA evidence); *id.* at 1350 ("I was under the impression that there was a confession to one of the crimes from the newspaper."); *id.* at 1398 (opining as to Petitioner's guilt based on newspaper accounts); *id.* at 1808 (indicating that "[t]here's a feeling of guilt there," based on media coverage); *id.* at 1888 (noting that one of the crimes was "really publicized"); *id.* at 1955 ("I do feel he's guilty," based on media coverage); *id.* at 1970 ("He did it. So, I guess, from the news and the media, my immediate reaction was, like, he did it."); *id.* at 2070 (referencing an article indicating that Petitioner "was either convicted or admitted to some other crime"); *id.* at 2142 ("I remember hearing about the time of the arrest that they were excited, or the possibility that we had our first serial killer."); *id.* at 2166 ("But I guess it's more so the newspapers, the conversations you have at work. You kind of form an opinion. Whether you should nor shouldn't, you do form an opinion."); *id.* at 2190 (from media accounts and personal conversations, indicating "I feel there is some guilt there, yes."); *id.* at 2281 ("It seems that the defendant seems to be guilty, based on the information that seems to have been put out in the public media."); *id.* at 2307 ("I believe I said the newspaper information was leading that way, saying that he had done it."); *id.* at 2407 ("I can say from what I'm reading it appears that he is guilty."); *id.* at 2441-42 (expressing a fixed opinion of guilt based on media accounts); *id.* at 2564 ("In following the case, . . . if there's DNA evidence out there that is pointing in that direction, which I think there is, I think there's only one answer for it.").

10

whether they could decide this high-profile case based on the evidence. *See, e.g.*, NT VD 218-50; *id.* at 2269-314.

"With such an opinion permeating their minds, it would be difficult to say that each [juror] could exclude this preconception of guilt from his deliberations." *Irvin v. Dowd*, 366 U.S. 717, 727 (1961); *see also Smith v. Phillips*, 455 U.S. 209, 221-22 (1982) (O'Connor, J., concurring) ("Determining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it."). Given the unknowing nature of the prejudicial effect of the inflammatory pretrial publicity, and the potential for equivocation by individual jurors impacted by these outside influences, Petitioner has shown a reasonable probability that the proceedings would have been different had counsel investigated and presented evidence of the pervasiveness of the pretrial publicity or had counsel renewed his motion for change of venire during jury selection.

At the very least, the Court should certify Claim VI for appeal. A COA is appropriate because reasonable jurists "could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336. Petitioner's claim for relief, which the Court rejected on the basis of several errors, is more than debatable, and it justifies a COA if the Court does not grant relief.

**III. THIS COURT SHOULD RECONSIDER ITS DENIAL OF HABEAS RELIEF AND CERTIFICATE OF APPEALABILITY ON PETITIONER'S CLAIM THAT THE TRIAL COURT'S INSTRUCTIONS ON THE MEANING OF LIFE IMPRISONMENT VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS AND THAT COUNSEL INEFFECTIVELY LITIGATED THE ISSUE (HABEAS CLAIM XIII).**

Claim XIII of the Petition alleges that Petitioner's jury should have been instructed that Petitioner was statutorily ineligible for parole if sentenced to life imprisonment. *See* ECF No. 33 at 165-179; ECF No. 53 at 19-24. During the trial, the Commonwealth presented evidence that, in addition to the charged crimes, Petitioner made multiple attempts to kill Denise Sam-Cali and had committed several assaults and burglaries in support of the aggravating factor that Petitioner had a significant history of felony convictions. In the penalty phase closing argument, the prosecutor argued that Petitioner's personality disorder made him inherently dangerous, and thus he posed a threat to anyone outside of his immediate family:

> Yes, within his household he may be fine, *but when he gets out, ladies and gentleman, watch out* if you are not in his circle of friends, or in his circle of family; *watch out*.

NT 11/10/94, 2710.[3] Because Petitioner's jury heard evidence and argument demonstrating his "propensity for violence," he was entitled to an instruction that

---

[3] The prosecutor made similar arguments during the guilt phase of trial, repeatedly describing Petitioner as a cunning predator. NT 10/24/94, 57 ("predator); *id.* at 59 ("acted with ferocity'); NT 11/8/94, 2246 ("territorial predator"); *id.* at 2259 ("devious" and "cunning"); *id.* at 2262 ("preditorial predator").

12

informed the jury of his parole ineligibility under Pennsylvania law. *Kelly v. South Carolina*, 534 U.S. 246, 253 (2002); *see also Simmons v. South Carolina*, 512 U.S. 154, 178 (1994) (O'Connor, J., concurring). Instead, when asked by the jury if life in prison meant life without parole, the trial court said "[w]ho knows two years from now if they'll change the law." NT 11/10/94, 2768.

The Court denied relief on Claim XIII, reasoning as follows: "The trial court did not ask whether the defendant will pose a threat to society, it did not need to as the Commonwealth focused on the deterrence factor with their statements." ECF No. 82 at 105. But that is the wrong standard for determining whether due process and the Eighth Amendment require a parole ineligibility instruction. As the United States Supreme Court explained in *Kelly*, evidence of propensity for violence or of dangerous character, as presented in this case, is evidence that tends to show future dangerousness even if it also has other proposes. "Evidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms." *Kelly*, 534 U.S. at 254; *id.* at 255 ("Characterizations of butchery did go to retribution, but that did not make them any the less arguments that Kelly would be dangerous down the road.").

The Court also reasoned that even if the trial court's initial response to the jury's question was "problematic," its clarification "render[ed] the instruction

13

sufficient under *Simmons.*" ECF No. 82 at 105. This too is an incorrect statement of law. Where a set of instructions is correct only in part, "[l]anguage that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity" because "[a] reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." *Francis v. Franklin*, 471 U.S. 307, 322 (1985); *see also Tyson v. Sup't Houtzdale SCI*, No. 19-1391, 2020 WL 5650813, at *7 (3d Cir. Sept. 24, 2020) (same). Although the trial court told the jury that "life is life," NT 11/10/94, 2770, this did not correct or explain the prior instruction that the law could be changed by the legislature.

If the Court is not persuaded to grant habeas relief on Claim XIII, it should it least certify the claim for appeal. Because the Court employed an incorrect legal standard and failed to consider all relevant aspects of the trial record, its ruling is "debatable among jurists of reason." *Miller-El*, 537 U.S. at 536.

## CONCLUSION

For the reasons stated, the Court should alter and amend its opinion and order of judgment by granting habeas relief on to Claims IV, VI, and XIII, or at a minimum, it should grant a certificate of appealability on all three claims.

Respectfully submitted,

/s/ Ayanna Williams
AYANNA WILLIAMS
Federal Community Defender for the
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
601 Walnut Street, Suite 545W
Philadelphia, PA 19106
(215) 928-0520
ayanna_williams@fd.org

Counsel for Petitioner

Dated: October 6, 2020

## CERTIFICATE OF SERVICE

I, Ayanna Williams, Esq., hereby certify that on this date I caused the foregoing *Motion to Alter and Amend Judgment Pursuant to Rule 59(e) and Consolidated Brief* to be filed electronically and served on the following person by the ECF system:

> Heather Gallagher
> Chief Deputy District Attorney
> Office of the District Attorney of Lehigh County
> 455 West Hamilton Street
> Allentown, PA 18101

/s/ Ayanna Williams
Ayanna Williams

Dated:     October 6, 2020